1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   NADIM G. HEGAZI (264841)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  nhegazi@rgrdlaw.com
          – and –
7  SCOTT H. SAHAM (188355)
   MATTHEW I. ALPERT (238024)
8  655 West Broadway, Suite 1900
   San Diego, CA  92101
9  Telephone:  619/231-1058
   619/231-7423 (fax)
10 scotts@rgrdlaw.com
   malpert@rgrdlaw.com
11
   Lead Counsel for Plaintiff
12
   [Additional counsel appear on signature page.]
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
16 DANIEL LUNA, Individually and on Behalf of )   Case No. 3:15-cv-05447-RMW
   All Others Similarly Situated,            )
17                                           )   **(Consolidated)**
                              Plaintiff,     )
18                                           )   <u>CLASS ACTION</u>
            vs.                              )
19                                           )   [CORRECTED] CONSOLIDATED CLASS
   MARVELL TECHNOLOGY GROUP, LTD., )             ACTION COMPLAINT FOR VIOLATIONS
20 et al.,                                   )   OF THE FEDERAL SECURITIES LAWS
                                             )
21                            Defendants.    )
   _____ )   <u>DEMAND FOR JURY TRIAL</u>
22
23
24
25
26
27
28

**INTRODUCTION**

1.      This is a securities class action brought on behalf of all persons who purchased or otherwise acquired the securities of Marvell Technology Group, Ltd. ("Marvell" or the "Company") from November 20, 2014 through December 7, 2015, inclusive (the "Class Period"), against Marvell and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), including Dr. Sehat Sutardja ("Sutardja"), the Chief Executive Officer ("CEO"), Michael Rashkin ("Rashkin"), Marvell's Chief Financial Officer ("CFO") until May 22, 2015, and Sukhi Nagesh (''Nagesh"), the Company's Interim CFO between May 22, 2015 and October 15, 2015.[1]

2.      Marvell is a producer of storage, communications and consumer semiconductor products, and is a global leader in providing complete silicon solutions.  The Company has design centers located in China, Europe, Hong Kong, India, Israel, Japan, Malaysia, Singapore, Taiwan and the United States.  Marvell's purported expertise in microprocessor architecture and digital signal processing drives multiple platforms including high volume storage solutions, mobile and wireless, networking, consumer and green products.

3.      Throughout the Class Period, defendants made false and/or misleading statements and/or omissions of material information regarding Marvell's key business metrics.  The Company reported Earnings Per Share ("EPS"), net income, margins and revenue that were false and/or misleading.  These metrics were false and/or misleading as defendants:  (1) failed to record domestic royalties that were incurred as a result of a jury verdict and judgment obtained against the Company by Carnegie Mellon University ("CMU") in a long running patent infringement lawsuit; and (2) violated Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange Commission ("SEC") disclosure rules by prematurely recognizing revenue that should have been earned and recognized in the subsequent period.  In addition, the Company's top officers falsely certified that the Company had adequate internal controls at all relevant times during the Class

---

[1]      Currently, Dave Eichler ("Eichler"), is Marvell's Interim CFO and has been since October 16, 2015.

1  Period.  Instead, the Company's management placed significant pressure on finance personnel to

2  meet revenue targets.

3       4.     In 2009, CMU filed a lawsuit against Marvell for patent infringement based upon

4  Marvell's development, use, and sale of certain semiconductor chips.  The case went to trial in

5  November 2012, and, on December 26, 2012, a jury reached a verdict in favor of CMU.  The jury

6  awarded CMU $1,169,140,271 as a reasonable royalty for Marvell's use of CMU's inventions,

7  corresponding to a $.50 per chip royalty on Marvell's worldwide sales.  Final judgment was entered

8  against Marvell by the District Court on May 14, 2014.

9       5.     Defendants were aware, or reckless in not becoming aware, of the failure to properly

10  record domestic royalties and the resulting overstatements of EPS, net income and margins as

11  judgment was entered against Marvell in the CMU patent litigation over six months prior to the start

12  of the Class Period, and the jury verdict relating to a $.50 per chip royalty on domestic sales was not

13  reasonably likely to be impacted by the Company's appeal of the December 26, 2012 jury verdict, as

14  Marvell made no meaningful arguments against applying the royalty rate to chips that enter or had

15  entered the United States.  Not only did Marvell make no meaningful arguments against the

16  domestic royalty, but the amicus brief filed by Google and other technology companies before the

17  Federal Circuit on August 11, 2014 actually assumed "that Marvell must pay Carnegie Mellon some

18  reasonable royalty" for these chips sold domestically.  Thus, defendants knew prior to the start of the

19  Class Period that it was probable that the royalty award would be applied to at least all domestic

20  transactions.  Defendants' failure to reserve for this likelihood and failure to record royalty expenses

21  violated GAAP for the reasons stated in ¶¶83-111 *infra*.

22       6.     Defendants reported revenue figures starting in the fourth quarter of fiscal 2015[2] were

23  also false and/or misleading and violated GAAP and SEC disclosure rules as the reported revenue

24  included improper pull-in transactions that were not organic to the quarter as the Company borrowed

25  future period sales in order to inflate current quarter revenue.  As a result, Marvell improperly, and

26  in violation of GAAP and SEC disclosure rules, recognized revenue in the current quarter from

27     [2]   Marvell's fiscal year ends on January 31.  Thus, Marvell refers to the quarters in the fiscal year

28  that ends on January 31, 2015 as fiscal 2015.

1    transactions that would have, in the normal course of events and but for action by Marvell

2    employees, been completed and recognized in a subsequent quarter.  Marvell has admitted that

3    revenue related to these pull-in transactions and distributor transactions was recognized prematurely

4    as a result of "significant pressure" from senior management on sales and finance personnel to meet

5    revenue targets as well as failures in the Company's internal controls including senior management's

6    failure to set an appropriate "tone at the top."  Following the revelation of this conduct,

7    PricewaterhouseCoopers LLP ("PwC"), Marvell's long time auditor abruptly resigned and stated that

8    disclosures should be made or actions taken to prevent reliance on previously issued audit reports or

9    complete interim reviews.

10           7.      As a result of these improper pull-in transactions, Marvell's reported revenue was

11   overstated and/or further disclosure was required as the reported revenue was the direct result of

12   improper earnings management which hid the Company's true performance.  *See* ¶¶63-82 *infra*.  The

13   Company's internal investigation conducted by the Audit Committee, counsel and a forensic

14   accounting specialist concluded that revenue from pull-in transactions was recognized prematurely

15   as a result of the extension of payment terms beyond Marvell's customary terms.  Such premature

16   revenue recognition violated GAAP for the reasons stated in ¶¶63-82 *infra*.  These transactions are

17   also currently under investigation by the U.S. Attorney's Office and the SEC.

18           8.      Defendants were aware of or reckless in not becoming aware of the improper pull-in

19   transactions as senior management applied "significant pressure" on sales and finance personnel to

20   meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a

21   result of these improper pull-in transactions.  The pressure and control exerted by senior

22   management set an improper "tone at the top" that resulted in premature recognition of revenue as a

23   result of improper pull-in transactions.

24           9.      Defendants' certifications that they had established and maintained adequate internal

25   controls were likewise false and misleading as: (1) defendants failed to set an appropriate "tone at

26   the top" for an effective control environment; (2) the Company's controls were inadequate as they

27   allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent

28

1    applications and Final-Level Cache ("FLC") invention that was in fact owned by Marvell[3]; (3)

2    Marvell lacked a well-structured process to establish significant and judgmental reserves associated

3    with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting

4    from the CMU judgment; (5) the Company had engaged in inappropriate pull-in transactions as a

5    result of significant pressure from senior management and senior managements' failure to set an

6    appropriate "tone at the top"; (6) the Company's senior management encouraged a closed and

7    ineffective control environment essentially running the Company as if it were their own privately

8    owned Company; (7) the Company's key financial metrics were false and/or misleading; and (8)

9    revenue was prematurely recognized in violation of GAAP.

10        10.    As a result of defendants' wrongful acts and omissions, and the decline in the market

11    value of the Company's securities, plaintiff and other Class members have suffered significant losses

12    and damages.

13                                    **JURISDICTION AND VENUE**

14        11.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C.

15    §78aa).  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C.

16    §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

17        12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Marvell's

18    U.S. headquarters is in this District and many of the acts and practices complained of herein

19    occurred in substantial part in this District.

20                                          **PARTIES**

21        13.    Plaintiff Plumbers and Pipefitters National Pension Fund ("Plumbers & Pipefitters")

22    manages the pension assets for Plumbers & Pipefitters participants and their families.  Plumbers &

23    Pipefitters is one of the nation's largest Taft-Hartley funds established in 1968 with approximately

---

24    [3]    According to Marvell's website, Marvell's FLC architecture solves  memory related issues "by
25    redefining the main memory hierarchy, automatically loading pieces of code as needed and purging
     unneeded code, freeing up space for other applications."  Sutardja claimed that he developed the
26    FLC technology and owned the patent.  The patent for the FLC was ultimately assigned to Marvell
     on August 27, 2015.  There was an internal dispute as to the ownership of the FLC invention as
27    Sutardja stated that he owned the invention.  After an investigation by the Company's Audit
     Committee, it was determined that, in fact, "the invention was owned by Marvell during all periods
28    in which company resources related to such invention were deployed."

1  150,000 participants and beneficiaries and assets of approximately $5 billion.  Plumbers &

2  Pipefitters purchased or acquired Marvell securities during the Class Period and was damaged by the

3  conduct alleged herein.

4          14.     On February 8, 2016, this Court appointed Plumbers & Pipefitters Lead Plaintiff for

5  the Class.

6          15.     Defendant Marvell is a Bermuda corporation.  Marvell stock trades on the The

7  Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "MRVL."  The Company's U.S.

8  corporate headquarters are located at 5488 Marvell Lane, Santa Clara, California 95054.

9          16.     Defendant Sutardja is, and was at all relevant times, CEO of the Company.  In 1995,

10 Sutardja, along with his wife and brother, founded Marvell in 1995.  Sutardja has served as CEO

11 since the Company's inception.  Sutardja holds Master of Science and Ph.D. degrees in Electrical

12 Engineering and Computer Science from the University of California at Berkeley and according to

13 the Company's website, " participates heavily in Marvell's engineering and marketing efforts across

14 analog, video processor, and microprocessor design while offering input across all of the [Marvell's]

15 other product lines."

16         17.     Defendant Rashkin started with Marvell in 1999, was named the Company's Interim

17 CFO in December 2013 and served as the Company's full-time CFO from February 17, 2014 until

18 May 22, 2015.[4]

19         18.     Defendant Nagesh originally joined Marvell in 2011 as Vice President of Investor

20 Relations.  He served as the Company's Interim CFO between May 22, 2015 and October 15, 2015,

21 and is currently Marvell's Senior Vice President of Corporate Development, Finance and Investor

22 Relations.

23         19.     The defendants named in ¶¶16-18 are referred to herein as the "Individual

24 Defendants."

25

26

27 ────────────────────
   [4]   Defendant Rashkin also served as the Company's Interim CFO between July 2007 and January

28 2008.

1

**CONTROL PERSONS**

2     20.     As officers and controlling persons of a publicly held company whose common stock

3 was and is traded on the NASDAQ and is governed by the provisions of the federal securities laws,

4 the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

5 with respect to the Company's financial condition, performance, growth, operations, financial

6 statements, business, markets, management, earnings and present and future business prospects, and

7 to correct any previously issued statements that had become materially misleading or untrue, so that

8 the market price of the Company's securities would be based upon truthful and accurate information.

9 The Company's and Individual Defendants' misrepresentations and omissions during the Class

10 Period violated these specific requirements and obligations.

11     21.     The Individual Defendants participated in the drafting, preparation and/or approval of

12 the various public, shareholder and investor reports and other communications complained of herein

13 and were aware of, or recklessly disregarded the misstatements contained therein and omissions

14 therefrom, and were aware of their materially false and misleading nature.  Because of their Board

15 membership and/or executive and managerial positions with Marvell, each of the Individual

16 Defendants had access to the adverse undisclosed information about the Company's financial

17 condition and performance as particularized herein, and knew (or recklessly disregarded) that these

18 adverse facts rendered the positive representations made by or about Marvell and its business, or

19 adopted by the Company, were materially false and misleading.

20     22.     The Individual Defendants, because of their positions of control and authority as

21 officers and/or directors of the Company, were able to and did control the content of the various SEC

22 filings, press releases and other public statements pertaining to the Company issued during the Class

23 Period.  Each Individual Defendant was provided with copies or had access to the documents alleged

24 herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

25 opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the

26 Individual Defendants is responsible for the accuracy of the public reports and releases detailed

27 herein and is therefore primarily liable for the representations contained therein.

28

23.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Marvell securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Marvell's business, operations, management and the intrinsic value of Marvell securities; and (ii) caused plaintiff and other members of the Class to purchase Marvell securities at artificially inflated prices.

**SOURCES OF INFORMATION**

24.     The allegations herein are based on plaintiff's ongoing investigation, including review of relevant Company documents, SEC filings, press releases, analyst reports and other reports or statements made by third parties.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

**FALSE AND MISLEADING STATEMENTS ISSUED
DURING THE CLASS PERIOD**

25.     On November 20, 2014, Marvell issued a press release entitled, "Marvell Technology Group Ltd. Reports Third Quarter of Fiscal Year 2015 Financial Results."  Therein, defendants, in relevant part, stated:

**Key Third Quarter of Fiscal 2015 Financial Highlights**

- Revenue: Q3 FY 2015, $930 Million

- ***GAAP Net Income: Q3 FY 2015, $115 Million***

- GAAP Diluted EPS: Q3 FY 2015, $0.22

- Non-GAAP Net Income: Q3 FY 2015, $155 Million

- ***Non-GAAP Diluted EPS: Q3 FY 2015, $0.29***

- Free Cash Flow: Q3 FY 2015, $167 Million

*     *     *

**Third Quarter of Fiscal 2015 Summary**

Revenue for the third quarter of fiscal 2015 was $930 million, down approximately 3% from $962 million in the second quarter of fiscal 2015, ended August 2, 2014, and approximately flat from $931 million in the third quarter of fiscal 2014, ended November 2, 2013.

GAAP net income for the third quarter of fiscal 2015 was $115 million, or $0.22 per share (diluted), compared with GAAP net income of $139 million, or $0.27 per share (diluted), for the second quarter of fiscal 2015, and $103 million, or $0.21 per share (diluted), for the third quarter of fiscal 2014.

***Non-GAAP net income was $155 million, or $0.29 per share (diluted), for the third quarter of fiscal 2015***, compared with non-GAAP net income of $181 million, or $0.34 per share (diluted), for the second quarter of fiscal 2015 and $163 million, or $0.32 per share (diluted), for the third quarter of fiscal 2014.

\*        \*        \*

***GAAP gross margin for the third quarter of fiscal 2015 was 51.1 percent***, compared to 50.3 percent for the second quarter of fiscal 2015 and 50.1 percent for the third quarter of fiscal 2014.

Non-GAAP gross margin for the third quarter of fiscal 2015 was 51.0 percent, compared to 50.6 percent for the second quarter of fiscal 2015 and 50.3 percent for the third quarter of fiscal 2014.

\*        \*        \*

Cash flow from operations for the third quarter of fiscal 2015 was $195 million, compared to the $157 million reported in the second quarter of fiscal 2015 and the $177 million reported in the third quarter of fiscal 2014.  Free cash flow for the third quarter of fiscal 2015 was $167 million, compared to the $137 million reported in the second quarter of fiscal 2015 and the $157 million reported in the third quarter of fiscal 2014.  Free cash flow as presented above is defined as cash flow from operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

26.    The net income, EPS and margin metrics reported by defendants were false and/or misleading as they were over stated as detailed in ¶¶83-111 *infra*, as a result of the Company's failure to properly record domestic sale royalties as a result of the CMU judgment.  These key financial metrics were further misleading as defendants failed to disclose that: net income, EPS and margin were being negatively impacted as a result of the domestic royalties subject to the CMU judgment as detailed in ¶¶83-111 *infra*.

27.    As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the third quarter of fiscal 2015:

| | |
|---|---|
| **EPS. (as reported)** | $0.29 |
| **EPS (adjusted for estimated current quarter domestic CMU royalties)** | $0.20 |
| **EPS (adjusted for estimated total domestic CMU royalties)** | $(0.43) |

28.     As a result of the Company's failure to properly record the CMU royalties as outlined at ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for third quarter of fiscal 2015:

| | |
|---|---|
| **Gross Margin (as reported)** | 51.1% |
| **Estimated royalties owed to CMU for domestic sales during the quarter** | $10.5 million |
| **Actual Gross Margin** | 50.0% |

29.     Defendants were aware, or reckless in not becoming aware, of the failure to properly record the CMU judgment and the resulting overstatements of critical financial metrics as judgment was entered against Marvell in the CMU patent litigation over six months prior to the start of the Class Period and the December 26, 2012 jury verdict relating to a $.50 per chip royalty on ***domestic sales*** was not reasonably likely to be impacted by the Company's appeal of the verdict as Marvell made ***no meaningful arguments*** against applying the royalty rate to chips that enter or entered the United States.  Not only did Marvell make no meaningful arguments against the domestic royalty which it ultimately paid, but the amicus brief filed by Google and other technology companies before the Federal Circuit actually assumed "that Marvell must pay Carnegie Mellon some reasonable royalty" for those chips sold domestically.  Thus, defendants knew, or were reckless in not knowing, prior to the start of the Class Period that it was probable that the royalty award would be applied to at least all domestic transactions.  Defendants' failure to timely reserve for this likelihood and failure to record royalty expenses violated GAAP for the reasons stated in ¶¶83-111 *infra*.

30.     On December 4, 2014, Marvell filed its Quarterly Report with the SEC on Form 10-Q for the third quarter of fiscal 2015 ended November 1, 2014.  The Company's Form 10-Q was signed by defendant Rashkin, and reaffirmed the Company's statements in the press release on November 20, 2014.  The Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Sutardja and Rashkin, who certified the following:

> 1.  I have reviewed this Quarterly Report on Form 10-Q of Marvell Technology Group, Ltd.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer[(s)] and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer[(s)] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31.     Sutardja and Rashkin's certifications were false and misleading as: (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3) Marvell lacked a well-structured process to establish significant and judgmental reserves associated with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting from the CMU judgment; and (5) the defendants had not established and maintained adequate internal controls at all relevant times.

32.     On February 19, 2015, Marvell issued a press release entitled, "Marvell Technology Group Ltd. Reports Fourth Fiscal Quarter and Fiscal Year 2015 Financial Results."  Therein, the Company, in relevant part, stated:

**Key Fourth Quarter of Fiscal 2015 and Fiscal Year 2015 Financial Highlights**

- ***Revenue: Q4 FY 2015, $857 Million; FY 2015, $3.7 Billion***
- ***GAAP Net Income: Q4 FY 2015, $82 Million; FY 2015, $435 Million***
- GAAP Diluted EPS: Q4 FY 2015, $0.16; FY 2015, $0.84
- Non-GAAP Net Income: Q4 FY 2015, $131 Million; FY 2015, $611 Million
- ***Non-GAAP Diluted EPS: Q4 FY 2015, $0.25; FY 2015, $1.15***
- Free Cash Flow: Q4 FY 2015, $135 Million; FY 2015, $650 Million

                    *        *        *

**Fourth Quarter of Fiscal 2015 and Fiscal Year 2015 Summary**

***Revenue for the fourth quarter of fiscal 2015 was $857 million***, down approximately 8 percent from $930 million in the third quarter of fiscal 2015, ended November 1, 2014, and down approximately 8 percent from $932 million in the fourth quarter of fiscal 2014, ended February 1, 2014.

For the fiscal year ended January 31, 2015, revenue was $3.7 billion, an increase of 9 percent from revenue of $3.4 billion for the fiscal year ended February 1, 2014.

GAAP net income for the fourth quarter of fiscal 2015 was $82 million, or $0.16 per share (diluted), compared with GAAP net income of $115 million, or $0.22 per share (diluted), for the third quarter of fiscal 2015, and $97 million, or $0.19 per share (diluted), for the fourth quarter of fiscal 2014.

For the fiscal year ended January 31, 2015, GAAP net income was $435 million, or $0.84 per share (diluted), compared with GAAP net income of $315 million, or $0.63 per share (diluted), for the fiscal year ended February 1, 2014.

***Non-GAAP net income was $131 million, or $0.25 per share (diluted)***, for the fourth quarter of fiscal 2015, compared with non-GAAP net income of $155 million, or $0.29 per share (diluted), for the third quarter of fiscal 2015 and $151 million, or $0.29 per share (diluted), for the fourth quarter of fiscal 2014.

For the fiscal year ended January 31, 2015, non-GAAP net income was $611 million, or $1.15 per share (diluted), compared with non-GAAP net income of $530 million, or $1.02 per share (diluted) for the fiscal year ended February 1, 2014.

\* \* \*

***GAAP gross margin for the fourth quarter of fiscal 2015 was 51.4 percent, compared to 51.1 percent for the third quarter of fiscal 2015 and 48.8 percent for the fourth quarter of fiscal 2014. GAAP gross margin for fiscal year 2015 was 50.3 percent as compared to 51.1 percent in fiscal year 2014***.

Non-GAAP gross margin for the fourth quarter of fiscal 2015 was 51.8 percent, compared to 51.0 percent for the third quarter of fiscal 2015 and 50.1 percent for the fourth quarter of fiscal 2014. Non GAAP gross margin for fiscal year 2015 was as 50.5 percent compared to 51.8 percent in fiscal year 2014.

Cash flow from operations for the fourth quarter of fiscal 2015 was $155 million, compared to the $195 million reported in the third quarter of fiscal 2015 and the $100 million reported in the fourth quarter of fiscal 2014. Cash flow from operations for fiscal year 2015 was $742 million, compared to $448 million in fiscal year 2014. Free cash flow for the fourth quarter of fiscal 2015 was $135 million, compared to the $167 million reported in the third quarter of fiscal 2015 and the $82 million reported in the fourth quarter of fiscal 2014. Free cash flow for fiscal year 2015 was $650 million, compared to $356 million in fiscal year 2014. Free cash flow as presented above is defined as cash flow from operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

33.     The net income, EPS, revenue and margin metrics reported by defendants were false and/or misleading as they were overstated as a result of: (1) improper pull-in transactions that should have been booked in the subsequent quarter; and (2) the Company's failure to properly record domestic sale royalties as a result of the CMU judgment. *See* ¶¶63-111 *infra*.

34.     Marvell's key financial metrics were also misleading as defendants failed to disclose that: (1) pull-in transactions were utilized to prematurely generate revenue in order to meet revenue targets and the subsequent quarter would be negatively impacted as a result, as detailed in ¶¶63-82 *infra*; and (2) net income, EPS and margin were being materially impacted as a result of the domestic royalties subject to the CMU judgment as described in ¶¶83-111 *infra*.

1    35.    Defendants falsely stated that "*[r]evenue for the fourth quarter of fiscal 2015 was*

2  *$857 million*."

3    36.    The reported revenue figure was false and/or misleading and violated GAAP as it

4  included improper pull-in transactions that were not organic to the quarter as the Company borrowed

5  future period sales in order to meet current quarter analyst expectations.  As a result, Marvell

6  improperly, and in violation of GAAP and SEC disclosure rules, recognized revenue in this quarter

7  from transactions that would have, in the normal course of events and but for action by Marvell

8  employees, been completed and recognized in a subsequent quarter.  Marvell has admitted that

9  revenue related to pull-in transactions and distributor transactions was recognized prematurely as a

10  result of "significant pressure" from senior management on sales and finance personnel to meet

11  revenue targets as well as failures in the Company's internal controls including senior management's

12  failure to set an appropriate "tone at the top."

13    37.    As a result of these improper pull-in transactions, Marvell's reported revenue was

14  overstated and/or further disclosure was required as the reported revenue was the direct result of

15  improper earnings management which hid the Company's true performance.  The Company's

16  internal investigation conducted by the Audit Committee, counsel and a forensic accounting

17  specialist concluded that revenue from pull-in transactions was recognized prematurely as a result of

18  the extension of payment terms beyond Marvell's customary terms.  Such premature revenue

19  recognition violated GAAP and SEC disclosure rules for the reasons stated in ¶¶63-82 *infra*.  These

20  transactions are also currently under investigation by the U.S. Attorney's Office and the SEC.

21    38.    Defendants were aware of or reckless in not becoming aware of the improper pull-in

22  transactions as senior management applied "significant pressure" on sales and finance personnel to

23  meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a

24  result of these improper pull-in transactions.  Sutardja and his wife, Weili Dai ("Dai") ran the

25  Company as if it were a family owned Company, not a public Company, controlling all important

26  aspects of the business.  The pressure and control exerted by senior management set an improper

27  "tone at the top" that resulted in premature recognition of revenue as a result of improper pull-in

28  transactions.

39.     Marvell's corporate culture was top down.  All important decisions were made from the top of the Company.  Defendant Sutardja was a micro manager and had his fingers in everything.  He left little room for mid-level managers to make decisions.  There was pressure from senior management to do what needed to be done in order to meet numbers.  This ultimately included a push to get revenue, which resulted in the use of extended payment terms to pull-in revenue from the subsequent quarter in order to meet revenue targets.

40.     Approximately 50% of Marvell's sales were made to three customers and one distributor, who were taken care of personally by Marvell co-founder and Sutardja's wife, Dai.

41.     As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the fourth quarter of fiscal 2015:

| EPS (as reported) | $0.25 |
|---|---|
| EPS (adjusted for estimated current quarter domestic CMU royalties) | $0.14 |
| EPS (adjusted for estimated total domestic CMU patent royalties) | $(0.52) |

42.     As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for the fourth quarter of fiscal 2015:

| Gross Margin (as reported) | 51.4% |
|---|---|
| Estimated royalties owed to CMU for domestic sales during the quarter | $10.5 million |
| Actual Gross Margin | 50.1% |

43.     Defendants were aware or reckless in not becoming aware, of the failure to properly record the CMU royalties and the resulting overstatements of critical financial metrics for the reasons stated in ¶¶29, 83-111 *infra*.

44.     On March 26, 2015, Marvell filed its Annual Report with the SEC on Form 10-K for the 2015 fiscal year ended January 31, 2015.  The Company's Form 10-K was signed by defendants Sutardja and Rashkin, and reaffirmed the Company's statements previously announced on February 19, 2015.

45.     Marvell's Form 10-K for the year ended January 31, 2015 included the following "Management's Report on Internal Control Over Financial Reporting":

Based on our evaluation, management has concluded that **we maintained effective internal control over financial reporting** as of January 31, 2015 based on the COSO criteria.

46.     Regarding "Management's Evaluation of Disclosure Controls and Procedures," the Company stated:

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of January 31, 2015.  Disclosure controls and procedures are designed to ensure that information required to be disclosed is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.  Based on this evaluation, our principal executive officer and principal financial officer concluded that, as of January 31, 2015, our disclosure controls and procedures were effective.

47.     The Form 10-K also contained SOX Certifications signed by defendants Sutardja and Rashkin, who certified the following:

1.  I have reviewed this Annual Report on Form 10-K of Marvell Technology Group Ltd.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to

provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.     Sutardja and Rashkin's certifications were false and misleading as: (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3) Marvell lacked a well-structured process to establish significant and judgmental reserves associated with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting from the CMU judgment; (5) the defendants had not established and maintained adequate internal controls at all relevant times; (6) the Company had engaged in inappropriate pull-in transactions; (7) the Company's senior management encouraged a closed and ineffective control environment essentially running the Company as if it were their own privately owned Company; (8) the Company's key financial metrics were false and/or misleading; and (9) revenue was prematurely recognized in violation of GAAP.

49. On May 21, 2015, Marvell issued a press release entitled, "Marvell Technology Group Ltd. Reports First Quarter of Fiscal 2016 Financial Results." Therein, the Company, in relevant part, stated:

**Key First Quarter of Fiscal 2016 Financial Highlights**

- ***Revenue: Q1 FY 2016, $724 Million***

- GAAP Net Income: Q1 FY 2016, $14 Million

- GAAP Diluted EPS: Q1 FY 2016, $0.03

- Non-GAAP Net Income: Q1 FY 2016, $71 Million

- ***Non-GAAP Diluted EPS: Q1 FY 2016, $0.13***

- Free Cash Flow: Q1 FY 2016, $44 Million

\*     \*     \*

**First Quarter of Fiscal 2016**

***Revenue for the first quarter of fiscal 2016 was $724 million***, down approximately 16 percent from $857 million in the fourth quarter of fiscal 2015, ended January 31, 2015, and down approximately 24 percent from $958 million in the first quarter of fiscal 2015, ended May 3, 2014.

GAAP net income for the first quarter of fiscal 2016 was $14 million, or $0.03 per share (diluted), compared with GAAP net income of $82 million, or $0.16 per share (diluted), for the fourth quarter of fiscal 2015, and $99 million, or $0.19 per share (diluted), for the first quarter of fiscal 2015.

Non-GAAP net income was $71 million, or $0.13 per share (diluted), for the first quarter of fiscal 2016, compared with non-GAAP net income of $131 million, or $0.25 per share (diluted), for the fourth quarter of fiscal 2015 and $144 million, or $0.27 per share (diluted), for the first quarter of fiscal 2015.

\*     \*     \*

***GAAP gross margin for the first quarter of fiscal 2016 was 51.5 percent, compared to 51.4 percent for the fourth quarter of fiscal 2015 and 48.4 percent for the first quarter of fiscal 2015***.

Non-GAAP gross margin for the first quarter of fiscal 2016 was 51.6 percent, compared to 51.8 percent for the fourth quarter of fiscal 2015 and 48.8 percent for the first quarter of fiscal 2015.

Cash flow from operations for the first quarter of fiscal 2016 was $59 million, compared to the $142 million reported in the fourth quarter of fiscal 2015 and the $235 million reported in the first quarter of fiscal 2015. Free cash flow for the first quarter of fiscal 2016 was $44 million, compared to the $121 million reported in the fourth quarter of fiscal 2015 and the $211 million reported in the first quarter of fiscal 2015. Free cash flow as presented above is defined as cash flow from

operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

50.     Defendants falsely stated that "*[r]evenue for the first quarter of fiscal 2016 was $724 million*."

51.     The reported revenue figure was false and/or misleading and violated GAAP and SEC disclosure rules as it included improper pull-in transactions that were not organic to the quarter as the Company borrowed future period sales in order to meet current quarter analyst expectations.  As a result, Marvell improperly, and in violation of GAAP and SEC disclosure rules, recognized revenue in this quarter from transactions that would have, in the normal course of events and but for action by Marvell employees, been completed and recognized in a subsequent quarter.  Marvell has admitted that revenue related to pull-in transactions and distributor transactions was recognized prematurely as a result of "significant pressure" from senior management on sales and finance personnel to meet revenue targets as well as failures in the Company's internal controls including senior management's failure to set an appropriate "tone at the top."

52.     As a result of these improper pull-in transactions Marvell's reported revenue was overstated and/or further disclosure was required as the reported revenue was the direct result of improper earnings management which hid the Company's true performance.  The Company's internal investigation conducted by the Audit Committee, counsel and a forensic accounting specialist concluded that revenue from pull-in transactions was recognized prematurely as a result of the extension of payment terms beyond Marvell's customary terms.  Such transactions violated GAAP and SEC disclosure rules for the reasons stated in ¶¶63-82 *infra*.  These transactions are also currently under investigation by the U.S. Attorney's Office and the SEC.

53.     Defendants were aware of or reckless in not becoming aware of the improper pull-in transactions as senior management applied "significant pressure" on sales and finance personnel to meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a result of these improper pull-in transactions.  Sutardja and Dai ran the Company as if it were a family owned Company, not a public Company, controlling all important aspects of the business.

1  The pressure and control exerted by senior management set an improper "tone at the top" that

2  resulted in premature recognition of revenue as a result of improper pull-in transactions.

3      54.     Marvell's corporate culture was top down.  All important decisions were made from

4  the top of the Company.  Defendant Sutardja was a micro manager and had his fingers in

5  everything.  He left little room for mid-level managers to make decisions.  There was pressure from

6  senior management to do what needs to be done in order to meet numbers.  This ultimately included

7  a push to get revenue, which resulted in the use of extended payment terms to pull-in revenue from

8  the subsequent quarter in order to meet revenue targets.

9      55.     Approximately 50% of Marvell's sales were made to three customers and one

10  distributor, who were taken care of personally by Marvell co-founder and defendant Sutardja's wife,

11  Dai.

12      56.     As a result of the Company's failure to properly record the CMU royalties as outlined

13  in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the first quarter of fiscal 2016:

|  |  |
| --- | --- |
| **EPS (as reported)** | $0.13 |
| **EPS (adjusting for estimated current quarter CMU domestic royalties)** | $0.01 |
| **EPS (adjusted for estimated total domestic CMU royalties)** | $(0.65) |

18      57.     As a result of the Company's failure to properly record the CMU royalties as outlined

19  in ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for first quarter of fiscal 2016:

|  |  |
| --- | --- |
| **Gross Margin (as reported)** | 51.5% |
| **Estimated royalties owed to CMU for domestic sales during the quarter** | $10.5 million |
| **Actual Gross Margin** | 50.1% |

24      58.     Defendants were aware, or reckless in not becoming aware, of the failure to properly

25  record the CMU royalties and the resulting overstatements of critical financial metrics for the

26  reasons stated in ¶¶29, 83-111 *infra*.

27      59.     In a separate press release also dated May 21, 2015, the Company announced that

28  defendant Rashkin, Marvell's Interim CFO for the past 17 months was retiring, effective at the close

1    of the day.  Marvell had only removed Rashkin's "Interim" title on February 21, 2014.  When

2    defendant Rashkin took over as Interim CFO in December 2013, he replaced another Interim CFO,

3    Brad Feller, who only served in that position for just over a year, between October 2012 and

4    December 2013.  When Marvell announced in May 2015 that the Company would have their third

5    Interim CFO in less than three years, this news caused some trepidation among analysts  who voiced

6    concern "that in the past five years MRVL has seen four different CFOs."

7         60.     On June 4, 2015, Marvell filed its Quarterly Report with the SEC on Form 10-Q for

8    the first quarter of fiscal 2016 ended May 2, 2015.  The Company's Form 10-Q was signed by

9    defendant Nagesh, and reaffirmed the Company's statements previously announced on May 21,

10   2015. Regarding "Management's Evaluation of Disclosure Controls and Procedures," the Company

11   stated:

12        Our management, with the participation of our Chief Executive Officer and
          our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls
13        and procedures (as defined in Rule 13a-15(e) of the Exchange Act).  Our disclosure
          controls and procedures are designed to ensure that information required to be
14        disclosed is recorded, processed, summarized and reported within the time periods
          specified in the rules and forms of the Securities and Exchange Commission and that
15        such information is accumulated and communicated to management, including the
          Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely
16        decisions regarding required disclosure.  Based on this evaluation, our Chief
          Executive Officer and Chief Financial Officer concluded that, as of May 2, 2015, our
17        disclosure controls and procedures were effective.

18        61.     The Form 10-Q also contained SOX Certifications signed by defendants Sutardja and

19   Nagesh, who certified the following:

20        1.   I have reviewed this Quarterly Report on Form 10-Q of Marvell
          Technology Group Ltd.;
21
22        2.   Based on my knowledge, this report does not contain any untrue statement
          of a material fact or omit to state a material fact necessary to make the statements
          made, in light of the circumstances under which such statements were made, not
23        misleading with respect to the period covered by this report;

24        3.   Based on my knowledge, the financial statements, and other financial
          information included in this report, fairly present in all material respects the financial
25        condition, results of operations and cash flows of the registrant as of, and for, the
          periods presented in this report;
26
27        4.   The registrant's other certifying officer and I are responsible for
          establishing and maintaining disclosure controls and procedures (as defined in
          Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
28

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

62.     The above statements were false and misleading and defendants failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose:  (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3) Marvell lacked a well-structured process to establish significant and judgmental reserves associated with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting

from the CMU judgment; (5) the defendants had not established and maintained adequate internal controls at all relevant times; (6) the Company had engaged in inappropriate pull-in transactions; (7) the Company's senior management encouraged a closed and ineffective control environment essentially running the Company as if it were their own privately owned Company; (8) the Company's key financial metrics were false and/or misleading; and (9) revenue was prematurely recognized in violation of GAAP.

**MARVELL FAILED TO PROPERLY ACCOUNT FOR
"PULL-IN" REVENUE TRANSACTIONS**

63.     During the Class Period, Marvell improperly reported revenue.  This included (1) recognizing revenue in violation of GAAP on certain pull-in and distributor transactions; and (2) failing to disclose the impact of "pull-in" revenue transactions in violation of GAAP and SEC disclosure rules.

**Marvell Improperly Recognized
Revenue in Violation of GAAP**

64.     On March 1, 2016 , Marvell revealed that during the Class Period, "***revenue from certain pull-in and distributor transactions was recognized prematurely***"  in violation of GAAP and Marvell's own revenue recognition policy.  More specifically, Marvell's Audit Committee investigation identified a number of Class Period transactions involving extended payment terms beyond Marvell's customary terms.

65.     GAAP relevant to revenue recognition are found in the Financial Accounting Standards Board Accounting Standards Codification  Topic 605, *Revenue Recognition* ("ASC 605"). According to GAAP, and revenue recognition guidance from SEC Staff Accounting Bulletin No. 104 ("SAB 104"), revenue may only be recognized when all of the following criteria are met:

        (a)     "Persuasive evidence of an arrangement exists";

        (b)     "Delivery has occurred or services have been rendered";

        (c)     "The seller's price to the buyer is fixed or determinable"; and

        (d)     "Collectability is reasonably assured."

66.     Extended payment terms affect the third revenue recognition requirement: "***[t]he seller's price to the buyer is fixed or determinable***."  In arrangements with extended payment terms,

1   the seller may be more likely to provide refunds or other types of sales concessions to the customer,

2   or the customer may be more likely to renegotiate payment terms (*e.g.*, because the product's value

3   has diminished as a result of technological obsolescence). It may therefore be less likely that the

4   vendor will collect the full payment stipulated in the payment terms. Thus, the arrangement fee may

5   not be fixed or determinable.

6       67.   Extended payment terms also affect the fourth revenue recognition requirement:

7   "*[c]ollectability is reasonably assured*." Under GAAP, the evaluation of collectability focuses both

8   on whether the customer has the intent and ability to pay (*i.e.*, creditworthiness) and on whether the

9   fee is deemed fixed or determinable. For example, in an arrangement with extended payment terms

10  and the potential for technological obsolescence, the fee may be renegotiated, potentially resulting in

11  nonpayment of all or part of the fee by the customer. The customer may be willing and able to pay,

12  however collectability is not reasonably assured.

13      68.   For the distributor transactions identified by the Audit Committee investigation, the

14  extended payment terms were even more problematic. Under GAAP, payment terms that are

15  extended until the products are resold by the distributor to end-user customers indicate the existence

16  of a consignment sale. SAB 104 clearly states: "consignment arrangement are not sales and do not

17  qualify for revenue recognition until a sale occurs."

18  **Marvell Failed to Properly Disclose**
    **"Pull-In" Revenue Transactions**
19

20      69.   In addition to the improper revenue transactions described above, Marvell recorded

21  additional "pull-in" revenue transactions during the Class Period. Marvell described its pull-in

    transactions as follows:
22

23          *[C]ertain revenue recognized in the first and second quarters of fiscal 2016 and the*
            *fourth quarter of fiscal 2015, including transactions that would have, in the*
24          *normal course of events and but for action by Marvell employees, been completed*
            *and recognized in a subsequent quarter (referred to internally as "pull-ins").*

25  These transactions were required to be disclosed under GAAP and SEC disclosure rules. The

26  premature recognition of sales that would have otherwise been recognized in a subsequent period is

27  commonly referred to as "channel stuffing." The SEC has defined channel stuffing as follows:

28

1   *[T]he pulling forward of revenue from future fiscal periods by inducing customers
2   – through price discounts, extended payment terms or other concession – to
    submit purchase orders in advance of when they would otherwise do so.*[5]

3       70.     The SEC affirmed this position when it filed claims of earnings management against

4   the Sunbeam Corporation ("Sunbeam").  The SEC specifically cited that Sunbeam's "undisclosed or

5   inadequately disclosed acceleration of sales through 'channel stuffing'. . . materially distorted the

6   Company's reported results of operations."[6]

7       71.     Subsequent speeches made by SEC staff further support these requirements.  Former

8   Chief Accountant with the SEC, Lynn Turner, noted the following in 2001:

9       The *Sunbeam* case highlights . . . **channel stuffing** abuses, among others and
        sends a message to registrants and their auditors – the SEC will aggressively attack
10      fraudulent revenue recognition practices. . . .  Sunbeam failed to disclose that it
        offered discounts and other inducements to customers to sell merchandise
11      immediately that otherwise would have been sold in later periods, which threatened
        to depress Sunbeam's future results of operations.  [SAB 104] notes that disclosure in
12      [("MD&A") Management's Discussion & Analysis of Financial Condition] is
        required of shipments of product at the end of a reporting period that significantly
13      reduce customer backlog and that reasonably might be expected to result in lower
        shipments and revenue in the next period.
14
15      MD&A disclosures also are required of the impact of granting extended
        payment terms to customers that will result in a longer collection period for accounts
16      receivable and, thus, slower cash inflows from operations, ultimately impacting a
        registrant's liquidity and capital resources.[7]

17      72.     Similar to Sunbeam, Marvell failed to disclose its practice of channel stuffing at

18  quarter-ends and the impact of those sales on its current period results and future financial results.

19  By failing to make required disclosures in accordance with GAAP and SEC disclosure rules,

20  Marvell's Class Period financial statements were materially misstated.  At a minimum, Marvell was

21  required to disclose its channel stuffing as well as its impact on Marvell's revenues during the Class

22  Period.[8]

23
    ───────────────────
24  [5]  *In re Sunbeam Corp.*, File No. 3-10482, SEC Order Instituting Public Administrative
    Proceedings (May 15, 2001).

25  [6]  *Id.*

26  [7]  Lynn Turner, SEC Chief Accountant, Speech: *Revenue Recognition*, May 31, 2001.

27  [8]  Marvell was also required to disclose the impact of revenue transactions involving extended
    payment terms.  SAB 104 sets forth specific examples of revenue-related transactions that the SEC
28  requires to be disclosed including "*[g]ranting of extended payment terms that will result in a*

**The Impact of Channel Stuffing on
Marvell's Quarterly Revenue**

73.     During the Class Period, Marvell stressed the quarterly revenue of its most important business – the "Storage" market and, more specifically, the HDD business within the Storage market. [9] For example:

- "Key Highlights from FQ3' 2015 Results . . . Revenue of $930M . . . ***Storage grew in-line with expectations***";

- "***Overall Storage revenue grew 3% q/q and increased 5% y/y . . . HDD grew q/q***";

- "Key Highlights from FY2015 Results . . . FY15 revenue of $3.7B, up 9% over FY14 . . . ***Steady growth in storage*** on HDD stabilization"; and

- "***Overall Storage revenue grew 4%*** over FY14 . . . ***Steady HDD unit growth***."

74.     Unbeknownst to investors, Marvell used channel stuffing to artificially inflate the quarterly revenue results in its Storage market.  During the Class Period, as much as 8% of its quarterly revenue was the result of channel stuffing.  Without the artificial boost from channel stuffing, Marvell would have been forced to disclose significantly lower revenues in its Storage market.

75.     In addition to artificially inflating its quarterly revenue, Marvell also used channel stuffing to conceal softening demand in its most important business (*i.e.*, the HDD segment of the Storage market).  Marvell eventually disclosed that the amount of revenue pulled in

> represents an increase over the prior four quarters and is ***indicative of softening demand for certain of the Company's products***.  This was particularly the case in the ***storage end market*** where, as a result of a weaker global economy and a slow-down in the PC market, the Company saw ***weaker than expected demand for HDD*** products as the overall total available market declined.

76.     Within SAB 104, the SEC staff provided specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenue:

> *longer collection period for accounts receivable (regardless of whether revenue has been recognized) and slower cash inflows from operations, and the effect on liquidity and capital resources.*"

[9]     During the Class Period, Marvell had three primary markets: Mobile and Wireless, Storage, and Networking.  The Storage market was by far the largest market – making up 47% of the Company's net revenue in the year ended January 2015.  Within the Storage market, there were two primary segments: Hard Disk Drive Controllers ("HDD") and Solid-State Drive Controllers ("SDD").

Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.

77.    The SEC has provided a relevant example of a required MD&A disclosure in light of a changing sales trend:

For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should *not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable.*  The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[10]

78.    This SEC guidance is clear: Marvell was required to disclose the underlying reasons behind its change in quarterly revenue.  Instead, defendants concealed the fact that Marvell had used channel stuffing to artificially inflate sales and to conceal softening demand in its most important business segment.

**The Impact of Channel Stuffing on Future Results**

79.    In addition to the impact on reported quarterly revenues, Marvell was required to disclose the impact of channel stuffing on its future financial results.  As described above, defendants routinely used channel stuffing to prop up quarterly revenue by "pulling" or borrowing revenue from future quarters.  Clearly, this practice had a material impact on Marvell's future revenues.[11]  Marvell has since acknowledged this impact: "[Approximately $53 million]of revenue recognized in the . . . second quarter of fiscal 2016 that, based upon the original customer request date, *would have been received and earned in the third quarter of fiscal 2016 and is now no longer*

---

[10]    SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective Date: December 29, 2003.

[11]    Marvell attempted to conceal the impact on a future quarter by repeating the practice at the end of each quarter (*e.g.*, at the second quarter Marvell made up for the second quarter revenue that had been artificially pulled into the first quarter by repeating the practice and artificially pulling the third quarter revenue into the second quarter).  However the practice of channel stuffing is unsustainable and will eventually impact future revenues.

1   *available for receipt in that quarter* . . . the amount of 'pull-ins' has had an impact on the revenue

2   attributable to each such quarter."

3         80.    Within SAB 104, the SEC staff also provided the following specific examples of

4   required disclosures pertaining to the Company's recognition of revenue:

5         Shipments of product at the end of a reporting period that significantly reduce
   customer backlog and that ***reasonably might be expected to result in lower***

6   ***shipments and revenue in the next period***.[12]

7         81.    The significant financial impact of channel stuffing on Marvell's future financial

8   results is precisely the type of information required to be disclosed under the SEC's MD&A rules.

9   For example:

10         MD&A must specifically focus on known material events and uncertainties that
    would cause reported financial information ***not to be necessarily indicative of future***

11   ***operating performance*** or of future financial condition.

12                   *        *        *

13         One of the principal objectives of MD&A is to provide information about the
    quality and potential variability of a company's earnings and cash flow, so that

14   readers can ascertain the ***likelihood that past performance is indicative of future***
    ***performance***.[13]

15

16         82.    By "pulling-in" or "borrowing" revenue from future quarters, Marvell was aware that

17   revenue in subsequent quarters would be adversely impacted.  As a result, Marvell was required to

18   warn investors that its reported revenue was not indicative of future revenue.

### MARVELL FAILED TO PROPERLY ACCOUNT
19   ### FOR THE CMU PATENT LITIGATION

20   **Loss Contingencies**

21         83.    As described above, despite a jury verdict in December 2012 that awarded CMU a

22   judgment in excess of $1 billion for Marvell's infringement of CMU's patents, Marvell assured

23   investors that a material loss resulting from the litigation was not "probable."  Marvell made this

24   disclosure in the footnotes to its Class Period financial statements which defendants certified had

25   _____

26   [12]   SAB 104, Topic 13.B.

27   [13]   SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of*
    *Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective

28   Date: December 29, 2003.

been prepared in accordance with U.S. GAAP. Accordingly, Marvell's accounting for the CMU patent litigation and the related disclosures were required to comply with GAAP rules covering the accounting for loss contingencies, namely FASB Accounting Standards Codification 450, *Contingencies* ("ASC 450").

84. ASC 450, as well as related SEC guidance, addresses the establishment of reserves and/or disclosures associated with loss contingencies such as adverse outcome of litigation. Specifically, ASC 450 states ***an accrual for a loss contingency (i.e., a reserve) must be made when both of the following conditions are met***:

(a) ***Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss***; and

(b) ***The amount of loss is reasonably estimable***.

**Evaluating the CMU Patent Judgment**
**as a Loss Contingency Under GAAP**

85. In evaluating the CMU patent litigation as a loss contingency under GAAP, it was inappropriate to consider the entire $1 billion judgment as a single item. While the infringement was uniform on Marvell's sales of affected products across all geographies, the damages award, and therefore the judgment itself, was based on two entirely distinct geographic circumstances. A significant portion of the CMU patent judgment related to royalties on sales of chips that were ***imported into the United States for use in the United States*** while the remainder of the judgment related to royalties on chips that were ***manufactured, sold, and used abroad without ever entering the United States***. This distinction was evident at all phases of the case – from the testimony of experts in the trial, to the arguments raised by Marvell on appeal, and to the eventual opinion issued by the Federal Circuit Court of Appeals.

86. The same geographical distinction was required in assessing the CMU Patent litigation as loss contingency under ASC 450. As described in further detail below, defendants were aware during the Class Period that an adverse outcome on the U.S. portion of the judgment was

1    *probable* (*i.e.*, the Court of Appeals would not reverse the District Court judgment) and defendants

2    had the ability to ***precisely estimate*** the amount of damages attributable to the U.S. portion of the

3    CMU patent judgment.  Because the loss contingency for the U.S. portion of the CMU patent

4    judgment was both ***probable*** and ***reasonably estimable***, Marvell was required under GAAP to record

5    a loss reserve in its Class Period financial statements.

6    **Marvell's Class Period Disclosures**
     **Violated GAAP**

7

8            87.    During the Class Period, Marvell's disclosure of the CMU patent litigation failed to

9    acknowledge the distinct differences in the loss contingency described above.  Instead, Marvell

10   disclosed only (1) the ***total*** judgment for past royalties calculated based on ***total worldwide sales*** of

11   infringing products and (2) the ***total*** amount of post-judgment ongoing royalties calculated based on

12   ***total post-judgment worldwide sales*** of infringing products.  Marvell disclosed only the purportedly

13   low probability of loss associated with those particular amounts (*i.e.*, the probability that Marvell

14   would be forced to pay the ***entire*** past damages award exceeding $1.5 billion and ***entire*** amount of

15   ongoing post-judgment royalties of $400 million).  In doing so, Marvell's disclosure failed to inform

16   investors of the true nature and scope of the loss contingencies that Marvell faced related to the

17   CMU patent litigation.  In particular, Marvell concealed the most probable loss exposure it faced: a

18   final judgment for damages associated with royalties on sales of infringing products imported into

19   the United States.  Likewise, by only disclosing the post-judgment ongoing royalties calculated

20   based on total worldwide sales each quarter (and not breaking out the portion of those ongoing

21   royalties that were subject to the U.S. portion of the CMU patent judgment), Marvell concealed its

22   true margins and profitability on recurring sales.  *See* ¶97 *infra* for further discussion of Marvell's

23   overstated gross margins.

24           88.    On September 11, 2015, Marvell disclosed a "***litigation accrual of approximately***

25   ***$394 million recognized by the Company under ASC Topic 450, 'Contingencies,' in connection***

26   ***with the Carnegie Mellon University and certain other pending litigation***."  This loss contingency,

27   relating to the U.S. portion of the CMU patent judgment had not been previously disclosed or

28   accrued.  As reinforced by the SEC, the accrual of a material loss contingency should not be the

first disclosure of that contingency.[14]  Marvell has also since disclosed that the Audit Committee was investigating deficiencies in internal controls that allowed the litigation accrual to have not been previously accrued:

- "The Audit Committee is also reviewing certain aspects of the Company's internal control over financial reporting, including *controls for the establishment of reserves for litigation* . . . ."

- "Marvell's Audit Committee is conducting an independent investigation of *certain accounting and internal control matters*. The investigation generally includes a review of certain revenue recognized in the first and second quarters of fiscal 2016 and the fourth quarter of fiscal 2015, *the accrual of a litigation reserve* . . . .  The Audit Committee is also reviewing *disclosure concerning the foregoing matters and related circumstances* . . . ."

89.  Marvell was required under ASC 450 to have previously accrued a loss contingency for the U.S. portion of the CMU patent judgment during the Class Period.  As detailed below, the loss was (a) probable and (b) reasonably estimable.[15]

**The U.S. Portion of the CMU
Patent Judgment Was "Probable"**

90.  Under GAAP, an assessment of the probability of a loss contingency incorporates an analysis of several factors.  Those factors are:

- The nature of the litigation, claim, or assessment;

- The progress of the case (including progress after the date of the financial statements but before those statements are issued);

- The strategy by the defendant to respond to the case; and

---

[14]  Speech by SEC staff, *Remarks Before The 2004 AICPA National Conference on Current SEC and Public Company Accounting Oversight Board* ("PCAOB") *Developments*, by Scott Taub on December 6, 2004:  "Given these requirements, the recording of a material accrual for a contingent liability related to an event that occurred several years before should not be the first disclosure regarding that contingency.  Rather, disclosures regarding the nature of the contingency and the amounts at stake should, in most cases, have already been provided.  Disclosures should discuss the nature of the contingency and the possible range of losses for any item where the maximum reasonably possible loss is material.  Vague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific kinds of loss contingencies being evaluated are not sufficient."

[15]  Alternatively, at the very minimum, the loss contingency for the U.S. portion of the CMU patent judgment was required to be disclosed under GAAP.  *See* ¶96 *infra*.

- The experience of the entity in similar cases and the experience of other entities in similar cases.

91.     Each of the factors presented above strongly indicated that a contingent loss associated with the U.S. portion of the CMU patent litigation was probable as judgment was entered against Marvell in the CMU patent litigation over six months prior to the start of the Class Period, and the jury verdict relating to a $.50 per chip royalty on domestic sales was not reasonably likely to be impacted by the Company's appeal of the December 26, 2012 jury verdict as Marvell made no meaningful arguments against applying the royalty rate to chips that enter or entered the United States.  Not only did Marvell make no meaningful arguments against the domestic royalty, but the amicus brief filed by Google and other technology companies before the Federal Circuit actually assumed "that Marvell must pay Carnegie Mellon some reasonable royalty" for those chips sold domestically.  Thus defendants knew prior to the start of the Class Period that it was probable that the royalty award would be applied to at least all domestic transactions.

92.     Marvell also monitored the experiences of other entities in similar patent litigations, especially as it related to the extraterritoriality issue.  One case in particular, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 900 (2014), was routinely mentioned by Marvell when responding to questions over the potential outcome of the CMU patent litigation.  *See, e.g.*, response to SEC FAQ dated April 30, 2013.  In *Power Integrations*, the court "***reduced the jury's damages award . . . to limit it to lost domestic sales***."[16]  Based on the prior case law, there was clearly a low probability of having the entire damages award reversed (*i.e.*, worldwide sales and U.S. sales).  As noted by the Court of Appeals: "***we see no extraterritoriality bar to including within the royalty base those chips which were imported into the United States for use in the United States.  Section 271(a) makes clear that Congress meant to reach such 'import[ation]' and 'use[]' as domestic conduct***."[17]  It appears that

---

[16]     *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd & Marvell Semiconductor, Inc.*, No. 2:09-cv-00290-NBF, Brief of *Amici Curiae* Broadcom Corporation, Aruba Networks, Inc., Dell Inc., Google Inc., Hewlett-Packard Corporation, Limelight Networks, Inc., Microsoft Corporation, SAS Institute Inc., and XiLinx, Inc. Supporting Appellants on the Worldwide Damages Issue (Fed. Cir. Aug. 11, 2014) at 6.

[17]     *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1308 (Fed. Cir. 2015).

1    Marvell acknowledged this fact as part of its appeal: "***Marvell makes no meaningful***

2    ***extraterritoriality argument against – and we see no problem with – applying the royalty rate to***

3    ***chips that do enter the United States***."[18]

4    **The U.S. Portion of the CMU Patent**
     **Judgment Was "Reasonably Estimable"**

5         93.   As noted above, the second requirement under GAAP for the accrual of a contingent

6    loss is met when the loss is reasonably estimable.   There were two components of the loss

7    contingency associated with the U.S. portion of CMU patent judgment: (1) a lump sum for past

8    royalties on sales of infringing products that were imported into the United States through the date of

9    the jury's original damages award (December 12, 2012); and (2) an amount for ongoing royalties on

10   sales of infringing products imported into the United States starting January 15, 2013 (the date

11   ordered by the District Court as part of its final judgment) through the present date.   Both amounts,

12   totaling approximately $351 million at the start of the Class Period, were not only reasonably

13   estimable but, in fact, known by defendants.

14   **Past Royalties**

15        94.   Marvell's expert testimony at trial bifurcated the sales of infringing products into U.S.

16   sales and worldwide sales.   The jury's award of damages for past royalties was based on a specific

17   number of infringing chips sold worldwide which included a specific number of chips that were

18   imported into the U.S.   As described above, defendants also made numerous post-trial arguments on

19   the issue of U.S. sales vs. worldwide sales in an attempt to reduce the damages owed pursuant to the

20   judgment.   As such, defendants could easily estimate (and in fact had already calculated) the U.S.

21   portion of the jury's original damages award of $1.17 billion.   In fact, the Court of Appeals relied on

22   these exact same calculations in affirming the past royalties attributable to U.S. sales:

23        ***Marvell-sold chips that, though made and delivered abroad, were imported into the***
         ***United States, and we affirm the judgment to the extent of $278,406,045.50 in past***
24       ***royalties (50 cents for each of the 556,812,091 chips the jury could properly find***
         ***were imported)***.
25

26   *Id.* at 1288.

27   _____

28   [18]   *Id.* at 1305.

**Ongoing Royalties**

95.   It is also clear that defendants could not only reasonably estimate the ongoing post-judgment royalties associated with the U.S. portion of the CMU patent judgment, but were in fact, actively tracking such amounts each quarter.  Following the original jury trial, the U.S. District Court ordered Marvell to track "ongoing royalties" covered by the judgment.[19]  Marvell publicly reported the ongoing royalties associated with total worldwide sales, but did not break out the amount attributable to royalties on sales of infringing products imported into the United States.[20]  The chart below is an estimate of such ongoing royalties during the Class Period:[21]

| (In $ millions) | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| Post-judgment ongoing royalties on cumulative U.S. sales (through prior quarter) | $63.00 | $73.50 | $84.00 |
| Ongoing royalties on U.S. sales in current quarter | $10.50 | $10.50 | $10.50 |
| Total post-judgment ongoing royalties on U.S. sales | $73.50 | $84.00 | $94.50 |

---

[19]   Marvell Form 10-K, Jan. 31, 2015: "***The Court has required us to report ongoing royalties under the current judgment.  Based on the royalty rate assessed by the District Court, such additional royalties for the period of time commencing on the date ordered by the District Court, January 15, 2013, through [present] could be as much as*** . . . ."

[20]   *Id.*

[21]   The Court of Appeals affirmed $278 million in past domestic royalties.  This past domestic royalty amount represented approximately 24% of the past royalties on total worldwide sales based on the jury's original damages calculation of $1.17 billion.  Based on the Company's charge of $383 million in the second quarter of fiscal 2016, there was $105 million related to post-judgment ongoing domestic royalties between January 2013 (date of initial jury award of damages) and August 1, 2015.  This ongoing domestic royalty amount, represented approximately 21% of the ongoing royalties on total worldwide sales as of August 1, 2015 (based on Company disclosures of worldwide ongoing royalty exposure).  Applying the same percentage of domestic sales compared to worldwide sales across all quarters, the Company's post-judgment ongoing domestic royalty obligation at the third quarter of fiscal 2015 was approximately $73.5 million.  *See Carnegie*, 807 F.3d at 1288.

1

**At a Minimum, Disclosure of the**
**U.S. Portion of the CMU**
2    **Patent Judgment Was Required**

3         96.    At a minimum, Marvell was required to disclose the loss contingency associated with

4  past royalties and post-judgment ongoing royalties on sales of infringing products imported into the

5  United States.  Importantly, ASC 450 requires the disclosure of a loss contingency when the

6  conditions for accrual are not met, but it is at least ***reasonably possible*** that a loss will be incurred.

7  GAAP defines the term "probable" to mean "***the future event or events are likely to occur***."  GAAP

8  defines the term "reasonably possible" as "***the chance of the future event or events occurring is***

9  ***more than remote but less than likely***."  As detailed above, it is clear that defendants did not view

10  the U.S. portion of the CMU patent judgment as "less than likely."  Instead of making the required

11  loss contingency disclosures under GAAP, defendants failed to disclose the U.S. portion of the CMU

12  patent judgment and instead emphasized the purportedly low probability of loss associated with the

13  ***entire*** past damages award exceeding $1.5 billion and the ***entire*** amount of ongoing post-judgment

14  royalties of approximately $400 million.

15         **MARVELL OVERSTATED ITS GROSS MARGINS BY NOT PROPERLY**
          **ACCOUNTING FOR ONGOING CMU ROYALTY COSTS**
16

17         97.    As described above, following the CMU patent litigation, Marvell was ordered by the

18  District Court to pay CMU a $0.50 royalty fee on all future sales of affected products.  Marvell

19  records royalty fees paid to third parties as part of cost of goods sold ("COGS") which affects the

20  gross margin on product sales.  Gross margin was a key metric for Marvell and was widely cited by

21  the Company and analysts in reporting its quarterly financial results.  During the Class Period,

22  Marvell overstated its gross margins by failing to record CMU royalty costs on sales of infringing

23  products that were imported into the United States.  As detailed above, Marvell was unlikely to have

24  the original District Court judgment reversed as it related to U.S. sales.  However, even in the event

25  reversal was deemed probable, Marvell would have still been required under GAAP to record the

26  royalty costs as COGS concurrent with its U.S. sales and then later reverse the COGS after a

27  successful outcome was achieved.  Analogous GAAP states that when a company sells a product and

28  the revenue it will receive is contingent on the outcome of a future event or uncertainty, the company

1  shall only recognize the full potential revenue amount "*to the extent it is highly probable that there*

2  *will not be a significant reversal in the amount of cumulative revenue recognized when the*

3  *uncertainty is resolved*."[22]   By direct comparison, Marvell's COGS on sales of affected products in

4  the United States should have included the CMU royalty costs ordered by the District Court.  The

5  potential of  reduced COGS (*i.e.*, without the CMU royalty costs) was contingent on the outcome of

6  its appeal.  Therefore, under GAAP Marvell could only recognize the reduced COGS amount, (*i.e.*,

7  without the CMU royalty costs) to the extent it was "*highly probable*" that it would not have to later

8  recognize a cumulative catch-up of those royalty costs upon an unsuccessful outcome of the appeal.

9  Marvell was forced to do exactly that in the second quarter of fiscal 2016 when it recorded an

10  approximately $105 million charge related to cumulative post-judgment ongoing royalties after the

11  Court of Appeals affirmed the U.S. portion of the CMU judgment.  As described above, defendants

12  had no reasonable basis to assert that it was *highly probable* that the Court of Appeals would *not*

13  affirm the U.S. portion of the CMU judgment.  Therefore, Marvell was required under GAAP to

14  record the CMU royalty costs concurrent with its U.S. sales during the Class Period.  The chart

15  below shows the impact of the CMU royalty costs on Marvell's reported gross margins during the

16  Class Period.  These impacts were clearly material.

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Gross Margin (as reported)** | 51.1% | 51.4% | 51.5% |
| **Estimated royalties owed to CMU for sales during the quarter** | $10.50 | $10.50 | $10.50 |
| **Actual Gross Margin** | 50.0% | 50.1% | 50.1% |

**THE MISSTATEMENTS DESCRIBED ABOVE WERE
MATERIAL TO MARVELL'S FINANCIAL STATEMENTS**

98.    SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99") sets forth the

generally accepted methods to evaluate materiality as it relates to the financial statements of SEC

registrants.  SAB 99 specifies numerous factors that clearly indicate Marvell's accounting and

---

[22]   ASC 605, *In depth: A look at current financial reporting issues*, No. US2014-01 (PwC June 18, 2014).

disclosure violations, as described above, were material to Marvell's Class Period financial statements.  SAB 99 states that: "*The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item.*"  SAB 99 also states that  both "quantitative" and "qualitative" factors must be considered in assessing materiality.  Marvell's accounting and disclosure violations surrounding both the CMU patent litigation and the impact of channel stuffing, as described above, were both quantitatively and qualitatively material.

**The Accounting Violations Were
Quantitatively Material**

99.   As depicted in the chart below, the required reserve associated with CMU patent litigation was quantitatively material to Marvell's Class Period financial statements:

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Revenue (as reported)** | $930.10 | $857.50 | $724.30 |
| **Operating Income (as reported)** | $115.50 | $79.80 | $13.30 |
| **EPS (as reported)** | $0.29 | $0.25 | $0.13 |
|  |  |  |  |
| **Required reserve for CMU Patent Litigation** | $351.50 | $362.00 | $372.50 |
| **EPS Effect ($)** | **$(0.72)** | **$(0.77)** | **$(0.78)** |
|  |  |  |  |

100.   The misstatements resulting from premature revenue recognition on pull-in transactions in violation of GAAP and the failure to disclose the impact of pull-in transactions (*i.e.*, channel stuffing) were also quantitatively material.  For example, the Company has disclosed that, during the Class Period, as much as 8% of its quarterly revenue, approximately $57 million, was the result of "pull-in" transactions.  During the Class Period, the impact of $57 million revenue on quarterly EPS would be least $0.05.

**The Accounting Violations Were
Qualitatively Material**

101.   The accounting and disclosure violations described above also met at least the following qualitative materiality criteria listed in SAB 99.

**The Misstatements Were Intentional**

102.   SAB 99 states:  "[W]here management has intentionally misstated items in the financial statements to '*manage*' *reported earnings* . . . it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."

103.   Marvell has acknowledged that the pull-in transactions were intentional: "transactions that would have, in the normal course of events and *but for action by Marvell employees*, been completed and recognized in a subsequent quarter."   Marvell has also acknowledged that the pull-in transactions were done to manage earnings and meet revenue expectations ("significant pressure on sales and finance personnel to meet revenue targets").

**The Misstatement Masks a Change in Earnings or Other Trends**

104.   The litigation reserve charges associated with the CMU patent litigation- including a one-time reserve charge for past royalties and ongoing COGS for recurring royalties – had a significant impact on Marvell's earnings trends.  Most notably, as described below, the ongoing CMU royalty costs had a material impact on Marvell's margin trends in its most important business segment.

105.   The Company's practice of channel stuffing, as described above, materially affected Marvell's revenue trend.  Most notably, the channel stuffing allowed Marvell to conceal a negative revenue trend in its most important business segment.  Marvell disclosed revenue growth in its Storage market and HDD business segment during the Class Period.[23]  The Company has since acknowledged that the channel stuffing concealed a trend of softening demand in these important business segments.  The Company also disclosed that the amount of revenue pulled in

> represents an increase over the prior four quarters and is *indicative of softening demand for certain of the Company's products*.  This was particularly the case in the storage end market where, as a result of a weaker global economy and a slow-down in the PC market, the Company saw *weaker than expected demand for HDD products* as the overall total available market declined.

---

[23]   For example: "*Storage grew in-line with expectations . . . Overall Storage revenue grew 3% q/q and increased 5% y/y . . . HDD grew q/q*."  Q3 2015 Earnings Presentation.  "*Overall Storage revenue grew 4% over FY14 . . . Steady HDD unit growth*."  Q4 2015 Earnings Presentation.

**The Misstatement Hides a Failure
to Meet Analysts' Consensus Expectations**

106.    As depicted in the chart below, the ongoing royalties on U.S. sales associated with the CMU patent litigation would have caused Marvell to miss analysts' estimates for gross margin during the Class Period.

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Gross Margin (as reported)** | 51.1% | 51.4% | 51.5% |
| **Analysts' Consensus Gross Margin estimate** | 50.2% | 50.6% | 50.2% |
| **Gross Margin (adjusted for current quarter CMU domestic royalties)** | 50.0% | 50.1% | 50.1% |

107.    Similarly, the charges associated with the CMU patent litigation, including the one-time charge for past royalties on U.S. sales and the ongoing COGS for recurring royalties on U.S. sales, would have caused Marvell to miss analysts' consensus EPS estimates during the Class Period:

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **EPS (as reported)** | $0.29 | $0.25 | $0.13 |
| **Analysts' Consensus EPS Estimate** | $0.29 | $0.24 | $0.11 |
| **EPS (adjusted for estimated current quarter domestic CMU royalties)** | $0.20 | $0.14 | $0.01 |
| **EPS (adjusted for estimated total domestic CMU royalties)** | $(0.43) | $(0.52) | $(0.65) |

**The Misstatement Changes a
Loss into Income**

108.    The charges associated with the CMU patent litigation, including the one-time charge for past royalties on U.S. sales and the ongoing COGS for recurring royalties on U.S. sales, would have changed Marvell's net income during the Class Period into a  net loss:

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Net Income (Loss) (as reported)** | $115.3 | $81.7 | $14.1 |
| **Net Income (Loss) (adjusted for estimated total domestic CMU royalties)** | $(236.2) | $(280.3) | $(358.4) |

**The Misstatement Concerns a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability**

109.     During the Class Period, Marvell had three primary markets:  Mobile and Wireless, Storage, and Networking.  The Storage market was by far the largest market – making up 47% of the Company's net revenue in the year ended January 2015.  Within the Storage market, there were two primary segments: HDD and SDD.

110.     The CMU patent charges described above impacted Marvell's most important business segment – the HDD segment of the Storage market.  As noted by one analyst, the ongoing CMU royalties were expected to have a material impact on Marvell's HDD margins going forward: "the CMU patents 'currently encompass all of Marvell's HD chips [and] the per-chip royalty will result in roughly a 20% hit to operating margins on their HD controller business.'"[24]

111.     Likewise, the channel stuffing, as described above, concealed softening demand in the most important segment of Marvell's business – the HDD segment of the Storage market.  The Company later disclosed that the amount of revenue pulled in

represents an increase over the prior four quarters and is indicative of softening demand for certain of the Company's products.  ***This was particularly the case in the storage end market*** where, as a result of a weaker global economy and a slow-down in the PC market, the Company saw ***weaker than expected demand for HDD products*** as the overall total available market declined.

---

[24]   Damion Rallis, *Can Only Spider-Man Save Marvell Technology Group?* (Jan. 9, 2013), http://mobile.businessinsider.com/can-only-spider-man-save-marvell-technology-group-2013-1.

## DEFENDANTS FALSELY CERTIFIED THAT
## MARVELL HAD EFFECTIVE INTERNAL CONTROLS

**Sarbanes-Oxley Act of 2002**

112.    Defendants were also responsible for establishing and maintaining effective internal controls over financial reporting ("ICFR") pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").[25] SOX required defendants to perform annual assessments of Marvell's ICFR and to issue a report on whether Marvell's ICFR were adequate and free from material weaknesses.[26] SOX required the use of an appropriate framework in assessing ICFR, such as the COSO *Internal Control – Integrated Framework* ("COSO Framework").[27]   During the Class Period, Marvell's financial statements contained the following Management's Report on ICFR:

> Management has evaluated the effectiveness of our internal control over financial reporting . . . using the criteria set forth in the ***Internal Control – Integrated Framework*** [(2013)] issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

**The Control Environment**
**and Tone at the Top**

113.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity.  The COSO Framework summarizes the control environment as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people.  It is the foundation for all other components of internal control, providing discipline and structure.  Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[28]

---

[25]    SEC Final Rule: *Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, Release Nos. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03, Effective Date: August 14, 2003.

[26]    *Id.*

[27]    The COSO Framework was developed and published in 1992 by COSO of the former Treadway Commission.  The 1992 publication included a section, "Reporting to External Parties" and in 1997, COSO issued an addendum to this section.

[28]    COSO Framework at 29.

1        114.     Because of the importance of the control environment and its pervasive influence on a

2    Company's ICFR, ***deficiencies affecting the control environment are strong indicators of a***

3    ***material weakness***.[29]

4        115.     An important as aspect of the control environment under the COSO Framework is the

5    establishment of an appropriate "tone at the top."  The concept of "tone at the top" has become

6    widely accepted within the accounting profession and the field of corporate governance to describe

7    the attitude and actions of an entity's senior management toward internal financial controls and the

8    control environment.  SAB 99 refers to "tone at the top" as:

9             The tone set by top management – the corporate environment or culture
        within which financial reporting occurs – is ***the most important factor contributing***

10    ***to the integrity of the financial reporting process***.  Notwithstanding an impressive
        set of written rules and procedures, if the tone set by management is lax, fraudulent

11    financial reporting is more likely to occur.[30]

12        116.     The  COSO Framework states, "[m]ore than any other individual [or function], ***the***

13    ***chief executive sets the 'tone at the top'*** that affects control environment factors and other

14    components of internal control.  ***The influence of the CEO on an entire organization cannot be***

15    ***overstated***."[31]

16    **Evaluating Control Deficiencies**

17        117.     During the Class Period, Marvell assured investors that its internal controls

18    functioned properly to prevent or detect material misstatements.  This disclosure, including

19    certifications signed by defendants,  assured investors that Marvell did not have a material weakness

20    in its internal control over financial reporting.  A material weakness is a:

21             [S]ignificant deficiency, or combination of significant deficiencies, that results in
        more than a remote likelihood that a material misstatement of the annual or interim

22    financial statements will not be prevented or detected. [32]

23

---

24    [29]   PCAOB Auditing Standard No. 2 ("AS 2"), ¶140.

25    [30]   SAB 99.  *See also* Report of the National Commission on Fraudulent Financial Reporting (Oct.
    1987); Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness

26    of Corporate Audit Committees (Feb. 1999).

27    [31]   COSO Framework at 83-86

28    [32]   AS 2, ¶10.

118.    Within this definition, "remote" means "[t]he chance of the future events . . . occurring is slight."[33]  A significant deficiency is a:

> [C]ontrol deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.[34]

119.    Accordingly, the key differentiation between a material weakness and a significant deficiency is whether a misstatement that could arise from the control deficiency would be more than inconsequential (a significant deficiency) or material (a material weakness).  A misstatement can only be inconsequential if it is "clearly immaterial."[35]

**Defendants' Class Period**
**Internal Control Certifications**

120.    Marvell's Form 10-K for the year ended January 31, 2015 included the following "Management's Report on Internal Control Over Financial Reporting":

> Based on our evaluation, management has concluded that ***we maintained effective internal control over financial reporting*** as of January 31, 2015 based on the COSO criteria.

121.    In addition, each of Marvell's Class Period financial statements included the following certifications signed by defendants Sutardja and Rashkin pursuant to SOX, Section 302:

---

[33]  AS 2, ¶9.

[34]  *Id.*

[35]  *Id.* ("A misstatement is ***inconsequential*** if a reasonable person would conclude, after considering the possibility of further undetected misstatements, that the misstatement, either individually or when aggregated with other misstatements, would clearly be immaterial to the financial statements. If a reasonable person could not reach such a conclusion regarding a particular misstatement, that misstatement is more than ***inconsequential***.").

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO SECURITIES EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dr. Sehat Sutardja, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Marvell Technology Group Ltd.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 26, 2015                  By:        /S/   SEHAT SUTARDJA
                                                    **Dr. Sehat Sutardja**
                                                    **Chief Executive Officer**
                                                    **(Principal Executive Officer)**

**Marvell's Class Period ICFR Statements Were False**

122.   On March 1, 2016, Marvell revealed that deficiencies existed in its ICFR during the Class Period.  The Company disclosed:

> The Audit Committee also found **certain** "**tone at the top**" **issues**, including **significant pressure** on sales and finance personnel to meet revenue targets and the failure to raise to the appropriate level at the appropriate times the initial assertion of Marvell's CEO and Chairman that he owned the Final-Level Cache invention, the patent applications for which he later assigned to Marvell.[36]

---

[36]   Marvell Form 8-K, March 1, 2016.   The Company also disclosed control deficiencies surrounding revenue recognition "for certain transactions Marvell's **internal controls were not fully**

123.     Marvell's disclosure identified control deficiencies involving Marvell's "'**tone at the top**,'" a key component of the Company's "control environment."   As described above, PCAOB No. 2 states that a deficiency in the control environment is presumed to be a ***material weakness in ICFR***. Because defendants had previously certified that Marvell's ICFR were effective (*i.e.*, free from material weaknesses), the March 1, 2015 disclosure was effectively a restatement of Marvell's prior ICFR statements including the certifications described above.

### THE TRUTH BEGINS TO BE REVEALED

124.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused plaintiff and class members' economic loss.  Plaintiff's claims for securities fraud are asserted under the fraud on the market theory of reliance.  *See* ¶¶158-159 *infra*.  Marvell stock actively traded on the NASDAQ during the Class Period, and was artificially inflated by the false and misleading statements and material omissions complained of herein.  As a result of the misrepresentations and omissions described herein, plaintiff and the Class were unable to evaluate the risks concealed by defendants' misstatements and omissions, and, therefore, were unable to choose whether or not to undertake those risks.

125.     These false and misleading statements had the intended effect and caused Marvell securities to trade at artificially inflated levels throughout the Class Period.

126.     The Class Period inflation in Marvell's stock price was removed when the conditions and risks concealed by defendants' false and misleading statements and omissions, or the financial and operational impacts thereof, were revealed to the market.   The adverse information was disseminated through partial disclosures that revealed the truth regarding the prospects of the Company.  These disclosures, more particularly described below, removed artificial inflation from Marvell securities, causing economic injury to plaintiff and other members of the Class.

127.     The corrective impact of the individual disclosures alleged herein was, however, tempered by defendants' continued false and misleading statements about the Company.  These continued misrepresentations maintained the price of Marvell stock at a level that was inflated by

*followed* and revenue from certain pull-in and distributor transactions was recognized prematurely [in violation of GAAP and Marvell's revenue recognition policy]."  *Id.*

1  fraud, inducing members of the Class to continue purchasing shares in Marvell, leading to further
2  price declines that caused additional injury to the Class upon the disclosure of additional information
3  about the true condition of the Company.

4       128.   None of the disclosures was sufficient on its own to fully remove the inflation from
5  Marvell's stock price because each only partially revealed the risks and conditions that had been
6  concealed from investors.  In addition, the individual corrective impact of these disclosures was
7  reduced by defendants' contemporaneous false statements and omissions about the Company.  As a
8  result of these partial corrective disclosures of the truth and the materialization of the risks concealed
9  by defendants' misrepresentations and omissions, the price of Marvell securities fell.

10      129.   The disclosures that corrected the market price to eliminate the inflation maintained
11  by defendants' fraud are detailed below.

12      130.   On August 20, 2015, the Company postponed the release of its second quarter of
13  fiscal 2016 earnings results.  Tellingly, as a result of the accounting and control problems detailed
14  herein, Marvell could not comply with its SEC mandated reporting requirements.  As a result, the
15  Company has not filed its required quarterly or annual reports with the SEC for approximately nine
16  months and has recently stated that in order to prevent the delisting of the Company's stock by
17  NASDAQ, it will be required to request a hearing before a NASDAQ hearings panel.

18      131.   Following the August 20, 2015 announcement, Marvell's share price declined over
19  12%.

20      132.   On September 11, 2015, Marvell issued a press release disclosing a $382 million net
21  loss for the second quarter of fiscal 2016 as well as an independent investigation of certain
22  accounting and internal control matters in the second quarter of fiscal 2016.  The Company further
23  disclosed that the investigation consists of a review of certain revenue recognition issues in the
24  second quarter of fiscal 2016 and any associated issues with whether senior management's operating
25  style during the period resulted in an open flow of information and communication to set an
26  appropriate tone for an effective control environment.  More specifically, the investigation focused
27  on the approximately 7%-8% of revenue recognized that, based upon the original customer request

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:15-cv-05447-RMW                                              - 45 -

1    date, would have been received and earned in the subsequent quarter and was thus, no longer

2    available for receipt in that quarter.

3         133.    The Company further revealed on September 11, 2015 that the Audit Committee is

4    also reviewing certain aspects of the Company's internal control over financial reporting, including

5    controls for the establishment of reserves for litigation and whether senior management's operating

6    style resulted in an open flow of information and communication to set an appropriate tone for an

7    effective control environment.

8         134.    Following this disclosure, Marvell's share price declined over 18%.

9         135.    On October 26, 2015, Marvell disclosed that PwC, the Company's auditor for over 15

10   years, had abruptly resigned.  This highly remunerative engagement generated tens of millions of

11   dollars in fees for PwC.  Prior to resigning, PwC advised the Company that it would need to expand

12   the scope of the 2016 audit in the following areas:  (1) the Company's entity level controls, including

13   whether senior management's operating style resulted in an open flow of information and

14   communication to set an appropriate tone for an effective control environment; (2) the Company's

15   process and controls over establishment of significant and judgmental reserves, including reserves

16   for litigation and royalties; (3) the Company's process and controls over identification,

17   communication and approval of related party transactions, including assignment of intellectual

18   property rights; and (4) the adequacy of financial reporting resources, including sufficient personnel

19   with appropriate knowledge, expertise, and training commensurate with the Company's corporate

20   structure and financial reporting requirements.

21        136.    PwC further advised the Company that disclosures should be made or action should

22   be taken to prevent future reliance on previously issued audit report or completed interim review

23   related to previously issued financial statements.

24        137.    Following this disclosure, Marvell's share price declined nearly 15%.

25        138.    On December 7, 2015, the Company disclosed that it was in the process of assessing

26   which transactions should be considered "pull-in" transactions for which revenue is properly

27   recognized in a quarter, but would have been expected to be received and earned in the subsequent

28   quarter.  The Company revealed that the Audit Committee was still investigating this conduct.  The

1  Company further revealed that these improper "pull-in" transactions were not limited in impact to

2  the second quarter of fiscal 2016, but also impacted the fourth quarter of fiscal 2015 and the first

3  quarter of fiscal 2016.  The Company further announced a $62 million net loss for the third quarter

4  of fiscal 2016.

5      139.   The Company further announced a $395 million litigation reserve to cover the CMU

6  patent judgment that had previously been obtained against the Company.  The Company would

7  within months agree to pay $750 million to cover domestic royalties owed to CMU.

8      140.   Marvell further disclosed that two government agencies, the U.S. Attorney's Office

9  and the SEC, are investigating its accounting and other issues.

10     141.   Following the December 7, 2015 disclosure, Marvell shares declined approximately

11 10%.

12     142.   On March 1, 2016, Marvell announced the completion of the Audit Committee

13 investigation, stating that the Audit Committee retained independent counsel and a forensic

14 accounting specialist to assist the Audit Committee in its investigation and that the investigation

15 generally included a review of certain revenue recognized in the first and second quarters of fiscal

16 2016 and the fourth quarter of fiscal 2015, including transactions that would have, in the normal

17 course of events and but for action by Marvell employees, been completed and recognized in a

18 subsequent quarter (referred to internally as "pull-ins"), the accrual of a litigation reserve in the

19 second quarter of fiscal 2016, and the initial stated belief by Marvell's CEO and Chairman of

20 ownership of certain patent rights related to his FLC invention and his later assignment of associated

21 patent applications to Marvell.  The Audit Committee also reviewed disclosure concerning the

22 foregoing matters and related circumstances, and whether senior management's operating style

23 during the relevant periods resulted in an open flow of information and communication to set an

24 appropriate "tone at the top" for an effective control environment.

25     143.   The Audit Committee concluded that for certain transactions, Marvell's internal

26 controls were not fully followed and ***revenue from certain pull-in and distributor transactions was***

27 ***recognized prematurely***.  The Audit Committee further concluded that while Marvell's CEO and

28 Chairman stated his belief that he had a good faith claim to ownership of the FLC invention, the

1  invention was owned by Marvell during all periods in which Company resources related to such

2  invention were deployed.  The Audit Committee further concluded that Marvell *lacked a well-*

3  *structured process to establish significant and judgmental reserves* associated with litigation and

4  *royalties*.

5  144.  The Audit Committee further concluded that certain "'*tone at the top*'" issues existed,

6  including *significant pressure on sales and finance personnel to meet revenue targets* and the

7  failure to raise to the appropriate level at the appropriate times the initial assertion of Marvell's CEO

8  and Chairman that he owned the FLC invention, the patent applications for which he later assigned

9  to Marvell.

10  145.  The Audit Committee stated that it identified a limited number of transactions that

11  had the effect of *recognizing revenue prematurely*, generally involving the *extension of payment*

12  *terms beyond Marvell's customary terms*.  The Company further stated that Marvell is evaluating

13  whether any of these errors were material to any previously reported financial period.  The Company

14  stated that if any correction to previously reported financial periods were to be made as a result of

15  these identified transactions, it would result in a *shift of revenues* from the fourth quarter of fiscal

16  2015 to the first quarter of fiscal 2016, or from the first quarter of fiscal 2016 to the second quarter

17  of fiscal 2016.

18  146.  The Audit Committee made a number of recommendations to the board of directors

19  of Marvell, including recommendations regarding the addition of certain compliance, finance and

20  legal personnel, the review and revision of certain policies and procedures, the augmented training of

21  employees in some areas and the addition of independent board members.

22  147.  The Audit Committee further stated that Marvell is also evaluating the impact of the

23  Audit Committee's findings on the effectiveness of Marvell's disclosure controls and internal

24  controls over financial reporting.  The Audit Committee also intends to review certain matters that

25  came to the Audit Committee's attention during the course of its now completed investigation,

26  including the setting of certain reserves in fiscal 2012 and the first quarter of fiscal 2013.

27  148.  The Audit Committee established a rapid timetable for implementation of many of

28  these recommendations, and the board of directors and management intend to meet all requirements

1  set by the Audit Committee.  As previously announced, the board of directors has engaged an

2  international executive search firm to conduct a search for additional independent board members

3  and with another firm to conduct a search for a permanent CFO.

4          149.    The Company reiterated that, as previously reported, Marvell has not yet filed its

5  Quarterly Reports on Form 10-Q for the second or third quarters of fiscal 2016 (the "Forms 10-Q").

6  As also previously reported, as a result of the delayed filing of the Forms 10-Q, Marvell is not in

7  compliance with NASDAQ Listing Rule 5250(c)(1) (the "Rule"), which requires the timely filing of

8  all required periodic financial reports.  As announced in Marvell's press release issued on

9  December 7, 2015:

10         The NASDAQ Stock Market LLC ("NASDAQ") granted Marvell through March 8,
           2016 to file the Forms 10-Q in order to regain compliance with the Rule.  Marvell is
11         working diligently to complete and file the Forms 10-Q as soon as possible, but it
           does not expect to have the Forms 10-Q on file by March 8, 2016.  Marvell expects
12         that it will be notified by NASDAQ that Marvell will be required to request a hearing
           before a NASDAQ Hearings Panel to remain listed on the NASDAQ Stock Market
13         until the Forms 10-Q are filed.  Upon receiving any such notification, Marvell
           intends to request such a hearing and to request that Marvell's common stock remain
14         listed pending such hearing.

15         150.    On March 8, 2016, Marvell announced that, as a result of the previously announced

16  delayed filings of its Forms 10-Q for the second and third quarters of fiscal 2016, Marvell received

17  notice that the Listing Qualifications Staff of NASDAQ had determined that Marvell will not meet

18  the terms of the previously granted extension, which expires on March 8, 2016, and by which date

19  Marvell was required to evidence compliance with the Rule, which requires the timely filing of all

20  required periodic reports with the SEC.

21         151.    Marvell indicated that it intends to request a hearing before a NASDAQ hearings

22  panel on or before March 11, 2016 to request a further extension.  The hearings panel has the

23  authority to grant Marvell an extension of up to 360 days from the due date of the first missed

24  periodic report, or September 5, 2016.

25         152.    Following this announcement, Marvell's share price declined over 3%.

26         153.    As a result of the Company's failure to file its required reports with the SEC,

27  additional highly relevant information is likely to be disclosed in the second half of this year.

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:15-cv-05447-RMW                                    - 49 -

**LOSS CAUSATION/ECONOMIC LOSS**

154.    Like other members of the Class of purchasers of Marvell securities (defined herein), who purchased at artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages, when Marvell's securities prices declined upon the disclosures correcting the alleged misrepresentations.

155.    The timing and magnitude of Marvell's securities price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate Marvell's securities price and the subsequent significant decline in the value of Marvell securities when the true state of the Company's operations was revealed to the market correcting the misrepresentations and/or the economic impact thereof.

**NO SAFE HARBOR**

156.    Marvell's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

157.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Marvell who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

158.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased Marvell securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

159.    At all relevant times, the market for Marvell's securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, Marvell filed periodic public reports with the SEC; and

(b)    Marvell regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**CLASS ACTION ALLEGATIONS**

160.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Marvell securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, and directors and officers of Marvell and their families and affiliates.

161.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

1  the parties and the Court.  Marvell has more than 517 million shares of stock outstanding, owned by

2  hundreds if not thousands of persons.

3       162.   There is a well-defined community of interest in the questions of law and fact

4  involved in this case.  Questions of law and fact common to the members of the Class that

5  predominate over questions that may affect individual Class members include:

6            (a)    Whether the Exchange Act was violated by defendants;

7            (b)    Whether defendants omitted and/or misrepresented material facts;

8            (c)    Whether defendants' statements omitted material facts necessary in order to

9  make the statements made, in light of the circumstances under which they were made, not

10  misleading;

11           (d)    Whether defendants knew or recklessly disregarded that their statements were

12  false and misleading;

13           (e)    Whether the price of Marvell securities was artificially inflated; and

14           (f)    The extent of damage sustained by Class members and the appropriate

15  measure of damages.

16       163.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class

17  sustained damages from defendants' wrongful conduct.

18       164.   Plaintiff will adequately protect the interests of the Class and has retained counsel

19  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

20  with those of the Class.

21       165.   A class action is superior to other available methods for the fair and efficient

22  adjudication of this controversy.

23                          **COUNT I**

24              **For Violation of §10(b) of the Exchange Act**
                **and Rule 10b-5 Against All Defendants**
25

26       166.   Plaintiff incorporates ¶¶1-165 by reference.

27       167.   During the Class Period, defendants disseminated or approved the false statements

28  specified above, which they knew or recklessly disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Marvell securities during the Class Period.

169.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Marvell securities. Plaintiff and the Class would not have purchased Marvell securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

170.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Marvell securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

171.    Plaintiff incorporates ¶¶1-170 by reference.

172.    The Individual Defendants acted as controlling persons of Marvell within the meaning of §20 of the Exchange Act. By virtue of their positions and their power to control public statements about Marvell, the Individual Defendants had the power and ability to control the actions of Marvell and its employees. Marvell controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

1

**PRAYER FOR RELIEF**

2        WHEREFORE, plaintiff prays for judgment as follows:

3        A.    Determining that this action is a proper class action, certifying plaintiff as a Class

4 representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class

5 Counsel;

6        B.    Awarding plaintiff and the members of the Class damages and interest;

7        C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

8        D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

9 proper.

10

**JURY DEMAND**

11        Plaintiff demands a trial by jury.

12 DATED: March 19, 2016            ROBBINS GELLER RUDMAN
                                                  & DOWD LLP

13                                    SCOTT H. SAHAM
                                    MATTHEW I. ALPERT

14

15

16                                           s/ Scott H. Saham
                                     SCOTT H. SAHAM

17                            655 West Broadway, Suite 1900
                            San Diego, CA  92101

18                            Telephone:  619/231-1058
                            619/231-7423 (fax)

19

20                            ROBBINS GELLER RUDMAN
                                & DOWD LLP

21                            SHAWN A. WILLIAMS
                            NADIM G. HEGAZI

22                            Post Montgomery Center
                            One Montgomery Street, Suite 1800

23                            San Francisco, CA  94104
                            Telephone:  415/288-4545

24                            415/288-4534 (fax)

25                            Lead Counsel for Plaintiff

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)

Additional Counsel for Plaintiff

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on March 19, 2016, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5

caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6

CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on March 19, 2016.

9

  s/ Scott H. Saham

10

SCOTT H. SAHAM

ROBBINS GELLER RUDMAN

11

& DOWD LLP

655 West Broadway, Suite 1900

12

San Diego, CA  92101-8498

Telephone:  619/231-1058

13

619/231-7423 (fax)

E-mail:  scotts@rgrdlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 5:15-cv-05447-RMW Luna et al v. Marvell Technology Group, Ltd. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,FileRoomSD@rgrdlaw.com,spatel@rgrdlaw.com

- **Daniel Scott Carlton**
  scottcarlton@paulhastings.com,lindayoung@paulhastings.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Joshua Garrett Hamilton**
  joshuahamilton@paulhastings.com,melmanahan@paulhastings.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com

- **Avi Josefson**
  avi@blbglaw.com

- **Jason Frank Lake**
  jasonlake@quinnemanuel.com,valerieroddy@quinnemanuel.com,harryolivar@quinnemanuel.com,calendar@quinnemanuel.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Harry Arthur Olivar , Jr**
  harryolivar@quinnemanuel.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Lesley Frank Portnoy**
  lportnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Valerie Suzanne Roddy**
  valerieroddy@quinnemanuel.com,calendar@quinnemanuel.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Scott H. Saham**
  scotts@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **Curtis Victor Trinko**
  ctrinko@gmail.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,stirabassi@rgrdlaw.com,dwilens@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,e_file_sf@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Patrick          V. Dahlstrom
Pomerantz LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
```