1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   NADIM G. HEGAZI (264841)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  nhegazi@rgrdlaw.com
           – and –
7  SCOTT H. SAHAM (188355)
   MATTHEW I. ALPERT (238024)
8  655 West Broadway, Suite 1900
   San Diego, CA  92101
9  Telephone:  619/231-1058
   619/231-7423 (fax)
10 scotts@rgrdlaw.com
   malpert@rgrdlaw.com
11
   Lead Counsel for Plaintiff
12
   [Additional counsel appear on signature page.]
13
                  UNITED STATES DISTRICT COURT
14
                 NORTHERN DISTRICT OF CALIFORNIA
15

16 DANIEL LUNA, Individually and on Behalf of )   Case No. 5:15-cv-05447-WHA
   All Others Similarly Situated,            )
17                                           )   **(Consolidated)**
                             Plaintiff,      )
18                                           )   <u>CLASS ACTION</u>
          vs.                                )
19                                           )   CONSOLIDATED AMENDED CLASS
   MARVELL TECHNOLOGY GROUP, LTD., )             ACTION COMPLAINT FOR VIOLATIONS
20 et al.,                                   )   OF THE FEDERAL SECURITIES LAWS
                                             )
21                           Defendants.     )
                                             )   <u>DEMAND FOR JURY TRIAL</u>
   _____ )

22

23

24

25

26

27

28

**INTRODUCTION**

1.      This is a securities class action brought on behalf of all persons who purchased or otherwise acquired the securities of Marvell Technology Group, Ltd. ("Marvell" or the "Company") from November 20, 2014 through December 7, 2015, inclusive (the "Class Period"), against Marvell and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), including Dr. Sehat Sutardja ("Sutardja"), the Chief Executive Officer ("CEO"), Michael Rashkin ("Rashkin"), Marvell's Chief Financial Officer ("CFO") until May 22, 2015, and Sukhi Nagesh (''Nagesh"), the Company's Interim CFO between May 22, 2015 and October 15, 2015.[1]

2.      Marvell is a producer of storage, communications and consumer semiconductor products, and is a global leader in providing complete silicon solutions.  The Company has design centers located in China, Europe, Hong Kong, India, Israel, Japan, Malaysia, Singapore, Taiwan and the United States.  Marvell's purported expertise in microprocessor architecture and digital signal processing drives multiple platforms including high volume storage solutions, mobile and wireless, networking, consumer and green products.

3.      Throughout the Class Period, defendants made false and/or misleading statements and/or omissions of material information regarding Marvell's key business metrics.  The Company reported Earnings Per Share ("EPS"), net income, margins and revenue that were false and/or misleading.  These metrics were false and/or misleading as defendants:  (1) failed to record domestic royalties that were incurred as a result of a jury verdict and judgment obtained against the Company by Carnegie Mellon University ("CMU") in a long running patent infringement lawsuit; and (2) violated Generally Accepted Accounting Principles ("GAAP") and U.S. Securities and Exchange

---

[1]      On October 12, 2016 the Honorable Ronald M. Whyte denied defendants' motions to dismiss plaintiff's allegations regarding "pull-in" transactions as to the elements of: material misrepresentation, materiality and loss causation.  Dkt. No. 98 at 16-20.  Judge Whyte granted defendants' motions regarding the element of scienter and allowed plaintiff to amend the complaint to add additional scienter allegations.  *Id.* at 20-24.  The additional scienter allegations addressing the issues raised in Judge Whyte's Opinion are found herein at ¶¶124-153.  Notably, the Company's firing of Sutardja and Dai and the filing of its long delayed SEC filings occurred after the filing of plaintiff's Consolidated Complaint in March of 2016.  No other substantive additions have been made to the other sections of the complaint and the allegations regarding the CMU patent litigation remain in the complaint to preserve plaintiff's appellate rights.

1    Commission ("SEC") disclosure rules by prematurely recognizing revenue that should have been

2    earned and recognized in the subsequent period.  In addition, the Company's top officers falsely

3    certified that the Company had adequate internal controls at all relevant times during the Class

4    Period.  Instead, the Company's management placed significant pressure on finance personnel to

5    meet revenue targets.

6          4.     In 2009, CMU filed a lawsuit against Marvell for patent infringement based upon

7    Marvell's development, use, and sale of certain semiconductor chips.  The case went to trial in

8    November 2012, and, on December 26, 2012, a jury reached a verdict in favor of CMU.  The jury

9    awarded CMU $1,169,140,271 as a reasonable royalty for Marvell's use of CMU's inventions,

10   corresponding to a $.50 per chip royalty on Marvell's worldwide sales.  Final judgment was entered

11   against Marvell by the District Court on May 14, 2014.

12         5.     Defendants were aware, or reckless in not becoming aware, of the failure to properly

13   record domestic royalties and the resulting overstatements of EPS, net income and margins as

14   judgment was entered against Marvell in the CMU patent litigation over six months prior to the start

15   of the Class Period, and the jury verdict relating to a $.50 per chip royalty on domestic sales was not

16   reasonably likely to be impacted by the Company's appeal of the December 26, 2012 jury verdict, as

17   Marvell made no meaningful arguments against applying the royalty rate to chips that enter or had

18   entered the United States.  Not only did Marvell make no meaningful arguments against the

19   domestic royalty, but the amicus brief filed by Google and other technology companies before the

20   Federal Circuit on August 11, 2014 actually assumed "that Marvell must pay Carnegie Mellon some

21   reasonable royalty" for these chips sold domestically.  Thus, defendants knew prior to the start of the

22   Class Period that it was probable that the royalty award would be applied to at least all domestic

23   transactions.  Defendants' failure to reserve for this likelihood and failure to record royalty expenses

24   violated GAAP for the reasons stated in ¶¶83-111 *infra*.

25         6.     Defendants reported revenue figures starting in the third quarter of fiscal 2015[2] were

26   also false and/or misleading and violated GAAP and SEC disclosure rules as the reported revenue

27   ─────────────

28   [2]   Marvell's fiscal year ends on January 31.  Thus, Marvell refers to the quarters in the fiscal year
     that ends on January 31, 2015 as fiscal 2015.

1    included improper pull-in transactions that were not organic to the quarter as the Company borrowed

2    future period sales in order to inflate current quarter revenue.  As a result, Marvell improperly, and

3    in violation of GAAP and SEC disclosure rules, recognized revenue in the current quarter from

4    transactions that would have, in the normal course of events and but for action by Marvell

5    employees, been completed and recognized in a subsequent quarter.  Marvell has admitted that

6    revenue related to these pull-in transactions and distributor transactions was recognized prematurely

7    as a result of "significant pressure" from senior management on sales and finance personnel to meet

8    revenue targets as well as failures in the Company's internal controls including senior management's

9    failure to set an appropriate "tone at the top."   Following the revelation of this conduct,

10    PricewaterhouseCoopers LLP ("PwC"), Marvell's long time auditor abruptly resigned.

11        7.      As a result of these improper pull-in transactions, Marvell's reported revenue was

12    overstated and/or further disclosure was required as the reported revenue was the direct result of

13    improper earnings management which hid the Company's true performance. *See* ¶¶63-82 *infra*.  The

14    Company's internal investigation conducted by the Audit Committee, counsel and a forensic

15    accounting specialist concluded that revenue from pull-in transactions was recognized prematurely

16    as a result of the extension of payment terms beyond Marvell's customary terms.  Such premature

17    revenue recognition violated GAAP for the reasons stated in ¶¶63-82 *infra*.  These transactions are

18    also currently under investigation by the U.S. Attorney's Office and the SEC.

19        8.      Defendants were aware of or reckless in not becoming aware of the improper pull-in

20    transactions as senior management applied "significant pressure" on sales and finance personnel to

21    meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a

22    result of these improper pull-in transactions.   The pressure and control exerted by senior

23    management set an improper "tone at the top" that resulted in premature recognition of revenue as a

24    result of improper pull-in transactions.  *See also* additional scienter allegations at ¶¶124-153.

25        9.      Defendants' certifications that they had established and maintained adequate internal

26    controls were likewise false and misleading as: (1) defendants failed to set an appropriate "tone at

27    the top" for an effective control environment; (2) the Company's controls were inadequate as they

28    allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent

1    applications and Final-Level Cache ("FLC") invention that was in fact owned by Marvell[3]; (3)

2    Marvell lacked a well-structured process to establish significant and judgmental reserves associated

3    with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting

4    from the CMU judgment; (5) the Company had engaged in inappropriate pull-in transactions as a

5    result of significant pressure from senior management and senior managements' failure to set an

6    appropriate "tone at the top"; (6) the Company's senior management encouraged a closed and

7    ineffective control environment essentially running the Company as if it were their own privately

8    owned Company; (7) the Company's key financial metrics were false and/or misleading; and (8)

9    revenue was prematurely recognized in violation of GAAP.

10          10.     As a result of defendants' wrongful acts and omissions, and the decline in the market

11   value of the Company's securities, plaintiff and other Class members have suffered significant losses

12   and damages.

13                           **JURISDICTION AND VENUE**

14          11.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C.

15   §78aa).  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C.

16   §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

17          12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Marvell's

18   U.S. headquarters is in this District and many of the acts and practices complained of herein

19   occurred in substantial part in this District.

20                                    **PARTIES**

21          13.     Plaintiff Plumbers and Pipefitters National Pension Fund ("Plumbers & Pipefitters")

22   manages the pension assets for Plumbers & Pipefitters participants and their families.  Plumbers &

23   Pipefitters is one of the nation's largest Taft-Hartley funds established in 1968 with approximately

24   ---

[3]    According to Marvell's website, Marvell's FLC architecture solves  memory related issues "by
25   redefining the main memory hierarchy, automatically loading pieces of code as needed and purging
     unneeded code, freeing up space for other applications."  Sutardja claimed that he developed the
26   FLC technology and owned the patent.  The patent for the FLC was ultimately assigned to Marvell
     on August 27, 2015.  There was an internal dispute as to the ownership of the FLC invention as
27   Sutardja stated that he owned the invention.  After an investigation by the Company's Audit
     Committee, it was determined that, in fact, "the invention was owned by Marvell during all periods
28   in which company resources related to such invention were deployed."

1    150,000 participants and beneficiaries and assets of approximately $5 billion. Plumbers &

2    Pipefitters purchased or acquired Marvell securities during the Class Period and was damaged by the

3    conduct alleged herein.

4        14.    On February 8, 2016, this Court appointed Plumbers & Pipefitters Lead Plaintiff for

5    the Class.

6        15.    Defendant Marvell is a Bermuda corporation. Marvell stock trades on the The

7    Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "MRVL." The Company's U.S.

8    corporate headquarters are located at 5488 Marvell Lane, Santa Clara, California 95054.

9        16.    Defendant Sutardja is, and was at all relevant times, CEO of the Company. In 1995,

10    Sutardja, along with his wife and brother, founded Marvell in 1995. Sutardja has served as CEO

11    since the Company's inception. Sutardja holds Master of Science and Ph.D. degrees in Electrical

12    Engineering and Computer Science from the University of California at Berkeley and according to

13    the Company's website, " participates heavily in Marvell's engineering and marketing efforts across

14    analog, video processor, and microprocessor design while offering input across all of the [Marvell's]

15    other product lines."

16        17.    Defendant Rashkin started with Marvell in 1999, was named the Company's Interim

17    CFO in December 2013 and served as the Company's full-time CFO from February 17, 2014 until

18    May 22, 2015.[4]

19        18.    Defendant Nagesh originally joined Marvell in 2011 as Vice President of Investor

20    Relations. He served as the Company's Interim CFO between May 22, 2015 and October 15, 2015,

21    and is currently Marvell's Senior Vice President of Corporate Development, Finance and Investor

22    Relations.

23        19.    The defendants named in ¶¶16-18 are referred to herein as the "Individual

24    Defendants."

25

26

27    _____

[4]    Defendant Rashkin also served as the Company's Interim CFO between July 2007 and January

28    2008.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                      - 5 -

1

**CONTROL PERSONS**

2      20.    As officers and controlling persons of a publicly held company whose common stock

3 was and is traded on the NASDAQ and is governed by the provisions of the federal securities laws,

4 the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

5 with respect to the Company's financial condition, performance, growth, operations, financial

6 statements, business, markets, management, earnings and present and future business prospects, and

7 to correct any previously issued statements that had become materially misleading or untrue, so that

8 the market price of the Company's securities would be based upon truthful and accurate information.

9 The Company's and Individual Defendants' misrepresentations and omissions during the Class

10 Period violated these specific requirements and obligations.

11      21.    The Individual Defendants participated in the drafting, preparation and/or approval of

12 the various public, shareholder and investor reports and other communications complained of herein

13 and were aware of, or recklessly disregarded the misstatements contained therein and omissions

14 therefrom, and were aware of their materially false and misleading nature.  Because of their Board

15 membership and/or executive and managerial positions with Marvell, each of the Individual

16 Defendants had access to the adverse undisclosed information about the Company's financial

17 condition and performance as particularized herein, and knew (or recklessly disregarded) that these

18 adverse facts rendered the positive representations made by or about Marvell and its business, or

19 adopted by the Company, were materially false and misleading.

20      22.    The Individual Defendants, because of their positions of control and authority as

21 officers and/or directors of the Company, were able to and did control the content of the various SEC

22 filings, press releases and other public statements pertaining to the Company issued during the Class

23 Period.  Each Individual Defendant was provided with copies or had access to the documents alleged

24 herein to be misleading prior to or shortly after their issuance and/or had the ability and/or

25 opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the

26 Individual Defendants is responsible for the accuracy of the public reports and releases detailed

27 herein and is therefore primarily liable for the representations contained therein.

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA               - 6 -

23.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Marvell securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Marvell's business, operations, management and the intrinsic value of Marvell securities; and (ii) caused plaintiff and other members of the Class to purchase Marvell securities at artificially inflated prices.

**SOURCES OF INFORMATION**

24.     The allegations herein are based on plaintiff's ongoing investigation, including review of relevant Company documents, SEC filings, press releases, analyst reports and other reports or statements made by third parties.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

**FALSE AND MISLEADING STATEMENTS ISSUED**
**DURING THE CLASS PERIOD**

25.     On November 20, 2014, Marvell issued a press release entitled, "Marvell Technology Group Ltd. Reports Third Quarter of Fiscal Year 2015 Financial Results."  Therein, defendants, in relevant part, stated:

**Key Third Quarter of Fiscal 2015 Financial Highlights**

- Revenue: Q3 FY 2015, $930 Million

- ***GAAP Net Income: Q3 FY 2015, $115 Million***

- GAAP Diluted EPS: Q3 FY 2015, $0.22

- Non-GAAP Net Income: Q3 FY 2015, $155 Million

- ***Non-GAAP Diluted EPS: Q3 FY 2015, $0.29***

- Free Cash Flow: Q3 FY 2015, $167 Million

*          *          *

**Third Quarter of Fiscal 2015 Summary**

Revenue for the third quarter of fiscal 2015 was $930 million, down approximately 3% from $962 million in the second quarter of fiscal 2015, ended August 2, 2014, and approximately flat from $931 million in the third quarter of fiscal 2014, ended November 2, 2013.

GAAP net income for the third quarter of fiscal 2015 was $115 million, or $0.22 per share (diluted), compared with GAAP net income of $139 million, or $0.27 per share (diluted), for the second quarter of fiscal 2015, and $103 million, or $0.21 per share (diluted), for the third quarter of fiscal 2014.

***Non-GAAP net income was $155 million, or $0.29 per share (diluted), for the third quarter of fiscal 2015***, compared with non-GAAP net income of $181 million, or $0.34 per share (diluted), for the second quarter of fiscal 2015 and $163 million, or $0.32 per share (diluted), for the third quarter of fiscal 2014.

\*   \*   \*

***GAAP gross margin for the third quarter of fiscal 2015 was 51.1 percent***, compared to 50.3 percent for the second quarter of fiscal 2015 and 50.1 percent for the third quarter of fiscal 2014.

Non-GAAP gross margin for the third quarter of fiscal 2015 was 51.0 percent, compared to 50.6 percent for the second quarter of fiscal 2015 and 50.3 percent for the third quarter of fiscal 2014.

\*   \*   \*

Cash flow from operations for the third quarter of fiscal 2015 was $195 million, compared to the $157 million reported in the second quarter of fiscal 2015 and the $177 million reported in the third quarter of fiscal 2014.  Free cash flow for the third quarter of fiscal 2015 was $167 million, compared to the $137 million reported in the second quarter of fiscal 2015 and the $157 million reported in the third quarter of fiscal 2014.  Free cash flow as presented above is defined as cash flow from operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

26.     The net income, EPS and margin metrics reported by defendants were false and/or misleading as they were over stated as detailed in ¶¶83-111 *infra*, as a result of the Company's failure to properly record domestic sale royalties as a result of the CMU judgment.  These key financial metrics were further misleading as defendants failed to disclose that: net income, EPS and margin were being negatively impacted as a result of the domestic royalties subject to the CMU judgment as detailed in ¶¶83-111 *infra*.[5]

27.     As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the third quarter of fiscal 2015:

---

[5]     The reported revenue and EPS was also false and misleading for the reasons stated in ¶¶36-40 and 124-153 as the Company, after the filing of the Consolidated Complaint, disclosed that pull-in transactions also occurred in 3Q15.  The quantitative impact of the pull-in transactions on revenue and EPS is detailed in ¶130.

| EPS. (as reported) | $0.29 |
|---|---|
| EPS (adjusted for estimated current quarter domestic CMU royalties) | $0.20 |
| EPS (adjusted for estimated total domestic CMU royalties) | $(0.43) |

28.     As a result of the Company's failure to properly record the CMU royalties as outlined at ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for third quarter of fiscal 2015:

| Gross Margin (as reported) | 51.1% |
|---|---|
| Estimated royalties owed to CMU for domestic sales during the quarter | $10.5 million |
| Actual Gross Margin | 50.0% |

29.     Defendants were aware, or reckless in not becoming aware, of the failure to properly record the CMU judgment and the resulting overstatements of critical financial metrics as judgment was entered against Marvell in the CMU patent litigation over six months prior to the start of the Class Period and the December 26, 2012 jury verdict relating to a $.50 per chip royalty on ***domestic sales*** was not reasonably likely to be impacted by the Company's appeal of the verdict as Marvell made ***no meaningful arguments*** against applying the royalty rate to chips that enter or entered the United States.  Not only did Marvell make no meaningful arguments against the domestic royalty which it ultimately paid, but the amicus brief filed by Google and other technology companies before the Federal Circuit actually assumed "that Marvell must pay Carnegie Mellon some reasonable royalty" for those chips sold domestically.  Thus, defendants knew, or were reckless in not knowing, prior to the start of the Class Period that it was probable that the royalty award would be applied to at least all domestic transactions.  Defendants' failure to timely reserve for this likelihood and failure to record royalty expenses violated GAAP for the reasons stated in ¶¶83-111 *infra*.

30.     On December 4, 2014, Marvell filed its Quarterly Report with the SEC on Form 10-Q for the third quarter of fiscal 2015 ended November 1, 2014.  The Company's Form 10-Q was signed by defendant Rashkin, and reaffirmed the Company's statements in the press release on November

20, 2014.  The Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Sutardja and Rashkin, who certified the following:

> 1.  I have reviewed this Quarterly Report on Form 10-Q of Marvell Technology Group, Ltd.;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.  The registrant's other certifying officer[(s)] and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5.  The registrant's other certifying officer[(s)] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):
>
>> a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31.  Sutardja and Rashkin's certifications were false and misleading as: (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3) Marvell lacked a well-structured process to establish significant and judgmental reserves associated with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting from the CMU judgment; and (5) the defendants had not established and maintained adequate internal controls at all relevant times.

32.  On February 19, 2015, Marvell issued a press release entitled, "Marvell Technology Group Ltd. Reports Fourth Fiscal Quarter and Fiscal Year 2015 Financial Results."  Therein, the Company, in relevant part, stated:

**Key Fourth Quarter of Fiscal 2015 and Fiscal Year 2015 Financial Highlights**

- ***Revenue: Q4 FY 2015, $857 Million; FY 2015, $3.7 Billion***

- ***GAAP Net Income: Q4 FY 2015, $82 Million; FY 2015, $435 Million***

- GAAP Diluted EPS: Q4 FY 2015, $0.16; FY 2015, $0.84

- Non-GAAP Net Income: Q4 FY 2015, $131 Million; FY 2015, $611 Million

- ***Non-GAAP Diluted EPS: Q4 FY 2015, $0.25; FY 2015, $1.15***

- Free Cash Flow: Q4 FY 2015, $135 Million; FY 2015, $650 Million

*              *              *

**Fourth Quarter of Fiscal 2015 and Fiscal Year 2015 Summary**

***Revenue for the fourth quarter of fiscal 2015 was $857 million***, down approximately 8 percent from $930 million in the third quarter of fiscal 2015, ended November 1, 2014, and down approximately 8 percent from $932 million in the fourth quarter of fiscal 2014, ended February 1, 2014.

For the fiscal year ended January 31, 2015, revenue was $3.7 billion, an increase of 9 percent from revenue of $3.4 billion for the fiscal year ended February 1, 2014.

GAAP net income for the fourth quarter of fiscal 2015 was $82 million, or $0.16 per share (diluted), compared with GAAP net income of $115 million, or $0.22

per share (diluted), for the third quarter of fiscal 2015, and $97 million, or $0.19 per share (diluted), for the fourth quarter of fiscal 2014.

For the fiscal year ended January 31, 2015, GAAP net income was $435 million, or $0.84 per share (diluted), compared with GAAP net income of $315 million, or $0.63 per share (diluted), for the fiscal year ended February 1, 2014.

***Non-GAAP net income was $131 million, or $0.25 per share (diluted)***, for the fourth quarter of fiscal 2015, compared with non-GAAP net income of $155 million, or $0.29 per share (diluted), for the third quarter of fiscal 2015 and $151 million, or $0.29 per share (diluted), for the fourth quarter of fiscal 2014.

For the fiscal year ended January 31, 2015, non-GAAP net income was $611 million, or $1.15 per share (diluted), compared with non-GAAP net income of $530 million, or $1.02 per share (diluted) for the fiscal year ended February 1, 2014.

\*     \*     \*

***GAAP gross margin for the fourth quarter of fiscal 2015 was 51.4 percent, compared to 51.1 percent for the third quarter of fiscal 2015 and 48.8 percent for the fourth quarter of fiscal 2014.  GAAP gross margin for fiscal year 2015 was 50.3 percent as compared to 51.1 percent in fiscal year 2014***.

Non-GAAP gross margin for the fourth quarter of fiscal 2015 was 51.8 percent, compared to 51.0 percent for the third quarter of fiscal 2015 and 50.1 percent for the fourth quarter of fiscal 2014.  Non GAAP gross margin for fiscal year 2015 was as 50.5 percent compared to 51.8 percent in fiscal year 2014.

Cash flow from operations for the fourth quarter of fiscal 2015 was $155 million, compared to the $195 million reported in the third quarter of fiscal 2015 and the $100 million reported in the fourth quarter of fiscal 2014.  Cash flow from operations for fiscal year 2015 was $742 million, compared to $448 million in fiscal year 2014.  Free cash flow for the fourth quarter of fiscal 2015 was $135 million, compared to the $167 million reported in the third quarter of fiscal 2015 and the $82 million reported in the fourth quarter of fiscal 2014.  Free cash flow for fiscal year 2015 was $650 million, compared to $356 million in fiscal year 2014.  Free cash flow as presented above is defined as cash flow from operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

33.     The net income, EPS, revenue and margin metrics reported by defendants were false and/or misleading as they were overstated as a result of:  (1) improper pull-in transactions that should have been booked in the subsequent quarter; and (2) the Company's failure to properly record domestic sale royalties as a result of the CMU judgment.  *See* ¶¶63-111 *infra*.

34.     Marvell's key financial metrics were also misleading as defendants failed to disclose that: (1) pull-in transactions were utilized to prematurely generate revenue in order to meet revenue targets and the subsequent quarter would be negatively impacted as a result, as detailed in ¶¶63-82

1   *infra*; and (2) net income, EPS and margin were being materially impacted as a result of the

2   domestic royalties subject to the CMU judgment as described in ¶¶83-111 *infra*.

3       35.    Defendants falsely stated that "*[r]evenue for the fourth quarter of fiscal 2015 was*

4   *$857 million*."

5       36.    The reported revenue figure was false and/or misleading and violated GAAP as it

6   included improper pull-in transactions that were not organic to the quarter as the Company borrowed

7   future period sales in order to meet current quarter analyst expectations.  As a result, Marvell

8   improperly, and in violation of GAAP and SEC disclosure rules, recognized revenue in this quarter

9   from transactions that would have, in the normal course of events and but for action by Marvell

10  employees, been completed and recognized in a subsequent quarter.  Marvell has admitted that

11  revenue related to pull-in transactions and distributor transactions was recognized prematurely as a

12  result of "significant pressure" from senior management on sales and finance personnel to meet

13  revenue targets as well as failures in the Company's internal controls including senior management's

14  failure to set an appropriate "tone at the top."

15      37.    As a result of these improper pull-in transactions, Marvell's reported revenue was

16  overstated and/or further disclosure was required as the reported revenue was the direct result of

17  improper earnings management which hid the Company's true performance.  The Company's

18  internal investigation conducted by the Audit Committee, counsel and a forensic accounting

19  specialist concluded that revenue from pull-in transactions was recognized prematurely as a result of

20  the extension of payment terms beyond Marvell's customary terms.  Such premature revenue

21  recognition violated GAAP and SEC disclosure rules for the reasons stated in ¶¶63-82 *infra*.  These

22  transactions are also currently under investigation by the U.S. Attorney's Office and the SEC.

23      38.    Defendants were aware of or reckless in not becoming aware of the improper pull-in

24  transactions as senior management applied "significant pressure" on sales and finance personnel to

25  meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a

26  result of these improper pull-in transactions.  Sutardja and his wife, Weili Dai ("Dai") ran the

27  Company as if it were a family owned Company, not a public Company, controlling all important

28  aspects of the business.  The pressure and control exerted by senior management set an improper

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA        - 13 -

"tone at the top" that resulted in premature recognition of revenue as a result of improper pull-in transactions.

39.     Marvell's corporate culture was top down.  All important decisions were made from the top of the Company.  Defendant Sutardja was a micro manager and had his fingers in everything.  He left little room for mid-level managers to make decisions.  There was pressure from senior management to do what needed to be done in order to meet numbers.  This ultimately included a push to get revenue, which resulted in the use of extended payment terms to pull-in revenue from the subsequent quarter in order to meet revenue targets.

40.     Approximately 50% of Marvell's sales were made to three customers and one distributor, who were taken care of personally by Marvell co-founder and Sutardja's wife, Dai.

41.     As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the fourth quarter of fiscal 2015:

| EPS (as reported) | $0.25 |
|---|---|
| EPS (adjusted for estimated current quarter domestic CMU royalties) | $0.14 |
| EPS (adjusted for estimated total domestic CMU patent royalties) | $(0.52) |

42.     As a result of the Company's failure to properly record the CMU royalties as outlined in ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for the fourth quarter of fiscal 2015:

| Gross Margin (as reported) | 51.4% |
|---|---|
| Estimated royalties owed to CMU for domestic sales during the quarter | $10.5 million |
| Actual Gross Margin | 50.1% |

43.     Defendants were aware or reckless in not becoming aware, of the failure to properly record the CMU royalties and the resulting overstatements of critical financial metrics for the reasons stated in ¶¶29, 83-111 *infra*.

44.     On March 26, 2015, Marvell filed its Annual Report with the SEC on Form 10-K for the 2015 fiscal year ended January 31, 2015.  The Company's Form 10-K was signed by defendants

1    Sutardja and Rashkin, and reaffirmed the Company's statements previously announced on
2    February 19, 2015.

3         45.    Marvell's Form 10-K for the year ended January 31, 2015 included the following
4    "Management's Report on Internal Control Over Financial Reporting":

> Based on our evaluation, management has concluded that ***we maintained effective***
> ***internal control over financial reporting*** as of January 31, 2015 based on the COSO
> criteria.

7         46.    Regarding "Management's Evaluation of Disclosure Controls and Procedures," the
8    Company stated:

> Our management, with the participation of our principal executive officer and
> principal financial officer, has evaluated the effectiveness of our disclosure controls
> and procedures (as defined in Rule 13a-15(e) of the Exchange Act) as of January 31,
> 2015.  Disclosure controls and procedures are designed to ensure that information
> required to be disclosed is recorded, processed, summarized and reported within the
> time periods specified in the rules and forms of the SEC and that such information is
> accumulated and communicated to management, including our principal executive
> officer and principal financial officer, as appropriate, to allow timely decisions
> regarding required disclosure.  Based on this evaluation, our principal executive
> officer and principal financial officer concluded that, as of January 31, 2015, our
> disclosure controls and procedures were effective.

15        47.    The Form 10-K also contained SOX Certifications signed by defendants Sutardja and
16   Rashkin, who certified the following:

> 1.  I have reviewed this Annual Report on Form 10-K of Marvell Technology
> Group Ltd.;
>
> 2.  Based on my knowledge, this report does not contain any untrue statement
> of a material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the financial
> condition, results of operations and cash flows of the registrant as of, and for, the
> periods presented in this report;
>
> 4.  The registrant's other certifying officer and I are responsible for
> establishing and maintaining disclosure controls and procedures (as defined in
> Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
> reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
> registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such
> disclosure controls and procedures to be designed under our supervision, to ensure
> that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.   Sutardja and Rashkin's certifications were false and misleading as: (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3) Marvell lacked a well-structured process to establish significant and judgmental reserves associated with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting from the CMU judgment; (5) the defendants had not established and maintained adequate internal controls at all relevant times; (6) the Company had engaged in inappropriate pull-in transactions; (7) the Company's senior management encouraged a closed and ineffective control environment essentially running the Company as if it were their own privately owned Company; (8) the

1   Company's key financial metrics were false and/or misleading; and (9) revenue was prematurely

2   recognized in violation of GAAP.

3       49.   On May 21, 2015, Marvell issued a press release entitled, "Marvell Technology

4   Group Ltd. Reports First Quarter of Fiscal 2016 Financial Results."   Therein, the Company, in

5   relevant part, stated:

6   **Key First Quarter of Fiscal 2016 Financial Highlights**

7   • ***Revenue: Q1 FY 2016, $724 Million***

8   • GAAP Net Income: Q1 FY 2016, $14 Million

9   • GAAP Diluted EPS: Q1 FY 2016, $0.03

10  • Non-GAAP Net Income: Q1 FY 2016, $71 Million

11  • ***Non-GAAP Diluted EPS: Q1 FY 2016, $0.13***

12  • Free Cash Flow: Q1 FY 2016, $44 Million

13                          *       *       *

14  **First Quarter of Fiscal 2016**

15  ***Revenue for the first quarter of fiscal 2016 was $724 million***, down
    approximately 16 percent from $857 million in the fourth quarter of fiscal 2015,
16  ended January 31, 2015, and down approximately 24 percent from $958 million in
    the first quarter of fiscal 2015, ended May 3, 2014.
17
    GAAP net income for the first quarter of fiscal 2016 was $14 million, or
18  $0.03 per share (diluted), compared with GAAP net income of $82 million, or $0.16
    per share (diluted), for the fourth quarter of fiscal 2015, and $99 million, or $0.19 per
19  share (diluted), for the first quarter of fiscal 2015.

20  Non-GAAP net income was $71 million, or $0.13 per share (diluted), for the first
    quarter of fiscal 2016, compared with non-GAAP net income of $131 million, or
21  $0.25 per share (diluted), for the fourth quarter of fiscal 2015 and $144 million, or
    $0.27 per share (diluted), for the first quarter of fiscal 2015.
22
                            *       *       *
23
    ***GAAP gross margin for the first quarter of fiscal 2016 was 51.5 percent,***
24  ***compared to 51.4 percent for the fourth quarter of fiscal 2015 and 48.4 percent for***
    ***the first quarter of fiscal 2015***.
25
    Non-GAAP gross margin for the first quarter of fiscal 2016 was 51.6 percent,
26  compared to 51.8 percent for the fourth quarter of fiscal 2015 and 48.8 percent for
    the first quarter of fiscal 2015.
27
    Cash flow from operations for the first quarter of fiscal 2016 was $59 million,
28  compared to the $142 million reported in the fourth quarter of fiscal 2015 and the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                    - 17 -

$235 million reported in the first quarter of fiscal 2015. Free cash flow for the first quarter of fiscal 2016 was $44 million, compared to the $121 million reported in the fourth quarter of fiscal 2015 and the $211 million reported in the first quarter of fiscal 2015. Free cash flow as presented above is defined as cash flow from operations, less capital expenditures and purchases of technology licenses reported under investing and financing activities in the consolidated statement of cash flows.

50.   Defendants falsely stated that "*[r]evenue for the first quarter of fiscal 2016 was $724 million*."

51.   The reported revenue figure was false and/or misleading and violated GAAP and SEC disclosure rules as it included improper pull-in transactions that were not organic to the quarter as the Company borrowed future period sales in order to meet current quarter analyst expectations. As a result, Marvell improperly, and in violation of GAAP and SEC disclosure rules, recognized revenue in this quarter from transactions that would have, in the normal course of events and but for action by Marvell employees, been completed and recognized in a subsequent quarter. Marvell has admitted that revenue related to pull-in transactions and distributor transactions was recognized prematurely as a result of "significant pressure" from senior management on sales and finance personnel to meet revenue targets as well as failures in the Company's internal controls including senior management's failure to set an appropriate "tone at the top."

52.   As a result of these improper pull-in transactions Marvell's reported revenue was overstated and/or further disclosure was required as the reported revenue was the direct result of improper earnings management which hid the Company's true performance. The Company's internal investigation conducted by the Audit Committee, counsel and a forensic accounting specialist concluded that revenue from pull-in transactions was recognized prematurely as a result of the extension of payment terms beyond Marvell's customary terms. Such transactions violated GAAP and SEC disclosure rules for the reasons stated in ¶¶63-82 *infra*. These transactions are also currently under investigation by the U.S. Attorney's Office and the SEC.

53.   Defendants were aware of or reckless in not becoming aware of the improper pull-in transactions as senior management applied "significant pressure" on sales and finance personnel to meet revenue targets and this pressure resulted in Marvell prematurely recognizing revenue as a result of these improper pull-in transactions. Sutardja and Dai ran the Company as if it were a

1  family owned Company, not a public Company, controlling all important aspects of the business.

2  The pressure and control exerted by senior management set an improper "tone at the top" that

3  resulted in premature recognition of revenue as a result of improper pull-in transactions.

4         54.    Marvell's corporate culture was top down.  All important decisions were made from

5  the top of the Company.  Defendant Sutardja was a micro manager and had his fingers in

6  everything.  He left little room for mid-level managers to make decisions.  There was pressure from

7  senior management to do what needs to be done in order to meet numbers.  This ultimately included

8  a push to get revenue, which resulted in the use of extended payment terms to pull-in revenue from

9  the subsequent quarter in order to meet revenue targets.

10        55.    Approximately 50% of Marvell's sales were made to three customers and one

11 distributor, who were taken care of personally by Marvell co-founder and defendant Sutardja's wife,

12 Dai.

13        56.    As a result of the Company's failure to properly record the CMU royalties as outlined

14 in ¶¶83-111 *infra*, Marvell's EPS was overstated as follows for the first quarter of fiscal 2016:

| EPS (as reported) | $0.13 |
|---|---|
| EPS (adjusting for estimated current quarter CMU domestic royalties) | $0.01 |
| EPS (adjusted for estimated total domestic CMU royalties) | $(0.65) |

19        57.    As a result of the Company's failure to properly record the CMU royalties as outlined

20 in ¶¶83-111 *infra*, Marvell's gross margins were overstated as follows for first quarter of fiscal 2016:

| Gross Margin (as reported) | 51.5% |
|---|---|
| Estimated royalties owed to CMU for domestic sales during the quarter | $10.5 million |
| Actual Gross Margin | 50.1% |

24        58.    Defendants were aware, or reckless in not becoming aware, of the failure to properly

25 record the CMU royalties and the resulting overstatements of critical financial metrics for the

26 reasons stated in ¶¶29, 83-111 *infra*.

27

28

1    59.    In a separate press release also dated May 21, 2015, the Company announced that

2  defendant Rashkin, Marvell's Interim CFO for the past 17 months was retiring, effective at the close

3  of the day.  Marvell had only removed Rashkin's "Interim" title on February 21, 2014.  When

4  defendant Rashkin took over as Interim CFO in December 2013, he replaced another Interim CFO,

5  Brad Feller, who only served in that position for just over a year, between October 2012 and

6  December 2013.  When Marvell announced in May 2015 that the Company would have their third

7  Interim CFO in less than three years, this news caused some trepidation among analysts  who voiced

8  concern "that in the past five years MRVL has seen four different CFOs."

9    60.    On June 4, 2015, Marvell filed its Quarterly Report with the SEC on Form 10-Q for

10  the first quarter of fiscal 2016 ended May 2, 2015.  The Company's Form 10-Q was signed by

11  defendant Nagesh, and reaffirmed the Company's statements previously announced on May 21,

12  2015.  Regarding "Management's Evaluation of Disclosure Controls and Procedures," the Company

13  stated:

14        Our management, with the participation of our Chief Executive Officer and
        our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls
15      and procedures (as defined in Rule 13a-15(e) of the Exchange Act).  Our disclosure
        controls and procedures are designed to ensure that information required to be
16      disclosed is recorded, processed, summarized and reported within the time periods
        specified in the rules and forms of the Securities and Exchange Commission and that
17      such information is accumulated and communicated to management, including the
        Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely
18      decisions regarding required disclosure.  Based on this evaluation, our Chief
        Executive Officer and Chief Financial Officer concluded that, as of May 2, 2015, our
19      disclosure controls and procedures were effective.

20    61.    The Form 10-Q also contained SOX Certifications signed by defendants Sutardja and

21  Nagesh, who certified the following:

22        1.    I have reviewed this Quarterly Report on Form 10-Q of Marvell
        Technology Group Ltd.;
23
        2.  Based on my knowledge, this report does not contain any untrue statement
24      of a material fact or omit to state a material fact necessary to make the statements
        made, in light of the circumstances under which such statements were made, not
25      misleading with respect to the period covered by this report;

26        3.  Based on my knowledge, the financial statements, and other financial
        information included in this report, fairly present in all material respects the financial
27      condition, results of operations and cash flows of the registrant as of, and for, the
        periods presented in this report;

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                          - 20 -

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit Committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

62.   The above statements were false and misleading and defendants failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose:  (1) defendants failed to set an appropriate "tone at the top" for an effective control environment; (2) the Company's controls were inadequate as they allowed Marvell's CEO and Chairman Sutardja to falsely assert that he owned the patent applications and FLC invention that was in fact owned by Marvell; (3)

1    Marvell lacked a well-structured process to establish significant and judgmental reserves associated

2    with litigation and royalties; (4) the Company failed to properly record domestic royalties resulting

3    from the CMU judgment; (5) the defendants had not established and maintained adequate internal

4    controls at all relevant times; (6) the Company had engaged in inappropriate pull-in transactions; (7)

5    the Company's senior management encouraged a closed and ineffective control environment

6    essentially running the Company as if it were their own privately owned Company; (8) the

7    Company's key financial metrics were false and/or misleading; and (9) revenue was prematurely

8    recognized in violation of GAAP.

### MARVELL FAILED TO PROPERLY ACCOUNT FOR "PULL-IN" REVENUE TRANSACTIONS

63.    During the Class Period, Marvell improperly reported revenue.  This included (1) recognizing revenue in violation of GAAP on certain pull-in and distributor transactions; and (2) failing to disclose the impact of "pull-in" revenue transactions in violation of GAAP and SEC disclosure rules.

**Marvell Improperly Recognized Revenue in Violation of GAAP**

64.    On March 1, 2016, Marvell revealed that during the Class Period, "***revenue from certain pull-in and distributor transactions was recognized prematurely***"  in violation of GAAP and Marvell's own revenue recognition policy.  More specifically, Marvell's Audit Committee investigation identified a number of Class Period transactions involving extended payment terms beyond Marvell's customary terms.

65.    GAAP relevant to revenue recognition are found in the Financial Accounting Standards Board Accounting Standards Codification Topic 605, *Revenue Recognition* ("ASC 605").  According to GAAP, and revenue recognition guidance from SEC Staff Accounting Bulletin No. 104 ("SAB 104"), revenue may only be recognized when all of the following criteria are met:

(a)    "Persuasive evidence of an arrangement exists";

(b)    "Delivery has occurred or services have been rendered";

(c)    "The seller's price to the buyer is fixed or determinable"; and

(d)    "Collectability is reasonably assured."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                           - 22 -

66.     Extended payment terms affect the third revenue recognition requirement: "*[t]he seller's price to the buyer is fixed or determinable.*"  In arrangements with extended payment terms, the seller may be more likely to provide refunds or other types of sales concessions to the customer, or the customer may be more likely to renegotiate payment terms (*e.g.*, because the product's value has diminished as a result of technological obsolescence).  It may therefore be less likely that the vendor will collect the full payment stipulated in the payment terms.  Thus, the arrangement fee may not be fixed or determinable.

67.     Extended payment terms also affect the fourth revenue recognition requirement: "*[c]ollectability is reasonably assured.*"  Under GAAP, the evaluation of collectability focuses both on whether the customer has the intent and ability to pay (*i.e.*, creditworthiness) and on whether the fee is deemed fixed or determinable.  For example, in an arrangement with extended payment terms and the potential for technological obsolescence, the fee may be renegotiated, potentially resulting in nonpayment of all or part of the fee by the customer.  The customer may be willing and able to pay, however collectability is not reasonably assured.

68.     For the distributor transactions identified by the Audit Committee investigation, the extended payment terms were even more problematic.  Under GAAP, payment terms that are extended until the products are resold by the distributor to end-user customers indicate the existence of a consignment sale.  SAB 104 clearly states: "consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs."

**Marvell Failed to Properly Disclose "Pull-In" Revenue Transactions**

69.     In addition to the improper revenue transactions described above, Marvell recorded additional "pull-in" revenue transactions during the Class Period.  Marvell described its pull-in transactions as follows:

> *[C]ertain revenue recognized in the first and second quarters of fiscal 2016 and the fourth quarter of fiscal 2015, including transactions that would have, in the normal course of events and but for action by Marvell employees, been completed and recognized in a subsequent quarter (referred to internally as "pull-ins").*

1    These transactions were required to be disclosed under GAAP and SEC disclosure rules.  The

2    premature recognition of sales that would have otherwise been recognized in a subsequent period is

3    commonly referred to as "channel stuffing."  The SEC has defined channel stuffing as follows:

4          *[T]he pulling forward of revenue from future fiscal periods by inducing customers
           – through price discounts, extended payment terms or other concession –  to
5          submit purchase orders in advance of when they would otherwise do so.*[6]

6          70.     The SEC affirmed this position when it filed claims of earnings management against

7    the Sunbeam Corporation ("Sunbeam").  The SEC specifically cited that Sunbeam's "undisclosed or

8    inadequately disclosed acceleration of sales through 'channel stuffing'. . . materially distorted the

9    Company's reported results of operations."[7]

10         71.     Subsequent speeches made by SEC staff further support these requirements.  Former

11   Chief Accountant with the SEC, Lynn Turner, noted the following in 2001:

12         The *Sunbeam* case highlights . . . ***channel stuffing*** abuses, among others and
           sends a message to registrants and their auditors – the SEC will aggressively attack
13         fraudulent revenue recognition practices. . . .  Sunbeam failed to disclose that it
           offered discounts and other inducements to customers to sell merchandise
14         immediately that otherwise would have been sold in later periods, which threatened
           to depress Sunbeam's future results of operations.  [SAB 104] notes that disclosure in
15         [("MD&A") Management's Discussion & Analysis of Financial Condition] is
           required of shipments of product at the end of a reporting period that significantly
16         reduce customer backlog and that reasonably might be expected to result in lower
           shipments and revenue in the next period.
17
18         MD&A disclosures also are required of the impact of granting extended
           payment terms to customers that will result in a longer collection period for accounts
19         receivable and, thus, slower cash inflows from operations, ultimately impacting a
           registrant's liquidity and capital resources.[8]

20         72.     Similar to Sunbeam, Marvell failed to disclose its practice of channel stuffing at

21   quarter-ends and the impact of those sales on its current period results and future financial results.

22   By failing to make required disclosures in accordance with GAAP and SEC disclosure rules,

23   Marvell's Class Period financial statements were materially misstated.  At a minimum, Marvell was

24

25   _____

     [6]   *In re Sunbeam Corp.*, File No. 3-10482, SEC Order Instituting Public Administrative
26   Proceedings (May 15, 2001).

27   [7]   *Id.*

28   [8]   Lynn Turner, SEC Chief Accountant, Speech: *Revenue Recognition*, May 31, 2001.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                          - 24 -

1    required to disclose its channel stuffing as well as its impact on Marvell's revenues during the Class

2    Period.[9]

3    **The Impact of Channel Stuffing on
     Marvell's Quarterly Revenue**

4

5           73.     During the Class Period, Marvell stressed the quarterly revenue of its most important

6    business – the "Storage" market and, more specifically, the HDD business within the Storage

     market. [10]  For example:

7

8    •    "Key Highlights from FQ3' 2015 Results . . . Revenue of $930M . . . ***Storage grew
          in-line with expectations***";

9    •    "***Overall Storage revenue grew 3% q/q and increased 5% y/y . . . HDD grew q/q***";

10   •    "Key Highlights from FY2015 Results . . . FY15 revenue of $3.7B, up 9% over
          FY14 . . . ***Steady growth in storage*** on HDD stabilization"; and

11

12   •    "***Overall Storage revenue grew 4%*** over FY14 . . . ***Steady HDD unit growth***."

13          74.     Unbeknownst to investors, Marvell used channel stuffing to artificially inflate the

14   quarterly revenue results in its Storage market.  During the Class Period, as much as 8% of its

15   quarterly revenue was the result of channel stuffing.  Without the artificial boost from channel

16   stuffing, Marvell would have been forced to disclose significantly lower revenues in its Storage

17   market.

18          75.     In addition to artificially inflating its quarterly revenue, Marvell also used channel

19   stuffing to conceal softening demand in its most important business (*i.e.*, the HDD segment of the

20   Storage market).  Marvell eventually disclosed that the amount of revenue pulled in

21          represents an increase over the prior four quarters and is ***indicative of softening
            demand for certain of the Company's products***.  This was particularly the case in

22

23   ---
     [9]    Marvell was also required to disclose the impact of revenue transactions involving extended

24   payment terms.  SAB 104 sets forth specific examples of revenue-related transactions that the SEC
     requires to be disclosed including "***[g]ranting of extended payment terms that will result in a
     longer collection period for accounts receivable (regardless of whether revenue has been
     recognized) and slower cash inflows from operations, and the effect on liquidity and capital***

25   ***resources***."

26   [10]   During the Class Period, Marvell had three primary markets: Mobile and Wireless, Storage, and
     Networking.  The Storage market was by far the largest market – making up 47% of the Company's

27   net revenue in the year ended January 2015.  Within the Storage market, there were two primary
     segments: Hard Disk Drive Controllers ("HDD") and Solid-State Drive Controllers ("SDD").

28

the **storage end market** where, as a result of a weaker global economy and a slow-down in the PC market, the Company saw **weaker than expected demand for HDD** products as the overall total available market declined.

76.     Within SAB 104, the SEC staff provided specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenue:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.

77.     The SEC has provided a relevant example of a required MD&A disclosure in light of a changing sales trend:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should **not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable.**  The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.[11]

78.     This SEC guidance is clear: Marvell was required to disclose the underlying reasons behind its change in quarterly revenue.  Instead, defendants concealed the fact that Marvell had used channel stuffing to artificially inflate sales and to conceal softening demand in its most important business segment.

**The Impact of Channel Stuffing
on Future Results**

79.     In addition to the impact on reported quarterly revenues, Marvell was required to disclose the impact of channel stuffing on its future financial results.  As described above, defendants routinely used channel stuffing to prop up quarterly revenue by "pulling" or borrowing revenue from future quarters.  Clearly, this practice had a material impact on Marvell's future revenues.[12]  Marvell has since acknowledged this impact: "[Approximately $53 million]of revenue

---

[11]    SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective Date: December 29, 2003.

[12]    Marvell attempted to conceal the impact on a future quarter by repeating the practice at the end of each quarter (*e.g.*, at the second quarter Marvell made up for the second quarter revenue that had been artificially pulled into the first quarter by repeating the practice and artificially pulling the third

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                    - 26 -

1    recognized in the . . . second quarter of fiscal 2016 that, based upon the original customer request

2    date, ***would have been received and earned in the third quarter of fiscal 2016 and is now no longer***

3    ***available for receipt in that quarter*** . . . the amount of 'pull-ins' has had an impact on the revenue

4    attributable to each such quarter."

5        80.    Within SAB 104, the SEC staff also provided the following specific examples of

6    required disclosures pertaining to the Company's recognition of revenue:

7        Shipments of product at the end of a reporting period that significantly reduce
         customer backlog and that ***reasonably might be expected to result in lower***
8        ***shipments and revenue in the next period***.[13]

9        81.    The significant financial impact of channel stuffing on Marvell's future financial

10   results is precisely the type of information required to be disclosed under the SEC's MD&A rules.

11   For example:

12       MD&A must specifically focus on known material events and uncertainties that
         would cause reported financial information ***not to be necessarily indicative of future***
13       ***operating performance*** or of future financial condition.

14                                  *        *        *

15       One of the principal objectives of MD&A is to provide information about the
         quality and potential variability of a company's earnings and cash flow, so that
16       readers can ascertain the ***likelihood that past performance is indicative of future***
         ***performance***.[14]

17
         82.    By "pulling-in" or "borrowing" revenue from future quarters, Marvell was aware that
18
     revenue in subsequent quarters would be adversely impacted.  As a result, Marvell was required to
19
     warn investors that its reported revenue was not indicative of future revenue.
20

21

22

23

24   _____
     quarter revenue into the second quarter).  However the practice of channel stuffing is unsustainable
25   and will eventually impact future revenues.

26   [13]   SAB 104, Topic 13.B.

27   [14]   SEC Interpretation: *Commission Guidance Regarding Management's Discussion and Analysis of
     Financial Condition and Results of Operations* (Release Nos. 33-8350; 34-48960; FR-72), Effective
28   Date: December 29, 2003.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                    - 27 -

## MARVELL FAILED TO PROPERLY ACCOUNT
## FOR THE CMU PATENT LITIGATION

**Loss Contingencies**

83.     As described above, despite a jury verdict in December 2012 that awarded CMU a judgment in excess of $1 billion for Marvell's infringement of CMU's patents, Marvell assured investors that a material loss resulting from the litigation was not "probable."  Marvell made this disclosure in the footnotes to its Class Period financial statements which defendants certified had been prepared in accordance with U.S. GAAP.  Accordingly, Marvell's accounting for the CMU patent litigation and the related disclosures were required to comply with GAAP rules covering the accounting for loss contingencies, namely FASB Accounting Standards Codification 450, *Contingencies* ("ASC 450").

84.     ASC 450, as well as related SEC guidance, addresses the establishment of reserves and/or disclosures associated with loss contingencies such as adverse outcome of litigation. Specifically, ASC 450 states ***an accrual for a loss contingency (i.e., a reserve) must be made when both of the following conditions are met***:

> (a)     ***Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss***; and

> (b)     ***The amount of loss is reasonably estimable***.

**Evaluating the CMU Patent Judgment**
**as a Loss Contingency Under GAAP**

85.     In evaluating the CMU patent litigation as a loss contingency under GAAP, it was inappropriate to consider the entire $1 billion judgment as a single item.  While the infringement was uniform on Marvell's sales of affected products across all geographies, the damages award, and therefore the judgment itself, was based on two entirely distinct geographic circumstances.  A significant portion of the CMU patent judgment related to royalties on sales of chips that were ***imported into the United States for use in the United States*** while the remainder of the judgment related to royalties on chips that were ***manufactured, sold, and used abroad without ever entering***

1  *the United States*.  This distinction was evident at all phases of the case – from the testimony of

2  experts in the trial, to the arguments raised by Marvell on appeal, and to the eventual opinion issued

3  by the Federal Circuit Court of Appeals.

4        86.        The same geographical distinction was required in assessing the CMU Patent

5  litigation as loss contingency under ASC 450.  As described in further detail below, defendants were

6  aware during the Class Period that an adverse outcome on the U.S. portion of the judgment was

7  *probable* (*i.e.*, the Court of Appeals would not reverse the District Court judgment) and defendants

8  had the ability to *precisely estimate* the amount of damages attributable to the U.S. portion of the

9  CMU patent judgment.  Because the loss contingency for the U.S. portion of the CMU patent

10  judgment was both *probable* and *reasonably estimable*, Marvell was required under GAAP to record

11  a loss reserve in its Class Period financial statements.

12  **Marvell's Class Period Disclosures**
   **Violated GAAP**

13

14        87.        During the Class Period, Marvell's disclosure of the CMU patent litigation failed to

15  acknowledge the distinct differences in the loss contingency described above.  Instead, Marvell

16  disclosed only (1) the *total* judgment for past royalties calculated based on *total worldwide sales* of

17  infringing products and (2) the *total* amount of post-judgment ongoing royalties calculated based on

18  *total post-judgment worldwide sales* of infringing products.  Marvell disclosed only the purportedly

19  low probability of loss associated with those particular amounts (*i.e.*, the probability that Marvell

20  would be forced to pay the *entire* past damages award exceeding $1.5 billion and *entire* amount of

21  ongoing post-judgment royalties of $400 million).  In doing so, Marvell's disclosure failed to inform

22  investors of the true nature and scope of the loss contingencies that Marvell faced related to the

23  CMU patent litigation.  In particular, Marvell concealed the most probable loss exposure it faced: a

24  final judgment for damages associated with royalties on sales of infringing products imported into

25  the United States.  Likewise, by only disclosing the post-judgment ongoing royalties calculated

26  based on total worldwide sales each quarter (and not breaking out the portion of those ongoing

27  royalties that were subject to the U.S. portion of the CMU patent judgment), Marvell concealed its

28

1    true margins and profitability on recurring sales.  *See* ¶97 *infra* for further discussion of Marvell's

2    overstated gross margins.

3        88.    On September 11, 2015, Marvell disclosed a "***litigation accrual of approximately***

4    ***$394 million recognized by the Company under ASC Topic 450, 'Contingencies,' in connection***

5    ***with the Carnegie Mellon University and certain other pending litigation***."  This loss contingency,

6    relating to the U.S. portion of the CMU patent judgment had not been previously disclosed or

7    accrued.  As reinforced by the SEC,  the accrual  of a material loss contingency should not be the

8    first disclosure of that contingency.[15]  Marvell has also since disclosed that the Audit Committee was

9    investigating deficiencies in internal controls that allowed the litigation accrual to have not been

10   previously accrued:

11       •    "The Audit Committee is also reviewing certain aspects of the Company's internal
            control over financial reporting, including ***controls for the establishment of reserves***
12          ***for litigation*** . . . ."

13       •    "Marvell's Audit Committee is conducting an independent investigation of ***certain***
            ***accounting and internal control matters***.  The investigation generally includes a
14          review of certain revenue recognized in the first and second quarters of fiscal 2016
            and the fourth quarter of fiscal 2015, ***the accrual of a litigation reserve*** . . . .  The
15          Audit Committee is also reviewing ***disclosure concerning the foregoing matters and***
            ***related circumstances*** . . . ."
16

17       89.    Marvell was required under ASC 450 to have previously accrued a loss contingency

18   for the U.S. portion of the CMU patent judgment during the Class Period.  As detailed below, the

19   loss was (a) probable and (b) reasonably estimable.[16]

20

21

_____

22   [15]   Speech by SEC staff, *Remarks Before The 2004 AICPA National Conference on Current SEC
     *and Public Company Accounting Oversight Board* ("PCAOB") *Developments*, by Scott Taub on
23   December 6, 2004: "Given these requirements, the recording of a material accrual for a contingent
     liability related to an event that occurred several years before should not be the first disclosure
24   regarding that contingency.  Rather, disclosures regarding the nature of the contingency and the
     amounts at stake should, in most cases, have already been provided.  Disclosures should discuss the
25   nature  of  the  contingency  and  the  possible  range  of  losses  for  any  item  where  the  maximum
     reasonably possible loss is material.   Vague or overly broad disclosures that speak merely to
26   litigation, tax, or other risks in general, without providing any information about the specific kinds of
     loss contingencies being evaluated are not sufficient."

27   [16]   Alternatively, at the very minimum, the loss contingency for the U.S. portion of the CMU patent
28   judgment was required to be disclosed under GAAP.  *See* ¶96 *infra*.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                          - 30 -

**The U.S. Portion of the CMU
Patent Judgment Was "Probable"**

90.     Under GAAP, an assessment of the probability of a loss contingency incorporates an analysis of several factors.  Those factors are:

- The nature of the litigation, claim, or assessment;

- The progress of the case (including progress after the date of the financial statements but before those statements are issued);

- The strategy by the defendant to respond to the case; and

- The experience of the entity in similar cases and the experience of other entities in similar cases.

91.     Each of the factors presented above strongly indicated that a contingent loss associated with the U.S. portion of the CMU patent litigation was probable as judgment was entered against Marvell in the CMU patent litigation over six months prior to the start of the Class Period, and the jury verdict relating to a $.50 per chip royalty on domestic sales was not reasonably likely to be impacted by the Company's appeal of the December 26, 2012 jury verdict as Marvell made no meaningful arguments against applying the royalty rate to chips that enter or entered the United States.  Not only did Marvell make no meaningful arguments against the domestic royalty, but the amicus brief filed by Google and other technology companies before the Federal Circuit actually assumed "that Marvell must pay Carnegie Mellon some reasonable royalty" for those chips sold domestically.  Thus defendants knew prior to the start of the Class Period that it was probable that the royalty award would be applied to at least all domestic transactions.

92.     Marvell also monitored the experiences of other entities in similar patent litigations, especially as it related to the extraterritoriality issue.  One case in particular, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 900 (2014), was routinely mentioned by Marvell when responding to questions over the potential outcome of the CMU patent litigation.  *See, e.g.*, response to SEC FAQ dated April 30, 2013.  In *Power Integrations*, the court "***reduced the jury's damages award . . . to limit it to lost***

1   *domestic sales*."[17]   Based on the prior case law, there was clearly a low probability of having the

2   entire damages award reversed (*i.e.*, worldwide sales and U.S. sales).  As noted by the Court of

3   Appeals: "*we see no extraterritoriality bar to including within the royalty base those chips which*

4   *were imported into the United States for use in the United States.  Section 271(a) makes clear that*

5   *Congress meant to reach such 'import[ation]' and 'use[]' as domestic conduct*."[18]  It appears that

6   Marvell  acknowledged  this  fact  as  part  of  its  appeal*:*  "*Marvell  makes  no  meaningful*

7   *extraterritoriality argument against – and we see no problem with – applying the royalty rate to*

8   *chips that do enter the United States*."[19]

9   **The U.S. Portion of the CMU Patent**
    **Judgment Was "Reasonably Estimable"**

10

11          93.     As noted above, the second requirement under GAAP for the accrual of a contingent

12  loss is met when the loss is reasonably estimable.   There were two components of the loss

13  contingency associated with the U.S. portion of CMU patent judgment: (1) a lump sum for past

14  royalties on sales of infringing products that were imported into the United States through the date of

15  the jury's original damages award (December 12, 2012); and (2) an amount for ongoing royalties on

16  sales of infringing products imported into the United States starting January 15, 2013 (the date

17  ordered by the District Court as part of its final judgment) through the present date.  Both amounts,

18  totaling approximately $351 million at the start of the Class Period, were not only reasonably

19  estimable but, in fact, known by defendants.

20  **Past Royalties**

21          94.     Marvell's expert testimony at trial bifurcated the sales of infringing products into U.S.

22  sales and worldwide sales.  The jury's award of damages for past royalties was based on a specific

23  number of infringing chips sold worldwide which included a specific number of chips that were

24  [17]   *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd & Marvell Semiconductor, Inc.*, No. 2:09-cv-
    00290-NBF, Brief of *Amici Curiae* Broadcom Corporation, Aruba Networks, Inc., Dell Inc., Google
25  Inc., Hewlett-Packard Corporation, Limelight Networks, Inc., Microsoft Corporation, SAS Institute
    Inc., and XiLinx, Inc. Supporting Appellants on the Worldwide Damages Issue (Fed. Cir. Aug. 11,
26  2014) at 6.

27  [18]   *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1308 (Fed. Cir. 2015).

28  [19]   *Id.* at 1305.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                      - 32 -

imported into the U.S.  As described above, defendants also made numerous post-trial arguments on the issue of U.S. sales vs. worldwide sales in an attempt to reduce the damages owed pursuant to the judgment.  As such, defendants could easily estimate (and in fact had already calculated) the U.S. portion of the jury's original damages award of $1.17 billion.  In fact, the Court of Appeals relied on these exact same calculations in affirming the past royalties attributable to U.S. sales:

> ***Marvell-sold chips that, though made and delivered abroad, were imported into the United States, and we affirm the judgment to the extent of $278,406,045.50 in past royalties (50 cents for each of the 556,812,091 chips the jury could properly find were imported)***.

*Id.* at 1288.

**Ongoing Royalties**

95.    It is also clear that defendants could not only reasonably estimate the ongoing post-judgment royalties associated with the U.S. portion of the CMU patent judgment, but were in fact, actively tracking such amounts each quarter.  Following the original jury trial, the U.S. District Court ordered Marvell to track "ongoing royalties" covered by the judgment.[20]  Marvell publicly reported the ongoing royalties associated with total worldwide sales, but did not break out the amount attributable to royalties on sales of infringing products imported into the United States.[21]  The chart below is an estimate of such ongoing royalties during the Class Period:[22]

---

[20]    Marvell Form 10-K, Jan. 31, 2015: "***The Court has required us to report ongoing royalties under the current judgment.  Based on the royalty rate assessed by the District Court, such additional royalties for the period of time commencing on the date ordered by the District Court, January 15, 2013, through [present] could be as much as*** . . . ."

[21]    *Id.*

[22]    The Court of Appeals affirmed $278 million in past domestic royalties.  This past domestic royalty amount represented approximately 24% of the past royalties on total worldwide sales based on the jury's original damages calculation of $1.17 billion.  Based on the Company's charge of $383 million in the second quarter of fiscal 2016, there was $105 million related to post-judgment ongoing domestic royalties between January 2013 (date of initial jury award of damages) and August 1, 2015.  This ongoing domestic royalty amount, represented approximately 21% of the ongoing royalties on total worldwide sales as of August 1, 2015 (based on Company disclosures of worldwide ongoing royalty exposure).  Applying the same percentage of domestic sales compared to worldwide sales across all quarters, the Company's post-judgment ongoing domestic royalty obligation at the third quarter of fiscal 2015 was approximately $73.5 million.  *See Carnegie*, 807 F.3d at 1288.

| (In $ millions) | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Post-judgment ongoing royalties on cumulative U.S. sales (through prior quarter)** | $63.00 | $73.50 | $84.00 |
| **Ongoing royalties on U.S. sales in current quarter** | $10.50 | $10.50 | $10.50 |
| **Total post-judgment ongoing royalties on U.S. sales** | $73.50 | $84.00 | $94.50 |

**At a Minimum, Disclosure of the U.S. Portion of the CMU Patent Judgment Was Required**

96.     At a minimum, Marvell was required to disclose the loss contingency associated with past royalties and post-judgment ongoing royalties on sales of infringing products imported into the United States.   Importantly, ASC 450 requires the disclosure of a loss contingency when the conditions for accrual are not met, but it is at least ***reasonably possible*** that a loss will be incurred. GAAP defines the term "probable" to mean "***the future event or events are likely to occur***."  GAAP defines the term "reasonably possible" as "***the chance of the future event or events occurring is more than remote but less than likely***."  As detailed above, it is clear that defendants did not view the U.S. portion of the CMU patent judgment as "less than likely."  Instead of making the required loss contingency disclosures under GAAP, defendants failed to disclose the U.S. portion of the CMU patent judgment and instead emphasized the purportedly low probability of loss associated with the ***entire*** past damages award exceeding $1.5 billion and the ***entire*** amount of ongoing post-judgment royalties of approximately $400 million.

**MARVELL OVERSTATED ITS GROSS MARGINS BY NOT PROPERLY ACCOUNTING FOR ONGOING CMU ROYALTY COSTS**

97.     As described above, following the CMU patent litigation, Marvell was ordered by the District Court to pay CMU a $0.50 royalty fee on all future sales of affected products.  Marvell records royalty fees paid to third parties as part of cost of goods sold ("COGS") which affects the gross margin on product sales.  Gross margin was a key metric for Marvell and was widely cited by the Company and analysts in reporting its quarterly financial results.  During the Class Period,

1    Marvell overstated its gross margins by failing to record CMU royalty costs on sales of infringing

2    products that were imported into the United States.  As detailed above, Marvell was unlikely to have

3    the original District Court judgment reversed as it related to U.S. sales.  However, even in the event

4    reversal was deemed probable, Marvell would have still been required under GAAP to record the

5    royalty costs as COGS concurrent with its U.S. sales and then later reverse the COGS after a

6    successful outcome was achieved.  Analogous GAAP states that when a company sells a product and

7    the revenue it will receive is contingent on the outcome of a future event or uncertainty, the company

8    shall only recognize the full potential revenue amount "***to the extent it is highly probable that there***

9    ***will not be a significant reversal in the amount of cumulative revenue recognized when the***

10    ***uncertainty is resolved***."[23]  By direct comparison, Marvell's COGS on sales of affected products in

11    the United States should have included the CMU royalty costs ordered by the District Court.  The

12    potential of reduced COGS (*i.e.*, without the CMU royalty costs) was contingent on the outcome of

13    its appeal.  Therefore, under GAAP Marvell could only recognize the reduced COGS amount, (*i.e.*,

14    without the CMU royalty costs) to the extent it was "***highly probable***" that it would not have to later

15    recognize a cumulative catch-up of those royalty costs upon an unsuccessful outcome of the appeal.

16    Marvell was forced to do exactly that in the second quarter of fiscal 2016 when it recorded an

17    approximately $105 million charge related to cumulative post-judgment ongoing royalties after the

18    Court of Appeals affirmed the U.S. portion of the CMU judgment.  As described above, defendants

19    had no reasonable basis to assert that it was ***highly probable*** that the Court of Appeals would ***not***

20    affirm the U.S. portion of the CMU judgment.  Therefore, Marvell was required under GAAP to

21    record the CMU royalty costs concurrent with its U.S. sales during the Class Period.  The chart

22    below shows the impact of the CMU royalty costs on Marvell's reported gross margins during the

23    Class Period.  These impacts were clearly material.

24

25

26

---

27  [23]    ASC 605, *In depth: A look at current financial reporting issues*, No. US2014-01 (PwC June 18,

28  2014).

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Gross Margin (as reported)** | 51.1% | 51.4% | 51.5% |
| **Estimated royalties owed to CMU for sales during the quarter** | $10.50 | $10.50 | $10.50 |
| **Actual Gross Margin** | 50.0% | 50.1% | 50.1% |

### THE MISSTATEMENTS DESCRIBED ABOVE WERE MATERIAL TO MARVELL'S FINANCIAL STATEMENTS

98.      SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99") sets forth the generally accepted methods to evaluate materiality as it relates to the financial statements of SEC registrants.  SAB 99 specifies numerous factors that clearly indicate Marvell's accounting and disclosure violations, as described above, were material to Marvell's Class Period financial statements. SAB 99 states that: "***The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item***."  SAB 99 also states that  both "quantitative" and "qualitative" factors must be  considered in assessing materiality.  Marvell's accounting and disclosure violations surrounding both the CMU patent litigation and the impact of channel stuffing, as described above, were both quantitatively and qualitatively material.

**The Accounting Violations Were Quantitatively Material**

99.      As depicted in the chart below, the required reserve associated with CMU patent litigation was quantitatively material to Marvell's Class Period financial statements:

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Revenue (as reported)** | $930.10 | $857.50 | $724.30 |
| **Operating Income (as reported)** | $115.50 | $79.80 | $13.30 |
| **EPS (as reported)** | $0.29 | $0.25 | $0.13 |
|  |  |  |  |
| **Required reserve for CMU Patent Litigation** | $351.50 | $362.00 | $372.50 |
| **EPS Effect ($)** | **$(0.72)** | **$(0.77)** | **$(0.78)** |
|  |  |  |  |

100.    The misstatements resulting from premature revenue recognition on pull-in transactions in violation of GAAP and the failure to disclose the impact of pull-in transactions (*i.e.*, channel stuffing) were also quantitatively material.  For example, the Company has disclosed that, during the Class Period, as much as 8% of its quarterly revenue, approximately $57 million, was the result of "pull-in" transactions.  During the Class Period, the impact of $57 million revenue on quarterly EPS would be least $0.05.

**The Accounting Violations Were**
**Qualitatively Material**

101.    The accounting and disclosure violations described above also met at least the following qualitative materiality criteria listed in SAB 99.

**The Misstatements Were Intentional**

102.    SAB 99 states:  "[W]here management has intentionally misstated items in the financial statements to '***manage***' ***reported earnings*** . . . it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."

103.    Marvell has acknowledged that the pull-in transactions were intentional: "transactions that would have, in the normal course of events and ***but for action by Marvell employees***, been completed and recognized in a subsequent quarter."   Marvell has also acknowledged that the pull-in transactions were done to manage earnings and meet revenue expectations ("significant pressure on sales and finance personnel to meet revenue targets").

**The Misstatement Masks a Change**
**in Earnings or Other Trends**

104.    The litigation reserve charges associated with the CMU patent litigation- including a one-time reserve charge for past royalties and ongoing COGS for recurring royalties – had a significant impact on Marvell's earnings trends.  Most notably, as described below, the ongoing CMU royalty costs had a material impact on Marvell's margin trends in its most important business segment.

105.    The Company's practice of channel stuffing, as described above, materially affected Marvell's revenue trend.  Most notably, the channel stuffing allowed Marvell to conceal a negative

revenue trend in its most important business segment.  Marvell disclosed revenue growth in its

Storage market and HDD business segment during the Class Period.[24]  The Company has since

acknowledged that the channel stuffing concealed a trend of softening demand in these important

business segments.  The Company also disclosed that the amount of revenue pulled in

> represents an increase over the prior four quarters and is ***indicative of softening
> demand for certain of the Company's products***.  This was particularly the case in
> the storage end market where, as a result of a weaker global economy and a slow-
> down in the PC market, the Company saw ***weaker than expected demand for HDD
> products*** as the overall total available market declined.

**The Misstatement Hides a Failure
to Meet Analysts' Consensus Expectations**

106.    As depicted in the chart below, the ongoing royalties on U.S. sales associated with the

CMU patent litigation would have caused Marvell to miss analysts' estimates for gross margin

during the Class Period.

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **Gross Margin (as reported)** | 51.1% | 51.4% | 51.5% |
| **Analysts' Consensus Gross Margin estimate** | 50.2% | 50.6% | 50.2% |
| **Gross Margin (adjusted for current quarter CMU domestic royalties)** | 50.0% | 50.1% | 50.1% |

107.    Similarly, the charges associated with the CMU patent litigation, including the one-

time charge for past royalties on U.S. sales and the ongoing COGS for recurring royalties on U.S.

sales, would have caused Marvell to miss analysts' consensus EPS estimates during the Class

Period:

|  | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|
| **EPS (as reported)** | $0.29 | $0.25 | $0.13 |
| **Analysts' Consensus EPS Estimate** | $0.29 | $0.24 | $0.11 |
| **EPS (adjusted for** | $0.20 | $0.14 | $0.01 |

[24]  For example: "***Storage grew in-line with expectations . . . Overall Storage revenue grew 3%
q/q and increased 5% y/y . . . HDD grew q/q.***"  Q3 2015 Earnings Presentation.  "***Overall Storage
revenue grew 4% over FY14 . . . Steady HDD unit growth***."  Q4 2015 Earnings Presentation.

| estimated current quarter domestic CMU royalties) | | | |
|---|---|---|---|
| **EPS (adjusted for estimated total domestic CMU royalties)** | $(0.43) | $(0.52) | $(0.65) |

**The Misstatement Changes a Loss into Income**

108.   The charges associated with the CMU patent litigation, including the one-time charge for past royalties on U.S. sales and the ongoing COGS for recurring royalties on U.S. sales, would have changed Marvell's net income during the Class Period into a  net loss:

| | **Q3 2015** | **Q4 2015** | **Q1 2016** |
|---|---|---|---|
| **Net Income (Loss) (as reported)** | $115.3 | $81.7 | $14.1 |
| **Net Income (Loss) (adjusted for estimated total domestic CMU royalties)** | $(236.2) | $(280.3) | $(358.4) |

**The Misstatement Concerns a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability**

109.   During the Class Period, Marvell had three primary markets:  Mobile and Wireless, Storage, and Networking.  The Storage market was by far the largest market – making up 47% of the Company's net revenue in the year ended January 2015.  Within the Storage market, there were two primary segments: HDD and SDD.

110.   The CMU patent charges described above impacted Marvell's most important business segment – the HDD segment of the Storage market.  As noted by one analyst, the ongoing CMU royalties were expected to have a material impact on Marvell's HDD margins going forward: "the CMU patents 'currently encompass all of Marvell's HD chips [and] the per-chip royalty will result in roughly a 20% hit to operating margins on their HD controller business.'"[25]

---

[25]   Damion Rallis, *Can Only Spider-Man Save Marvell Technology Group?* (Jan. 9, 2013), http://mobile.businessinsider.com/can-only-spider-man-save-marvell-technology-group-2013-1.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA

111.     Likewise, the channel stuffing, as described above, concealed softening demand in the most important segment of Marvell's business – the HDD segment of the Storage market.  The Company later disclosed that the amount of revenue pulled in

> represents an increase over the prior four quarters and is indicative of softening demand for certain of the Company's products.  ***This was particularly the case in the storage end market*** where, as a result of a weaker global economy and a slow-down in the PC market, the Company saw ***weaker than expected demand for HDD products*** as the overall total available market declined.

### DEFENDANTS FALSELY CERTIFIED THAT
### MARVELL HAD EFFECTIVE INTERNAL CONTROLS

**Sarbanes-Oxley Act of 2002**

112.     Defendants were also responsible for establishing and maintaining effective internal controls over financial reporting ("ICFR") pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").[26]  SOX required defendants to perform annual assessments of Marvell's ICFR and to issue a report on whether Marvell's ICFR were adequate and free from material weaknesses.[27]  SOX required the use of an appropriate framework in assessing ICFR, such as the COSO *Internal Control – Integrated Framework* ("COSO Framework").[28]  During the Class Period, Marvell's financial statements contained the following Management's Report on ICFR:

> Management has evaluated the effectiveness of our internal control over financial reporting . . . using the criteria set forth in the ***Internal Control – Integrated Framework*** [(2013)] issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

**The Control Environment**
**and Tone at the Top**

113.     According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity.  The COSO Framework summarizes the control environment as follows:

---

[26]   SEC Final Rule: *Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, Release Nos. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03, Effective Date: August 14, 2003.

[27]   *Id.*

[28]   The COSO Framework was developed and published in 1992 by COSO of the former Treadway Commission.  The 1992 publication included a section, "Reporting to External Parties" and in 1997, COSO issued an addendum to this section.

> The control environment sets the tone of an organization, influencing the control consciousness of its people.  It is the foundation for all other components of internal control, providing discipline and structure.  Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[29]

114.    Because of the importance of the control environment and its pervasive influence on a Company's ICFR, *deficiencies affecting the control environment are strong indicators of a material weakness*.[30]

115.    An important as aspect of the control environment under the COSO Framework is the establishment of an appropriate "tone at the top."  The concept of "tone at the top" has become widely accepted within the accounting profession and the field of corporate governance to describe the attitude and actions of an entity's senior management toward internal financial controls and the control environment.  SAB 99 refers to "tone at the top" as:

> The tone set by top management – the corporate environment or culture within which financial reporting occurs – is *the most important factor contributing to the integrity of the financial reporting process*.  Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[31]

116.    The  COSO Framework states, "[m]ore than any other individual [or function], *the chief executive sets the 'tone at the top'* that affects control environment factors and other components of internal control.  *The influence of the CEO on an entire organization cannot be overstated*."[32]

**Evaluating Control Deficiencies**

117.    During the Class Period, Marvell assured investors that its internal controls functioned properly to prevent or detect material misstatements.  This disclosure, including

---

[29]    COSO Framework at 29.

[30]    PCAOB Auditing Standard No. 2 ("AS 2"), ¶140.

[31]    SAB 99.  *See also* Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987); Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (Feb. 1999).

[32]    COSO Framework at 83-86

1    certifications signed by defendants,  assured investors that Marvell did not have a material weakness

2    in its internal control over financial reporting.  A material weakness is a:

3           [S]ignificant deficiency, or combination of significant deficiencies, that results in
             more than a remote likelihood that a material misstatement of the annual or interim
4            financial statements will not be prevented or detected. [33]

5           118.    Within this definition, "remote" means "[t]he chance of the future events . . .

6    occurring is slight."[34]  A significant deficiency is a:

7           [C]ontrol deficiency, or combination of control deficiencies, that adversely affects
             the Company's ability to initiate, authorize, record, process, or report external
8            financial data reliably in accordance with generally accepted accounting principles
             such that there is more than a remote likelihood that a misstatement of the company's
9            annual or interim financial statements that is more than inconsequential will not be
             prevented or detected. [35]

10
11          119.    Accordingly, the key differentiation between a material weakness and a significant

12   deficiency is whether a misstatement that could arise from the control deficiency would be more than

13   inconsequential (a significant deficiency) or material (a material weakness).  A misstatement can

14   only be inconsequential if it is "clearly immaterial."[36]

**Defendants' Class Period**
15   **Internal Control Certifications**

16          120.    Marvell's Form 10-K for the year ended January 31, 2015 included the following

17   "Management's Report on Internal Control Over Financial Reporting":

18          Based on our evaluation, management has concluded that **we maintained effective
             internal control over financial reporting** as of January 31, 2015 based on the COSO
19           criteria.

20          121.    In addition, each of Marvell's Class Period financial statements included the

21   following certifications signed by defendants Sutardja and Rashkin pursuant to SOX, Section 302:

22   _____

23   [33]  AS 2, ¶10.

24   [34]  AS 2, ¶9.

25   [35]  *Id.*

26   [36]  *Id.* ("A misstatement is **inconsequential** if a reasonable person would conclude, after considering
     the possibility of further undetected misstatements, that the misstatement, either individually or
27   when aggregated with other misstatements, would clearly be immaterial to the financial statements.
     If a reasonable person could not reach such a conclusion regarding a particular misstatement, that
28   misstatement is more than **inconsequential**.").

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                    - 42

1

2

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO SECURITIES EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dr. Sehat Sutardja, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Marvell Technology Group Ltd.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit
to state a material fact necessary to make the statements made, in light of the circumstances under
which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this
report, fairly present in all material respects the financial condition, results of operations and cash
flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining
disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))
for the registrant and have:

     a)   Designed such disclosure controls and procedures, or caused such disclosure controls and
procedures to be designed under our supervision, to ensure that material information relating to
the registrant, including its consolidated subsidiaries, is made known to us by others within
those entities, particularly during the period in which this report is being prepared;

     b)   Designed such internal control over financial reporting, or caused such internal control over
financial reporting to be designed under our supervision, to provide reasonable assurance
regarding the reliability of financial reporting and the preparation of financial statements for
external purposes in accordance with generally accepted accounting principles;

     c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented
in this report our conclusions about the effectiveness of the disclosure controls and procedures,
as of the end of the period covered by this report based on such evaluation; and

     d)   Disclosed in this report any change in the registrant's internal control over financial reporting
that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal
quarter in the case of an annual report) that has materially affected, or is reasonably likely to
materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of
internal control over financial reporting, to the registrant's auditors and the audit committee of the
registrant's board of directors (or persons performing the equivalent functions):

     a)   All significant deficiencies and material weaknesses in the design or operation of internal
control over financial reporting which are reasonably likely to adversely affect the registrant's
ability to record, process, summarize and report financial information; and

     b)   Any fraud, whether or not material, that involves management or other employees who have a
significant role in the registrant's internal control over financial reporting.

Date: March 26, 2015                     By:   /s/   SEHAT SUTARDJA
                                              Dr. Sehat Sutardja
                                              Chief Executive Officer
                                              (Principal Executive Officer)

**Marvell's Class Period ICFR**
**Statements Were False**

122.   On March 1, 2016, Marvell revealed that deficiencies existed in its ICFR during the

Class Period.  The Company disclosed:

> The Audit Committee also found **certain "*tone at the top*" issues**, including
> **_significant pressure_** on sales and finance personnel to meet revenue targets and the
> failure to raise to the appropriate level at the appropriate times the initial assertion of
> Marvell's CEO and Chairman that he owned the Final-Level Cache invention, the
> patent applications for which he later assigned to Marvell.[37]

---

[37]   Marvell Form 8-K, March 1, 2016.   The Company also disclosed control deficiencies
surrounding revenue recognition "for certain transactions Marvell's **_internal controls were not fully_**

123.    Marvell's disclosure identified control deficiencies involving Marvell's "'**tone at the top**,'" a key component of the Company's "control environment."   As described above, PCAOB No. 2 states that a deficiency in the control environment is presumed to be a *material weakness in ICFR*. Because defendants had previously certified that Marvell's ICFR were effective (*i.e.*, free from material weaknesses), the March 1, 2015 disclosure was effectively a restatement of Marvell's prior ICFR statements including the certifications described above.

## ADDITIONAL SCIENTER ALLEGATIONS REGARDING "PULL-IN" TRANSACTIONS

**Sutardja and Dai Were Necessarily Aware of the Pull-Ins**

124.    In its long delayed July of 2016 SEC filings, the Company admitted that the pull-in transactions accounted for "approximately 9 percent and 11 percent of net revenue in the first and second quarters of fiscal 2016."   The Company further admitted that "certain concessions or side agreements" were entered into in order to allow Marvell to pull-in revenue from future quarters in order to meet current quarter revenue targets.   Sutardja was aware of the pull-in transactions not only because *he had his hands in everything* and made *all key decisions*, but also because he was involved in the minutia of corporate operations.   As but one example of his involvement in even minor transactions and agreements, he would physically hand sign any purchase order over $100,000.

125.    In addition, according to the *Wall Street Journal*, former employees say that the couple (Sutardja and Dai) maintained *unusually tight control over key decisions*.   This would necessarily include the decision to extend payment terms beyond that which was customary in order to pull in revenue from future periods in order to meet current quarter revenue targets as such conduct would necessarily result in a revenue deficit at the start of the subsequent quarter.   It is implausible that a "micro manager" like Sutardja at a company where everything was run through him and his wife would be unaware that his next quarters revenue was being *cannibalized* in order to meet current quarter revenue targets.   These transactions could not plausibly occur without

*followed* and revenue from certain pull-in and distributor transactions was recognized prematurely [in violation of GAAP and Marvell's revenue recognition policy]."   *Id.*

1  Sutardja's knowledge and/or approval as Marvell was a family run and controlled company where

2  even hiring a clerk required Sutardja and Dai's approval.

3  126.    The pull-in transactions were intentional acts that occurred as a result of *significant*

4  *pressure by senior management to meet revenue targets*.  The pull-ins also resulted in a revenue

5  gap in which the Company would start the subsequent quarter.  A decision to pull in 9-11% of the

6  subsequent quarters revenue is necessarily a key decision for which senior management, including

7  Sutardja and Dai would be consulted.

8  127.    The audit committee investigation consisted of a review of certain revenue

9  recognition issues and associated issues with whether senior management's operating style during

10  the period resulted in an open flow of information and communication to set an appropriate tone for

11  an effective control environment.  This implied, and the audit committee later confirmed, that the

12  accounting issues did not in fact revolve around a rogue sales manager, nor a one-time breakdown in

13  accounting controls.  The problem is what is known in accounting circles as the "tone at the top,"

14  meaning the people responsible are at the top of the chain of command.

15  128.    As the SEC has illuminated: "'First and foremost, Sarbanes-Oxley makes clear that a

16  company's senior officers are responsible for the culture they create, and must be faithful to the same

17  rules they set out for other employees.'"  Similarly, a February 5, 2016 Morning Star analyst report

18  stated that: "[W]e have concerns that the firm may be run as a family controlled enterprise."

19  129.    Marvell has also admitted in its long delayed July 2016 SEC filings that the "pull-in"

20  transactions were defined as those situations where *the Company would ask customers*, and those

21  customers agreed "to take shipments of product in an earlier fiscal quarter than the fiscal quarter they

22  originally requested delivery."  These pull-in transactions are now *prohibited under the Company's*

23  *revenue recognition policy* – and were not initiated by accident or aberration.  The Company has

24  now admitted in its July 2016 quarterly SEC filings that the pull-in transactions were effectuated

25  *intentionally to counterbalance* "*softening demand for [Marvell's] products*."

26  130.    In fact, as illustrated in the chart below, but for the pull-in transactions the Company

27  would have missed analyst EPS estimates for 3Q15, 4Q15 and 1Q16.  The fact that the pull-ins were

28  utilized to meet analyst estimates is further indicia of scienter.  The pull-ins were so *core* to Marvell

operations that in 1Q16 46% of EPS resulted from pull-in transactions.  It is not plausible that a "micro manager" like Sutardja at a company where everything was run through him and his wife would not be aware that 46% of EPS came from pull-in transactions.  Sutardja's scienter is further evidenced by the fact that the pull-in transactions primarily occurred at the handful of large customers with which his wife Dai had a *close relationship*.

|  | 3Q15 | 4Q15 | 1Q16 |
|---|---|---|---|
| Reported revenue | $  930,136 | $  857,452 | $  724,288 |
| **Pull-in revenue** | **$  (9,301)** | **$  (25,724)** | **$  (65,186)** |
|  |  |  |  |
| Reported EPS | $  0.29 | $  0.25 | $  0.13 |
| Street EPS estimate | $  0.29 | $  0.24 | $  0.11 |
| **EPS without pull-in revenue** | **$  0.28** | **$  0.22** | **$  0.07** |

**Sutardja and Dai Were Fired as a Result**
**of the Audit Committee Investigation**

131.    On or about April 1, 2016, Marvell fired Sutardja and Dai, the management team that founded the Company two decades earlier.  Their firings occurred one month after the Audit Committee's conclusion of its probe of the Company's pull-in transactions, which also prompted investigations by the SEC and U.S. Attorney's office.[38]

132.    On July 21, 2016, Marvell further clarified that the above-referenced personnel changes were implemented as part of the Company's *remediation plans* to fully address the findings of the audit committee.  The Company additionally stated that "*we have revised our revenue recognition policy to prohibit Company-initiated 'pull-in' transactions*" and that "[w]e are fully cooperating with the SEC and U.S. Attorney with respect to those investigations."

133.    Analysts noted that the departures of Sutardja and Dai from their leadership positions were linked to a series of accounting issues including revenue recognition that led to delays in filing financial results.

---

[38]    In conducting its internal investigation, Marvell's Audit Committee was assisted by outside legal counsel – Gibson, Dunn & Crutcher LLP and Sheppard, Mullin, Richter & Hampton LLP – as well as the auditing firms KPMG LLP and Ernst & Young LLP.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                                - 46 -

1    **The Audit Committee Found that Senior**
**Management Placed Significant Pressure**
2    **on Finance Personnel to Meet Revenue Targets**

3        134.    "The audit committee [investigation] also found certain 'tone at the top' issues,

4 including ***significant pressure*** on sales and ***finance personnel*** to meet revenue targets." Finance

5 personnel are not in charge of obtaining or initiating sales with customers – they are in charge of

6 recording the revenue and applying GAAP and Marvell's revenue recognition  policies to decide in

7 which period sales should be recorded on Marvell's books.

8        135.    It is implausible that pressure directed by senior management towards finance

9 personnel involved "pressing for sales to be made earlier" as this is not the job of finance personnel.

10 It is more plausible that any pressure directed towards finance personnel to "meet revenue targets"

11 involved pressure to bend the revenue recognition rules that were in place in order to record sales

12 prematurely.  Finance personnel would not have any other means of  ensuring "sales [are] made

13 earlier than in the normal course" to "meet revenue targets."

14        136.    ***Revenue recognition*** is separate from the function of "making" or "initiating" sales

15 with customers.  Revenue recognition involves the ***recording*** of revenue on a company's books,

16 including making accounting determinations as to whether specific GAAP revenue recognition

17 criteria were met and, if so, determining in which period particular sales transactions should be

18 recorded on a company's books.  These are functions performed by ***finance personnel***.

19        137.    If ***senior management*** "were merely pressing for ***sales to be made*** earlier than in the

20 normal course," pressure would only need to be applied to ***sales personnel*** –  whose job it is to ***make***

21 or ***initiate*** sales with customers.

22    **Additional Remediation Efforts and Other**
**Allegations Supporting Scienter**
23

24        138.    The following additional remediation efforts were implemented to address material

25 weaknesses in internal controls ("improper tone at the top") that lead to the pull-in transactions.

26 According to the belatedly filed July 21, 2016 10-Q, "Our Board of Directors and management take

27 internal controls over financial reporting and the integrity of the Company's financial statements

28 seriously and believe that the remediation steps described below, including with respect to personnel

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA        - 47 -

changes, were and are essential steps to maintaining strong and effective internal controls over financial reporting and a strong internal control environment.  The Company has taken significant steps to address the material weaknesses set forth above.  The Company believes that making the following changes was a critical step forward addressing the 'tone at the top' concerns that contributed to the material weaknesses it has identified."

139.   As a result, the following remedial steps were taken:

- "We appointed five new independent directors to our Board of Directors."

- "We appointed a new chairman of our Board of Directors."

- "We recently appointed a new Chief Executive Officer."

- "We conducted a training program for our executives, vice presidents and associate vice presidents, led by our executive management team, to enhance awareness and understanding of the Company's Code of Conduct and Ethics Policy and the importance of financial reporting integrity.  We are developing and planning to implement a similar program for finance, operations and sales personnel and others involved in the sales process."

- "In accordance with changes to the Audit Committee Charter approved by the Board on September 23, 2015, the Audit Committee now approves future earnings guidance in accordance with the Company's normal earnings cycle."

140.   In addition, as part of the same remediation plan, less than two weeks after publicly announcing on September 11, 2015, that the Company was conducting an internal investigation into its revenue recognition practices and any associated issues with whether senior management's operating style during the period set an inappropriate tone at the top, Marvell's Executive Compensation Committee ("ECC") approved changes to its charter on September 23, 2015.  One of the "changes" included:

> *Review and approve the compensation arrangements of any employees* with a title of Associate Vice President or higher *reporting directly to the Chief Executive Officer* who are not otherwise deemed to be executive officers.

141.   When this "change" to the ECC Charter is read in tandem with the Company's March 1, 2016 announcement of its Audit Committee's internal investigation findings, specifically that it found "certain 'tone at the top' issues, *including significant pressure on sales and finance personnel to meet revenue targets,*" it is clear that this amendment to the Charter in September 2015

1   was an attempt (at least facially) to prevent Sutardja and/or those who directly reported to him, from

2   improperly incentivizing and/or pressuring sales and finance personnel to meet revenue targets.

3       142.   But it was not until July 21, 2016, when the Company admitted in its long delayed

4   SEC filings for 2Q16 and 3Q16, that this supposed new oversight of the compensation agreements of

5   employees who reported directly to Sutardja – then CEO – was a "change" at all.  In fact, the

6   Company seemed to be also admitting that apparently, this "change" was never really implemented

7   previously; but, as the new Marvell regime explained, it would be implemented "now." As Marvell

8   stated:

9       •   In accordance with **changes to the Executive Compensation Committee**
**Charter** approved by the Board on September 23, 2015, the Executive

10   Compensation Committee **now** reviews and approves the compensation
arrangements of any employees with a title of Associate Vice President or

11   higher reporting directly to the Chief Executive Officer, including, but not
limited to, those designated as executive officers.  **We believe this provides**

12   **more transparent monitoring of performance of, and incentives offered to,**
**senior management that may influence** "**tone at the top**."

13       143.   In the wake of firing Sutardja and Dai, Marvell now felt it necessary that, as far as

14   revenue recognition, the Company's executive officers, vice presidents and associate vice presidents

15   would have to undergo training to grasp the "importance of financial reporting integrity."

16       144.   Marvell's new Chairman, Rick Hill, told investors and analysts during Marvell's

17   4Q16 earnings call on July 19, 2016 ("Q4 Earnings Call"), the investigations by the SEC and U.S.

18   Attorney's Office "continues to go on."  On September 6, 2016, at the Citi Global Technologies

19   Conference, Marvell's current Chairman reiterated that these government investigations were still

20   ongoing.

21       145.   Even more telling than what the Company did say about the pull-in transactions, was

22   what it did not.  For example, Marvell did not state that its internal investigation revealed that these

23   improper pull-in transactions were the result of rogue, lower-level employees who failed to adhere to

24   Company policies or procedures.  And Marvell did not state that the employees involved in the pull-

25   in transactions did so without either the permission or knowledge of senior management, including,

26   but not limited to, Sutardja, Rashkin, Nagesh or Dai.  Marvell also did not state that as part of its

27   remediation plan, it had terminated the employment of lower-level employees who were involved in

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                                          - 49 -

1   the improper pull-in transactions.  In fact, the Company only named two individuals who were fired

2   as a result of its remediation efforts: (i) Marvell's CEO Sutardja; and (ii) Marvell's President, Dai –

3   the same two individuals who, according to Marvell's new Chairman, "have been instrumental in

4   helping bring me up to speed on technology and the customers of Marvell."

5       146.    The fact that Dai, Marvell's former President and the wife of its former CEO, would

6   have in-depth knowledge about Marvell's customers is not surprising.  Marvell's website currently

7   boasts about her "***close relationship with her customers***" and that she "served a pivotal role in

8   creating some of the Company's most important strategic partnerships."  In a 2009 interview with

9   *The Mercury News*, Dai said about herself, "[m]y responsibility today is very much focused on the

10  customer."  And when the Company announced on December 22, 2014 that she had been appointed

11  has President, her husband and Marvell CEO was quoted in the press release, stating:

12          Since Weili Dai co-founded Marvell, she has been a driving force for the company's
            success.  ***Her dedication to our customers***, partners and stakeholders is widely
13          recognized by the industry.  ***In her current role as the President of the company***,
            Weili brings to the leadership a long-term vision, integrity, strong principles,
14          unrelenting drive, ***customer focus*** and passion for Marvell.

15      147.    Marvell's former President was proud of her "dedication" to and "close relationship"

16  with her customers.

17      148.    Marvell further admitted in its July 2016 SEC filings: (i) the Company has a

18  dependence on a "small number of customers"; (ii) during the Class Period, a "relatively small

19  number of customers have accounted for a significant portion of [the Company's] revenue," *i.e.*,

20  between 14% and 20%; and (iii) the improper pull-in transactions accounted for "approximately 9%

21  and 11% of net revenue in the first and second quarters of fiscal 2016."

22      149.    In a January 2011 interview with Xconomy.com, entitled "You Can't Run A

23  Company Based on Hearsay: A Rare Interview with Marvell's Hands-On CEO, Sehat Sutardja,"

24  Sutardja stated:

25          ***I don't believe you can run a company based on hearsay***.  A company has to be run
            based on real, scientific data.  And it's the job of the CEO.  If the CEO is not
26          designing the chip or writing the software, ***the CEO has to know what people are
            working on and whether people are on the right path, and make the call if they***
27          ***have to change direction***.

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                      - 50 -

1    150.    When the interviewer followed up by asking Sutardja, "[b]ut if the CEO has to be

2    personally involved in every project, doesn't that put an upper limit on the number of projects a

3    company can pursue," Sutardja responded:

> For Marvell to propagate this culture where the leader needs to be hands on, we
> could basically create a number of mini-me's.  They don't have to have as much
> knowledge as I do.  ***I happen to have a lot of knowledge, so I can make a lot of
> decisions.  But if each vice president has one quarter of my knowledge, and if their
> knowledge overlaps each other, then the union of this knowledge will not have
> holes***.  But if the management has no knowledge, or only PowerPoint knowledge,
> then when you put things together you have holes everywhere, and when the time
> comes to make a call, nobody knows how.

8    151.    According to the *Wall Street Journal*, some former employees would categorize

9    Sutardja's and Dai's hands-on approach a little differently. In the April 5, 2016 article, it reported

10   former Marvell employees "say the couple maintained unusually tight control over key decisions"

11   and that "Their management style . . . contributed to a revolving door of midlevel executives who

12   would leave after short stints at the company."

13   **PwC's Abrupt Resignation Is**
14   **Further Indicia of Scienter**

15   152.    According to Marvell's Proxy Statement filed on May 19, 2015, PWC had been

16   Marvell's "auditors and independent registered public accounting firm for the financial statements

17   for each year since the year ended January 31, 1998." Marvell's proxy statement also stated that the

18   Company's "audit committee re-appointed PricewaterhouseCoopers as our independent registered

19   public accounting firm for the year ending January 30, 2016, subject to our shareholders approving

20   such appointment at the 2015 annual general meeting of shareholders." And then, nearly five

21   months later to the day, on October 20, 2015, PWC informs Marvell – the client that had paid it

22   nearly $14 million in fees for its work on the 2011 through 2015 financials – that it was resigning.

23   Marvell has admitted that "[t]he Audit Committee did not request, recommend or approve the

24   resignation of PWC."

25   153.    On October 27, 2015, one Morgan Stanley analyst noted that PwC's concerns "were

26   significant enough to drive the auditor to resign rather than resolving them." An RBC Capital

27   Markets analyst wrote on October 26, 2015 that the resignation "suggests notable problems with

28   current financial controls." Morningstar wrote on October 27, 2015, that they saw PwC's

1   resignation "as another troubling sign" and "the resignation suggests that further management

2   shakeups may be in the cards for the company."  Deutsche Bank noted on October 26, 2015 that it

3   viewed the resignation as "a serious and negative action that adds unneeded uncertainty to an already

4   difficult time for MRVL."

5   **THE TRUTH BEGINS TO BE REVEALED**

6   154.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused

7   plaintiff and class members' economic loss.  Plaintiff's claims for securities fraud are asserted under

8   the fraud on the market theory of reliance.  *See* ¶¶187-188 *infra*.  Marvell stock actively traded on

9   the NASDAQ during the Class Period, and was artificially inflated by the false and misleading

10  statements and material omissions complained of herein.  As a result of the misrepresentations and

11  omissions described herein, plaintiff and the Class were unable to evaluate the risks concealed by

12  defendants' misstatements and omissions, and, therefore, were unable to choose whether or not to

13  undertake those risks.

14  155.   These false and misleading statements had the intended effect and caused Marvell

15  securities to trade at artificially inflated levels throughout the Class Period.

16  156.   The Class Period inflation in Marvell's stock price was removed when the conditions

17  and risks concealed by defendants' false and misleading statements and omissions, or the financial

18  and operational impacts thereof, were revealed to the market.  The adverse information was

19  disseminated through partial disclosures that revealed the truth regarding the prospects of the

20  Company.  These disclosures, more particularly described below, removed artificial inflation from

21  Marvell securities, causing economic injury to plaintiff and other members of the Class.

22  157.   The corrective impact of the individual disclosures alleged herein was, however,

23  tempered by defendants' continued false and misleading statements about the Company.  These

24  continued misrepresentations maintained the price of Marvell stock at a level that was inflated by

25  fraud, inducing members of the Class to continue purchasing shares in Marvell, leading to further

26  price declines that caused additional injury to the Class upon the disclosure of additional information

27  about the true condition of the Company.

28

1     158.    None of the disclosures was sufficient on its own to fully remove the inflation from

2    Marvell's stock price because each only partially revealed the risks and conditions that had been

3    concealed from investors.  In addition, the individual corrective impact of these disclosures was

4    reduced by defendants' contemporaneous false statements and omissions about the Company.  As a

5    result of these partial corrective disclosures of the truth and the materialization of the risks concealed

6    by defendants' misrepresentations and omissions, the price of Marvell securities fell.

7    159.    The disclosures that corrected the market price to eliminate the inflation maintained

8    by defendants' fraud are detailed below.

9    160.    On August 20, 2015, the Company postponed the release of its second quarter of

10    fiscal 2016 earnings results.  Tellingly, as a result of the accounting and control problems detailed

11    herein, Marvell could not comply with its SEC mandated reporting requirements.  As a result, the

12    Company has not filed its required quarterly or annual reports with the SEC for approximately nine

13    months and has recently stated that in order to prevent the delisting of the Company's stock by

14    NASDAQ, it will be required to request a hearing before a NASDAQ hearings panel.

15    161.    Following the August 20, 2015 announcement, Marvell's share price declined over

16    12%.

17    162.    On September 11, 2015, Marvell issued a press release disclosing a $382 million net

18    loss for the second quarter of fiscal 2016 as well as an independent investigation of certain

19    accounting and internal control matters in the second quarter of fiscal 2016.  The Company further

20    disclosed that the investigation consists of a review of certain revenue recognition issues in the

21    second quarter of fiscal 2016 and any associated issues with whether senior management's operating

22    style during the period resulted in an open flow of information and communication to set an

23    appropriate tone for an effective control environment.  More specifically, the investigation focused

24    on the approximately 7%-8% of revenue recognized that, based upon the original customer request

25    date, would have been received and earned in the subsequent quarter and was thus, no longer

26    available for receipt in that quarter.

27    163.    The Company further revealed on September 11, 2015 that the Audit Committee is

28    also reviewing certain aspects of the Company's internal control over financial reporting, including

1    controls for the establishment of reserves for litigation and whether senior management's operating

2    style resulted in an open flow of information and communication to set an appropriate tone for an

3    effective control environment.

4         164.    Following this disclosure, Marvell's share price declined over 18%.

5         165.    On October 26, 2015, Marvell disclosed that PwC, the Company's auditor for over 15

6    years, had abruptly resigned.  This highly remunerative engagement generated tens of millions of

7    dollars in fees for PwC.  Prior to resigning, PwC advised the Company that it would need to expand

8    the scope of the 2016 audit in the following areas: (1) the Company's entity level controls, including

9    whether senior management's operating style resulted in an open flow of information and

10   communication to set an appropriate tone for an effective control environment; (2) the Company's

11   process and controls over establishment of significant and judgmental reserves, including reserves

12   for litigation and royalties; (3) the Company's process and controls over identification,

13   communication and approval of related party transactions, including assignment of intellectual

14   property rights; and (4) the adequacy of financial reporting resources, including sufficient personnel

15   with appropriate knowledge, expertise, and training commensurate with the Company's corporate

16   structure and financial reporting requirements.

17        166.    Following this disclosure, Marvell's share price declined nearly 15%.

18        167.    On December 7, 2015, the Company disclosed that it was in the process of assessing

19   which transactions should be considered "pull-in" transactions for which revenue is properly

20   recognized in a quarter, but would have been expected to be received and earned in the subsequent

21   quarter.  The Company revealed that the Audit Committee was still investigating this conduct.  The

22   Company further revealed that these improper "pull-in" transactions were not limited in impact to

23   the second quarter of fiscal 2016, but also impacted the fourth quarter of fiscal 2015 and the first

24   quarter of fiscal 2016.  The Company further announced a $62 million net loss for the third quarter

25   of fiscal 2016.

26        168.    The Company further announced a $395 million litigation reserve to cover the CMU

27   patent judgment that had previously been obtained against the Company.  The Company would

28   within months agree to pay $750 million to cover domestic royalties owed to CMU.

1    169.    Marvell further disclosed that two government agencies, the U.S. Attorney's Office

2    and the SEC, are investigating its accounting and other issues.

3    170.    Following the December 7, 2015 disclosure, Marvell shares declined approximately

4    10%.

5    171.    On March 1, 2016, Marvell announced the completion of the Audit Committee

6    investigation, stating that the Audit Committee retained independent counsel and a forensic

7    accounting specialist to assist the Audit Committee in its investigation and that the investigation

8    generally included a review of certain revenue recognized in the first and second quarters of fiscal

9    2016 and the fourth quarter of fiscal 2015, including transactions that would have, in the normal

10   course of events and but for action by Marvell employees, been completed and recognized in a

11   subsequent quarter (referred to internally as "pull-ins"), the accrual of a litigation reserve in the

12   second quarter of fiscal 2016, and the initial stated belief by Marvell's CEO and Chairman of

13   ownership of certain patent rights related to his FLC invention and his later assignment of associated

14   patent applications to Marvell.  The Audit Committee also reviewed disclosure concerning the

15   foregoing matters and related circumstances, and whether senior management's operating style

16   during the relevant periods resulted in an open flow of information and communication to set an

17   appropriate "tone at the top" for an effective control environment.

18   172.    The Audit Committee concluded that for certain transactions, Marvell's internal

19   controls were not fully followed and ***revenue from certain pull-in and distributor transactions was***

20   ***recognized prematurely***.  The Audit Committee further concluded that while Marvell's CEO and

21   Chairman stated his belief that he had a good faith claim to ownership of the FLC invention, the

22   invention was owned by Marvell during all periods in which Company resources related to such

23   invention were deployed.  The Audit Committee further concluded that Marvell ***lacked a well-***

24   ***structured process to establish significant and judgmental reserves*** associated with litigation and

25   ***royalties***.

26   173.    The Audit Committee further concluded that certain "'***tone at the top***'" issues existed,

27   including ***significant pressure on sales and finance personnel to meet revenue targets*** and the

28   failure to raise to the appropriate level at the appropriate times the initial assertion of Marvell's CEO

1  and Chairman that he owned the FLC invention, the patent applications for which he later assigned

2  to Marvell.

3        174.    The Audit Committee stated that it identified a limited number of transactions that

4  had the effect of ***recognizing revenue prematurely***, generally involving the ***extension of payment***

5  ***terms beyond Marvell's customary terms***.  The Company further stated that Marvell is evaluating

6  whether any of these errors were material to any previously reported financial period.  The Company

7  stated that if any correction to previously reported financial periods were to be made as a result of

8  these identified transactions, it would result in a ***shift of revenues*** from the fourth quarter of fiscal

9  2015 to the first quarter of fiscal 2016, or from the first quarter of fiscal 2016 to the second quarter

10  of fiscal 2016.

11        175.    The Audit Committee made a number of recommendations to the board of directors

12  of Marvell, including recommendations regarding the addition of certain compliance, finance and

13  legal personnel, the review and revision of certain policies and procedures, the augmented training of

14  employees in some areas and the addition of independent board members.

15        176.    The Audit Committee further stated that Marvell is also evaluating the impact of the

16  Audit Committee's findings on the effectiveness of Marvell's disclosure controls and internal

17  controls over financial reporting.  The Audit Committee also intends to review certain matters that

18  came to the Audit Committee's attention during the course of its now completed investigation,

19  including the setting of certain reserves in fiscal 2012 and the first quarter of fiscal 2013.

20        177.    The Audit Committee established a rapid timetable for implementation of many of

21  these recommendations, and the board of directors and management intend to meet all requirements

22  set by the Audit Committee.  As previously announced, the board of directors has engaged an

23  international executive search firm to conduct a search for additional independent board members

24  and with another firm to conduct a search for a permanent CFO.

25        178.    The Company reiterated that, as previously reported, Marvell has not yet filed its

26  Quarterly Reports on Form 10-Q for the second or third quarters of fiscal 2016 (the "Forms 10-Q").

27  As also previously reported, as a result of the delayed filing of the Forms 10-Q, Marvell is not in

28  compliance with NASDAQ Listing Rule 5250(c)(1) (the "Rule"), which requires the timely filing of

all required periodic financial reports.  As announced in Marvell's press release issued on December 7, 2015:

> The NASDAQ Stock Market LLC ("NASDAQ") granted Marvell through March 8, 2016 to file the Forms 10-Q in order to regain compliance with the Rule.  Marvell is working diligently to complete and file the Forms 10-Q as soon as possible, but it does not expect to have the Forms 10-Q on file by March 8, 2016.  Marvell expects that it will be notified by NASDAQ that Marvell will be required to request a hearing before a NASDAQ Hearings Panel to remain listed on the NASDAQ Stock Market until the Forms 10-Q are filed.  Upon receiving any such notification, Marvell intends to request such a hearing and to request that Marvell's common stock remain listed pending such hearing.

179.   On March 8, 2016, Marvell announced that, as a result of the previously announced delayed filings of its Forms 10-Q for the second and third quarters of fiscal 2016, Marvell received notice that the Listing Qualifications Staff of NASDAQ had determined that Marvell will not meet the terms of the previously granted extension, which expires on March 8, 2016, and by which date Marvell was required to evidence compliance with the Rule, which requires the timely filing of all required periodic reports with the SEC.

180.   Marvell indicated that it intends to request a hearing before a NASDAQ hearings panel on or before March 11, 2016 to request a further extension.  The hearings panel has the authority to grant Marvell an extension of up to 360 days from the due date of the first missed periodic report, or September 5, 2016.

181.   Following this announcement, Marvell's share price declined over 3%.

182.   As a result of the Company's failure to file its required reports with the SEC, the disclosure of highly relevant information was delayed until July 2016.

### LOSS CAUSATION/ECONOMIC LOSS

183.   Like other members of the Class of purchasers of Marvell securities (defined herein), who purchased at artificially inflated prices during the Class Period, plaintiff suffered an economic loss, *i.e.*, damages, when Marvell's securities prices declined upon the disclosures correcting the alleged misrepresentations.

184.   The timing and magnitude of Marvell's securities price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the

1   defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other

2   members of the Class, was a direct result of defendants' fraudulent scheme and misrepresentations to

3   artificially inflate Marvell's securities price and the subsequent significant decline in the value of

4   Marvell securities when the true state of the Company's operations was revealed to the market

5   correcting the misrepresentations and/or the economic impact thereof.

**NO SAFE HARBOR**

7       185.    Marvell's verbal "Safe Harbor" warnings accompanying its oral forward-looking

8   statements ("FLS") issued during the Class Period were ineffective to shield those statements from

9   liability.

10      186.    The defendants are also liable for any false or misleading FLS pleaded because, at the

11  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

12  authorized and/or approved by an executive officer of Marvell who knew that the FLS was false.

13  None of the historic or present tense statements made by defendants were assumptions underlying or

14  relating to any plan, projection or statement of future economic performance, as they were not stated

15  to be such assumptions underlying or relating to any projection or statement of future economic

16  performance when made, nor were any of the projections or forecasts made by defendants expressly

17  related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

19

20      187.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

market doctrine in that, among other things:

21

22          (a)     Defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

23

24          (b)     The omissions and misrepresentations were material;

25          (c)     The Company's securities traded in an efficient market;

26          (d)     The misrepresentations alleged would tend to induce a reasonable investor to

misjudge the value of the Company's securities; and

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                                    - 58 -

1           (e)     Plaintiff and other members of the Class purchased Marvell securities between

2  the time defendants misrepresented or failed to disclose material facts and the time the true facts

3  were disclosed, without knowledge of the misrepresented or omitted facts.

4         188.    At all relevant times, the market for Marvell's securities was efficient for the

5  following reasons, among others:

6           (a)     As a regulated issuer, Marvell filed periodic public reports with the SEC; and

7           (b)     Marvell regularly communicated with public investors via established market

8  communication mechanisms, including through regular dissemination of press releases on the major

9  news wire services and through other wide-ranging public disclosures, such as communications with

10  the financial press, securities analysts and other similar reporting services.

11  **CLASS ACTION ALLEGATIONS**

12         189.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

13  of Civil Procedure on behalf of all persons who purchased Marvell securities during the Class Period

14  (the "Class").  Excluded from the Class are defendants and their families, and directors and officers

15  of Marvell and their families and affiliates.

16         190.    The members of the Class are so numerous that joinder of all members is

17  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

18  the parties and the Court.  Marvell has more than 517 million shares of stock outstanding, owned by

19  hundreds if not thousands of persons.

20         191.    There is a well-defined community of interest in the questions of law and fact

21  involved in this case.  Questions of law and fact common to the members of the Class that

22  predominate over questions that may affect individual Class members include:

23           (a)     Whether the Exchange Act was violated by defendants;

24           (b)     Whether defendants omitted and/or misrepresented material facts;

25           (c)     Whether defendants' statements omitted material facts necessary in order to

26  make the statements made, in light of the circumstances under which they were made, not

27  misleading;

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA        - 59 -

1          (d)      Whether defendants knew or recklessly disregarded that their statements were

2     false and misleading;

3          (e)      Whether the price of Marvell securities was artificially inflated; and

4          (f)      The extent of damage sustained by Class members and the appropriate

5     measure of damages.

6          192.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

7     sustained damages from defendants' wrongful conduct.

8          193.     Plaintiff will adequately protect the interests of the Class and has retained counsel

9     who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

10    with those of the Class.

11         194.     A class action is superior to other available methods for the fair and efficient

12    adjudication of this controversy.

13                              **COUNT I**

14              **For Violation of §10(b) of the Exchange Act
                and Rule 10b-5 Against All Defendants**

15

16         195.     Plaintiff incorporates ¶¶1-194 by reference.

17         196.     During the Class Period, defendants disseminated or approved the false statements

18    specified above, which they knew or recklessly disregarded were misleading in that they contained

19    misrepresentations and failed to disclose material facts necessary in order to make the statements

20    made, in light of the circumstances under which they were made, not misleading.

21         197.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

22         (a)      Employed devices, schemes and artifices to defraud;

23         (b)      Made untrue statements of material facts or omitted to state material facts

24    necessary in order to make the statements made, in light of the circumstances under which they were

25    made, not misleading; or

26         (c)      Engaged in acts, practices, and a course of business that operated as a fraud or

27    deceit upon plaintiff and others similarly situated in connection with their purchases of Marvell

28    securities during the Class Period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA

198.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Marvell securities.  Plaintiff and the Class would not have purchased Marvell securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

199.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Marvell securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

200.     Plaintiff incorporates ¶¶1-199 by reference.

201.     The Individual Defendants acted as controlling persons of Marvell within the meaning of §20 of the Exchange Act.  By virtue of their positions and their power to control public statements about Marvell, the Individual Defendants had the power and ability to control the actions of Marvell and its employees.  Marvell controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

**JURY DEMAND**

2
     Plaintiff demands a trial by jury.

3
DATED:  November 28, 2016            ROBBINS GELLER RUDMAN
                                            & DOWD LLP

4
                                     SCOTT H. SAHAM
                                     MATTHEW I. ALPERT

5

6

7
                                       _s/ Scott H. Saham_
                                    SCOTT H. SAHAM

8
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101

9
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

10

11
                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP

12
                                    SHAWN A. WILLIAMS
                                    NADIM G. HEGAZI

13
                                    Post Montgomery Center
                                    One Montgomery Street, Suite 1800

14
                                    San Francisco, CA  94104
                                    Telephone:  415/288-4545

15
                                    415/288-4534 (fax)

16
                                    Lead Counsel for Plaintiff

17
                                    O'DONOGHUE & O'DONOGHUE LLP
                                    LOUIS P. MALONE

18
                                    4748 Wisconsin Avenue, N.W.
                                    Washington, DC  20016

19
                                    Telephone:  202/362-0041
                                    202/362-2640 (fax)

20
                                    Additional Counsel for Plaintiff

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 5:15-cv-05447-WHA                  - 62 -

CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 28, 2016.

s/ Scott H. Saham
SCOTT H. SAHAM

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  scotts@rgrdlaw.com

1203818_1

# Mailing Information for a Case 3:15-cv-05447-WHA Luna et al v. Marvell Technology Group, Ltd. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,FileRoomSD@rgrdlaw.com

- **Ian Edward Browning**
  ian@altolit.com

- **Daniel Scott Carlton**
  scottcarlton@paulhastings.com,lindayoung@paulhastings.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Joshua Garrett Hamilton**
  joshuahamilton@paulhastings.com,melmanahan@paulhastings.com

- **Nadim Gamal Hegazi**
  nhegazi@rgrdlaw.com,smorris@rgrdlaw.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com

- **Avi Josefson**
  avi@blbglaw.com

- **Bryan Jacob Ketroser**
  bryan@altolit.com

- **Jason Frank Lake**
  jasonlake@quinnemanuel.com,valerieroddy@quinnemanuel.com,harryolivar@quinnemanuel.com,calendar@quinnemanuel.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com

- **Harry Arthur Olivar , Jr**
  harryolivar@quinnemanuel.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Lesley Frank Portnoy**
  lportnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Valerie Suzanne Roddy**
  valerieroddy@quinnemanuel.com,calendar@quinnemanuel.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Jason David Russell**
  jrussell@skadden.com,nandi.berglund@skadden.com,ljohnsto@skadden.com,jon.powell@skadden.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,hectorm@rgrdlaw.com

- **Bahram Seyedin-Noor**
  bahram@altolit.com,gabriel@altolit.com,mark@altolit.com

- **Gerald H. Silk**
  jerry@blbglaw.com

- **Curtis Victor Trinko**
  ctrinko@gmail.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Patrick        V. Dahlstrom**
Pomerantz LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603