IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANIEL LUNA, individually and on behalf of all others similarly situated

    Plaintiff,

v.

MARVELL TECHNOLOGY GROUP, *et al.*,

    Defendants.

No. C 15-05447 WHA

(Consolidated)

**ORDER RE MOTIONS TO DISMISS AMENDED CONSOLIDATED COMPLAINT**

## INTRODUCTION

In this securities fraud action, the company and three individual defendants each move to dismiss the amended consolidated complaint. For the reasons stated below, the motions as to the company and its chief executive officer are **DENIED**, and the other motions are **GRANTED**.

## STATEMENT

Defendant Marvell Technology Group, Ltd., was and remains a publicly-traded company holding stakes in subsidiaries that produced and sold various semiconductor products. Defendant Sehat Sutardja served as the chief executive officer of Marvell throughout the class period (November 20, 2014 through December 7, 2015). Sutardja's wife, third-party Weili Dai, served as the president. Defendant Sukhi Nagesh served as its interim chief financial officer

until from March 2015 (following Rashkin's departure) until he became a senior vice president in October 2015 (Amd. Consolidated Compl. ¶¶ 2, 15–18, 59).[1]

Marvell's fiscal years ended on January 31, so fiscal year 2015 ended on January 31, 2015, and fiscal year 2016 began on February 1, 2015 (*id.* ¶ 1 n.1). In a press release on September 11, 2015 (soon after the second quarter of fiscal year 2016 closed), Marvell disclosed that its audit committee had begun an independent investigation of certain accounting and internal control matters, *inter alia*, and that its quarterly report for the second quarter of 2016 would be delayed (*id.* ¶¶ 88, 162–63).

Marvell's use of so-called "pull-in" transactions in recognizing revenue became one focus of the audit committee's investigation. Such pull-in transactions, whereby "revenue recognized in the second quarter of fiscal 2016 that, based on the original customer request date, would have been received and earned in the *third* quarter of fiscal 2016 and is now no longer available for receipt in that quarter" constituted seven to eight percent of revenue in the second quarter of fiscal year 2016 (Defs.' RJN, Exh. 4 at Exh. 99.1 (emphasis added)).[2]

That same morning, Marvell's share price declined more than 18% (Amd. Consolidated Compl. ¶ 164). Within hours, plaintiff Daniel Luna commenced this action for securities fraud against Marvell in federal court here in San Francisco, where it was assigned to Judge Ronald Whyte. Two other plaintiffs filed similar complaints in federal court in the Southern District of New York.

In October 2015, Marvell disclosed in a press release that PricewaterhouseCoopers LLP, its auditor of over fifteen years, had resigned (*id.* ¶ 165). This disclosure did not address the

---

[1] At oral argument on the instant motions to dismiss, counsel for lead plaintiff stated that they did not name President Dai as a defendant because she never made any of the allegedly fraudulent statements at issue herein.

[2] A primary instigator of this investigation was Marvell's failure to accrue a reserve for certain litigation losses. In its previous complaint, our lead plaintiff alleged claims relating to that failure and certain issues relating to Marvell's internal controls. Judge Ronald Whyte, to whom this case was initially assigned until his retirement, dismissed those claims (*see* Dkt. No. 98). This order only addresses claims relating to pull-in transactions. Plaintiff acknowledges that no substantive changes have been made to the other claims, and that they remain in the complaint solely to preserve appellate rights (Pl.'s Opp. at 1–2). Except for claims relating to pull-in transactions, addressed in this order, all other claims are **DISMISSED** for the reasons stated in Judge Whyte's order.

reason for PwC's resignation, but PWC did not disavow any previous opinions or audits (Defs.' RJN, Exh. 5 at 2).

In November 2015, an order consolidated the actions before Judge Whyte (Dkt. No. 8).

On December 7, 2015, Marvell disclosed in a press release that its audit committee continued to investigate which of the company's transactions constituted pull-ins, noting that the pull-in transactions impacted not only the second quarter of fiscal year 2016, but also the previous two quarters (quarter four of fiscal year 2015 and quarter one of fiscal year 2016) (Amd. Consolidated Compl. ¶ 167).

Marvell also disclosed that the Securities and Exchange Commission and the United States Attorney's Office had opened investigations into various practices, including its revenue recognition (Amd. Consolidated Compl. ¶ 169).

In February 2016, Judge Whyte appointed plaintiff Plumbers and Pipefitters National Pension Fund as lead plaintiff (*see* Dkt. No. 53).

In March 2016, Marvell issued a press release announcing the completion of the audit committee's investigation, which concluded that "revenue related to pull-in transactions . . . was for most such transactions properly recognized in accordance with Marvell's revenue recognition policy and generally accepted accounting principles, though for certain transactions Marvell's internal controls were not fully followed and revenue from certain pull-in and distributor transactions was recognized prematurely," generally due to side agreements involving the extension of purchasers' payment terms beyond the terms Marvell customarily offered. That press release also stated that "[t]he Audit Committee identified no fraudulent activity," and the prematurely recognized revenue had no "impact on the total amount of revenue ultimately recognized . . . for the aggregate of the three quarters" at issue and did "not reflect a lack of validity of the underlying transactions." Rather, it stated "[i]f any correction to previously reported financial periods were to be made as a result of these identified transactions, it would result in a shift of revenues from the fourth quarter of fiscal 2015 to the first quarter of fiscal 2016 or from the first quarter of fiscal 2016 to the second quarter of fiscal 2016." The press release identified several recommendations of the audit committee,

"including recommendations regarding the addition of certain compliance, finance and legal personnel, the review and revision of certain policies and procedures, the augmented training of employees in some areas, and the addition of independent board members (Defs.' RJN, Exh. 6 at Exh. 99.1 at 1–2).

In April 2016, Marvell disclosed the departure of CEO Sutardja and President Dai from their management positions, though they would remain on the board. No other departures were announced at that time (*id.*, Exh. 7 at Exh. 99.1)

In July 2016, Marvell belatedly released its quarterly reports from the second and third quarters of 2016 and its annual report from fiscal year 2016. (July 2016 fell at the end of the second quarter of Marvell's fiscal year 2017.) These filings indicated that pull-in sales increased beginning in the fourth quarter of fiscal year 2015 and that nine to eleven percent of net revenue in the first two quarters of 2016 comprised pull-in transactions, though the transactions made up only one percent of net revenue for the remaining quarters in 2016 Marvell did not restate its revenue. The annual report stated that the company had "terminated" CEO Sutardja and President Dai (rather than stating they merely "departed" as stated in earlier disclosures) (Defs.' RJN, Exhs. 8–10).

The annual report reiterated that the audit committee had made no finding of fraud. It described a remediation plan to fully address the findings of the audit committee and explained that the company had revised its revenue recognition practices to prohibit recognition of pull-in transactions initiated by Marvell. The company also appointed five independent directors, a new chairman of the board, and a new CEO, and it conducted training for senior employees on ethics and financial-reporting integrity (*id.*, Exh. 10; Amd. Consolidated Compl. ¶¶ 132, 139).

In October 2016, Judge Whyte granted defendants' motions to dismiss as to each of lead plaintiff's claims. As to the claim relating to pull-in transactions, Judge Whyte rejected defendants' arguments that lead plaintiff failed to adequately allege a material misstatement or loss causation. Nevertheless, Judge Whyte dismissed that claim because lead plaintiff failed to allege defendants held the requisite scienter. Judge Whyte allowed lead plaintiff an opportunity to amend its complaint (Dkt. No. 98).

The action was reassigned to the undersigned upon Judge Whyte's retirement, and lead plaintiff amended its complaint shortly after the reassignment. The only substantive amendments relate to the pull-in transactions. The remaining allegations are in place solely to preserve appellate rights. Defendants now move to dismiss the amended consolidated complaint. This order follows full briefing and oral argument.

**ANALYSIS**

Judge Ron Whyte already ruled that the allegations in the complaint "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement" with regard to the pull-in transactions (Dkt. No. 98 at 19 (quoting *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014))). He similarly held that the complaint already sufficiently pled loss causation (*id.* at 20). Accordingly, the only issue on this motion is whether lead plaintiff has adequately alleged that defendants acted with the required state of mind to commit securities fraud, which Judge Whyte found inadequately pled on the prior complaint.

A plaintiff alleging securities fraud under Section 10(b) of the Securities Exchange Act of 1934 must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2). That is, plaintiff must allege particularized facts supporting a strong inference that defendants made false or misleading statements "intentionally or with deliberate recklessness." *Reese*, 747 F.3d at 569 (9th Cir. 2014). A strong inference is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In evaluating scienter, the proper inquiry is not whether "any individual allegation, scrutinized in isolation, meets that standard," but rather "whether all of the facts alleged, taken collectively" satisfy the scienter burden. *Id.* at 323.

"The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of [Section 10(b) and Rule 10b-5] when those senior officials were acting within the scope of their apparent authority." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475–76 (9th Cir. 2015).

### 1. SEHAT SUTARDJA.

Lead plaintiff contends that CEO Sutardja specifically intentionally or with deliberate recklessness made statements about the company's revenue that failed to account for prematurely-recognized revenue. To support that theory, lead plaintiff relies on allegations of (1) CEO Sutardja's micromanagement, (2) Marvell's inappropriate tone at the top, (3) the importance of the pull-in transactions to Marvell's ability to meet its revenue targets, and (4) Marvell's termination of Sutardja as its CEO one month after announcing the audit committee investigation.[3]

Although Judge Whyte's prior order addressed most of these allegations, the amended complaint offers details that were not before Judge Whyte, particularly with regard to Sutardja's termination. Moreover, Judge Whyte's decision focused primarily on the issues with litigation reserves, rather than on the pull-in transactions. With the benefit of those additional details and streamlined focus and evaluating the allegations holistically, this order concludes that lead plaintiff has now alleged facts sufficient to support a strong inference of scienter as to CEO Sutardja as to the pull-in transactions.

Lead plaintiff alleges that CEO Sutardja was a micromanager who maintained (according to former employees as stated in the press) "unusually tight control over key decisions." His management style led him to be involved in the "minutia of corporate operations," including physically signing any purchase order over one hundred thousand dollars and approving the hiring of a clerk (Amd. Consolidated Compl. ¶¶ 124–25).

Judge Whyte rejected allegations of CEO Sutardja's micromanagement as insufficient but found the complaint failed to specifically link him to the alleged improper pull-in transactions. The only new substantive allegation in this category is CEO Sutardja's physical signature for orders over one hundred thousand dollars, which does nothing to link him to the pull-ins.

---

[3] It appears that lead plaintiff seeks to impute allegations of scienter relating to President Dai to CEO Sutardja simply based on their marriage. It offers no authority as support. This order need not reach whether President Dai's conduct supports a strong inference of scienter or whether that state of mind can be imputed to CEO Sutardja inasmuch as the allegations relating to Sutardja are sufficient to allow claims against him and Marvell to survive. (As stated, Dai is not named as a defendant.)

Indeed, our court of appeals has held that "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient. However, specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (citations omitted).

Here, we do not have specific *admissions* that CEO Sutardja became involved in every detail of the company (though that fact is alleged), but we *do* have admissions that senior management employed an inappropriate "tone at the top" that applied pressure to meet revenue targets not only on sales personnel (who, presumably, could work harder to generate more revenue), but also on *finance* personnel (who could only work with the transactions they were given).

Judge Whyte rejected this theory because "there is nothing inherently improper in pressing for sales to be made earlier than in the normal course" (Dkt. No. 98 at 21 (citations omitted)). But his decision did not address the pressure on the *finance* department at all. New allegations in the amended consolidated complaint highlight the importance of that distinction. Specifically, although pull-in transactions constituted less than ten percent of revenue, the amended consolidated complaint alleges it constituted as much as forty-six percent of earnings per share in at least one of the affected quarters. Indeed, Marvell's earnings per share without pull-in transactions would have fallen shy of their targets in the affected quarters, but the inclusion of pull-in transactions brought Marvell over its targets. Even if we only include half of the pull-in transactions (as defendants contend we must inasmuch as no more than half have been deemed improper, though defendant's assertion is not entitled to any presumption of truth here), Marvell's earnings per share either barely make or barely miss the target (Amd. Consolidated Compl. ¶ 130). This supports an inference that certain revenue was prematurely recognized due to pressure from senior management to meet revenue targets.

Our defendants contend that the most reasonable inference is that some rogue lower-level employee in the finance department at Marvell adopted the revenue recognition practices that led to this action, and that no senior manager knew about this.

But Marvell terminated CEO Sutardja (along with President Dai) just one month after its audit committee began investigating these issues, and it did not terminate any lower-level employees (or any senior employees, for that matter). Although it did not specifically call out those terminations as remedial measures following the audit committee's report, it did identify the hiring of a new CEO as one such remedial measure. Moreover, Marvell provided training for executive officers, vice presidents and associate vice presidents, but it relegated implementation of a similar program for lower-level personnel to a future project. Marvell also prohibited the use of pull-in transactions outright.

The undersigned judge has previously held that "house-cleaning and reforms" like terminating certain employees, restructuring, and instituting training programs "do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls." *In re Sipex Corp. Securities Litig.*, No. 05-00392, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

Marvell took the same "strong medicine" prescribed in *Sipex*. Upon the revelation that the finance department had misstated revenue in response to pressure via an inappropriate tone at the top, it fired its micromanager CEO and implemented trainings for executives and has not fired or re-trained any lower-level employees. True, CEO Sutardja's termination occurred amid *several* scandals at Marvell, but neither Marvell nor Sutardja can escape these adequate allegations of fraud by hiding behind other shortfalls in management. These allegations support an inference at least as strong as any competing inference that Sutardja (and through imputation, Marvell) had the requisite state of mind to support the claims of security fraud herein when he stated revenue figures that incorporated prematurely recognized revenue.

Allegations relating to Sutardja's termination were not directly before Judge Whyte. Rather, lead plaintiff raised them for the first time in opposition to the prior motion to dismiss. In dictum, Judge Whyte rejected that theory as a basis for inferring scienter. But Judge Whyte

8

did not have the benefit of the statement that Marvell viewed its hiring of a new CEO as part of the remedial measures taken after the audit committee's investigations or that Marvell had instituted training about financial reporting for executives *before* instituting such training for lower-level employees. These allegations tend to refute defendants' alternative theory that these alleged misstatements were the sole decisions of a lower-level accountant, and therefore support a different result from that reached by Judge Whyte as to both Sutardja and Marvell, namely, denying the motion to dismiss as to those defendants.

### 2. CFOS SUKHI NAGESH AND MICHAEL RASHKIN.

Lead plaintiff's claims as to two CFOs, Sukhi Nagesh and Michael Rashkin, do not fare so well. Critically, neither were terminated. Rashkin served as CFO from February 2014 through May 2015 (the same month the audit committee began investigating pull-in transactions), and Nagesh became CFO after Rashkin until October 2015 (Amd. Consolidated Compl. ¶¶ 18).

But our lead plaintiff offers no more than the timing of Rashkin's departure or of Nagesh's tenure and their role as part of senior management as the basis for attributing scienter to them. Judge Whyte found those allegations insufficient before, and no new allegations tie their personnel shifts to the pull-in transactions at all. Lead plaintiff has failed to adequately allege facts supporting an inference that Rashkin and Nagesh had the requisite state of mind at least as strongly as the inference that they were unaware of any misrepresentations and transitioned to new positions organically.

### 3. CONTROL PERSON LIABILITY.

Section 20(a) of the Securities Exchange Act of 1934 extends liability for violations of other provisions, such as Section 10(b) to "controlling persons." *See* 15 U.S.C. 78t(a); *Desai v. Deutsche Bank Securities Ltd.*, 573 F.3d 931, 935 (9th Cir. 2009). Lead plaintiff seeks to hold Sutardja, Rashkin, and Nagesh liable for the Section 10(b) claims discussed above as "control persons" under Section 20(a).

"In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or

control over the primary violator." *No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (internal quotations omitted). "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 230.405. Although lead plaintiff's contentions regarding Sutardja's conduct are sufficient to establish control (over himself and the company), the complaint is simply lacking in allegations that Rashkin or Nagesh had any power or control over Sutardja or Marvell, such that they could be held liable under Section 20(a). In fact, the complaint alleges that the company was "family run and controlled" (by Sutardja and Dai), and that the "couple . . . maintained *unusually tight control over key decisions*" (Amd. Consolidated Compl. ¶ 125 (emphasis in original)). That allegation tends to *contradict* any notion of control by Rashkin or Nagesh.

Those defendants' roles as CFO and as signing the public disclosures at issue herein are simply insufficient to establish their liability as control persons under the law.

## CONCLUSION

For the reasons stated above, Marvell's and Sutardja's motions to dismiss are **DENIED**. All other motions to dismiss are **GRANTED**. Leave to amend may not be sought inasmuch as lead plaintiff has already had an opportunity to amend its complaint with a fully-reasoned decision critiquing the same allegations. Defendants request judicial notice of various public filings. To the extent those documents are cited above, that request is **GRANTED**. Otherwise, they were not necessary to this order and the requests are therefore **DENIED AS MOOT**.

A further case management conference is hereby **SET** for **JUNE 1 AT 11:00 A.M.**

**IT IS SO ORDERED.**

Dated: May 17, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10